# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **WENCESLAUS PROVOST JR**. and **ANGELA PROVOST,** both individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>       v.<br><br>**THOMAS J. VILSACK**, in his official capacity as the SECRETARY OF AGRICULTURE and his successors in interest, 1400 Independence Avenue, S.W. Washington, D.C. 20250,<br><br>*and*<br><br>**THE UNITED STATES DEPARTMENT OF AGRICULTURE**, 1400 Independence Avenue, S.W. Washington, D.C. 20250,<br><br>              Defendants. | **CIVIL ACTION NO.: 1:24-920**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE OF THE CASE ........................................................................ 1

THE PARTIES ..................................................................................... 3

SUBJECT MATTER JURISDICTION ..................................................... 6

PERSONAL JURISDICTION AND VENUE .............................................. 7

FACTUAL BACKGROUND .................................................................. 7

    I.    The USDA's Pattern and Practice of Racial Discrimination ................ 7

        A.    USDA Discrimination in Federal Loan Programs .................... 12

        B.    The USDA's Systemic Racial Discrimination in Civil Rights Investigations .................................................. 18

        C.    The United States Justice Department Admits to Decades of Discrimination in USDA-Administered Programs ................ 20

    II.    The Provosts' Story ................................................................. 22

        A.    2007:  The USDA Forces Mr. Provost To Begin His Independent Farming Career By Assuming His Father's $800,000+ Debt. ................................................ 29

        B.    2008 - 2012: The USDA Departed From Its Regulations And Guaranteed Infeasible Loans, Which Had The Effect Of Setting Up Mr. Provost's Farm For Failure. ....................... 34

        C.    2013 - 2015:  After Years Of Infeasible Loans, Mr. Provost Loses His Farm.  Mrs. Provost Tries To Pick Up The Pieces But Faces The Same Headwinds Of Discrimination. ............................................. 43

        D.    2016 - 2018: The Provosts File Formal Civil Rights Complaints Against FSA Officials And Their Local Bank Lender. ............................................. 61

        E.    2022:  The USDA Refuses to Allow the Provosts To Apply For An Operating Loan ................................... 78

        F.    2023:  The USDA Delayed Processing Mrs. Provost's Loan Application And Then Offered An Infeasible Loan. .................. 79

    III.    The Provosts' Experiences Are Not Unique. ......................... 87

    IV.    The USDA Inappropriately Withheld Documents in Response to Freedom of Information Act Request ................................... 89

CLASS ALLEGATIONS ..................................................................... 93

FIRST CLAIM FOR RELIEF ...................................................................... 96

SECOND CLAIM FOR RELIEF ................................................................. 97

THIRD CLAIM FOR RELIEF ..................................................................... 99

FOURTH CLAIM FOR RELIEF ............................................................... 100

FIFTH CLAIM FOR RELIEF ..................................................................... 101

SIXTH CLAIM FOR RELIEF ..................................................................... 102

DEMAND FOR JURY TRIAL ................................................................... 103

PRAYER FOR RELIEF ............................................................................. 103

TABLE OF EXHIBITS ............................................................................... 107

## NATURE OF THE CASE

1.     The United States Department of Agriculture ("USDA") has never given Black farmers a fair deal.[1]  It has systematically discriminated against them for *centuries*.  This well-documented pattern and practice of discrimination is largely accomplished through a decentralized structure in which the power of the Secretary of Agriculture is handed over to (mostly White) officials in local offices who exercise their authority to benefit White farmers over Black and other minority farmers.  The USDA has admitted that these discriminatory practices have cost Black farmers **hundreds of billions of dollars** in funding and opportunities.  But, despite acknowledging this racist history and the USDA's continued preference for White farmers over Black and other minority farmers, the USDA has never shed its racist past.  As a result, Black farmers like Wenceslaus ("June") Provost Jr. and Angela Provost are set up for failure.

2.     For over a decade, Mr. and Mrs. Provost applied for and were denied equal access to federal farm loan programs on account of their race.  USDA officials refused (and still refuse) to process their loans in a timely manner.  They decided Mr. and Mrs. Provost should make do with 25 to 50% of the funding White farmers were given for the same number of acres.  They insisted Mr. and Mrs. Provost should have supervised loan accounts where official signoff was required before a single dollar could be spent.  They allowed USDA county committee members to

---

[1] In truth, the statistical evidence shows that the USDA has and continues to discriminate against all minorities.  Plaintiffs have served FOIA requests concerning other minority groups and will amend this Complaint as appropriate once the evidence develops.

abuse their authority and enrich themselves by targeting and taking over Mr. and Mrs. Provost's land.  And when Mr. and Mrs. Provost did not have the funds to fertilize, weed, spray, water, plant, and harvest at the right time because of the USDA's untimely and inadequate loans, USDA officials said Mr. and Mrs. Provost were just "bad farmers."  Mr. Provost is, in fact, an award-winning farmer whose family has farmed sugarcane in Louisiana for generations.

3.     Mr. and Mrs. Provost did not just accept this discriminatory treatment. Starting in 2016, Mr. and Mrs. Provost filed formal civil rights complaints asking the USDA to investigate and correct the discriminatory practices of its empowered local officials.  The USDA sat on those complaints for *years*.  When it finally



investigated *some* of the allegations, its investigations were far from fair, impartial, and diligent.  Indeed, on information and belief, including the lack of records produced in response to FOIA requests, Mr. and Mrs. Provost's earliest civil rights complaint *still* has not been resolved eight years later.

4.     Mr. and Mrs. Provost did not want to file suit.  They only

want to work their family farm with the same opportunities given to others.  For the past two years, they have met with USDA officials, including officials in the national office in Washington, D.C.  Those outreach efforts have failed.  The USDA *still* refuses to give Mr. and Mrs. Provost adequate, timely, and feasible farm loans.  Accordingly, Plaintiffs have no choice but to bring this lawsuit.

## THE PARTIES

1.      Plaintiff Wenceslaus Provost Jr. ("Mr. Provost" or "June Provost") is a Black farmer who has been denied equal treatment under the law by USDA officials.  He is a resident of the state of Louisiana.  For decades, USDA officials have discriminated against Mr. Provost when administering federal loan programs.  Worse still, USDA officials have also targeted his farm to enrich themselves—despite, and in violation of, conflict-of-interest regulations meant to prevent such self-dealing behavior.

Mr. Provost tried to use the USDA's administrative process to stop this discrimination, but the USDA refused to investigate and properly resolve his complaints, treatment that was itself discriminatory, arbitrary, and capricious.



2.      Plaintiff Angela Provost ("Mrs. Provost" or "Angie Provost") is a Black farmer who has been denied equal treatment under the law by

USDA officials.  She is a resident of the state of Louisiana.  For the past decade,

USDA officials have discriminated against Mrs. Provost when administering federal loan programs.  USDA officials have also targeted her farm to enrich themselves in violation of conflict-of-interest regulations preventing such self-dealing behavior.  Mrs. Provost tried to use the USDA's administrative process to stop this discrimination, but the USDA refused to investigate and properly resolve her complaints, treatment



that was itself discriminatory, arbitrary, and capricious.

3.     Mr. and Mrs. Provost (collectively, "Plaintiffs" or the "Provosts") have struggled to maintain their sugarcane farm in Louisiana despite discriminatory treatment by USDA officials.  Like many Black farmers in the area and throughout the country, they have personally felt the discriminatory impact of the USDA's long history of racist policies and practices that result in the unequal treatment of Black farmers when compared to their White counterparts.  This happened despite the

fact that the Provosts are award-winning farmers and public figures.[2]  Their story

has been covered widely by *The New York Times*,[3] *The Guardian*,[4] NBC Left Field,[5]

and other media outlets.[6]  In 2022, Mr. and Mrs. Provost received the 2022

Illuminating Injustice Award by the nonprofit organization Public Justice.[7]  Even

this public spotlight has not put a stop to the discrimination they and other Black

farmers face.

    4.     Defendant Thomas James Vilsack is the Secretary of Agriculture and

is sued in his official capacity.  On information and belief, Mr. Vilsack performs his

duties as the Secretary of Agriculture from USDA headquarters in Washington,

D.C.

    5.     Defendant the United States Department of Agriculture ("USDA") is

---

[2] *See* https://www.provostfarmllc.com/.

[3] *See* https://www.nytimes.com/2019/10/04/podcasts/1619-slavery-sugar-farm-land.html; *see also* https://www.nytimes.com/interactive/2019/08/14/magazine/sugar-slave-trade-slavery.html; https://podcasts.apple.com/us/podcast/1619/id1476928106?i=1000452394193.

[4] *See* https://www.theguardian.com/world/2018/oct/30/america-black-farmers-louisiana-sugarcane.

[5] *See* https://www.youtube.com/watch?app=desktop&v=q-WIZIL4ag&feature=youtu.be#dialog.

[6] *See, e.g.*, https://www.youtube.com/watch?v=pQmaxB9MwfI; https://civileats.com/2020/02/28/resistance-served-2020-centers-the-power-of-black-women-in-food/; https://talkpoverty.org/2019/05/01/case-reparations-black-farmers/; https://crooked.com/podcast/we-deserve-better-with-angie-june-provost/; https://www.thenorthstar.com/p/black-farmers-are-americas-future; https://offkiltershow.medium.com/the-hidden-racism-on-americas-farms-254b0a0ad64c; https://www.americanprogress.org/issues/economy/reports/2019/04/03/467892/progressive-governance-can-turn-tide-black-farmers/.

[7] *See* https://www.youtube.com/watch?v=DYoq7mM3XZg&t=20s.

headquartered in Washington, D.C.[8]  It is "made up of 29 agencies and offices with

nearly 100,000 employees . . . at more than 4,500 locations across the country and

abroad."[9]  On information and belief, the subagencies most relevant to this case are

the Farm Service Agency ("FSA"), the Office of the Assistant Secretary for Civil

Rights ("OASCR"), and the Office of the Inspector General ("OIG").

## SUBJECT MATTER JURISDICTION

6.      This Court has subject matter jurisdiction over Plaintiffs' Equal Credit

Opportunity Act Claim under 15 U.S.C. § 1691e(f), 28 U.S.C. §§ 1331, 1343,

1346(b)(1), 1361 and 42 U.S.C. § 2000d.

7.      This Court has subject matter jurisdiction over Plaintiffs'

Administrative Procedure Act claim under 5 U.S.C. § 706, 28 U.S.C. §§ 1331, 1343,

1346(b)(1), 1361 and 42 U.S.C. § 2000d.

8.      This Court has subject matter jurisdiction over Plaintiffs' Fifth

Amendment claim under 28 U.S.C. §§ 1331, 1343, 1346(b)(1), 1361 and 42 U.S.C.

§ 2000d.

9.      This Court has subject matter jurisdiction over Plaintiffs' mandamus

relief claim under 28 U.S.C. §§ 1331, 1343, 1346(b)(1), 1361 and 42 U.S.C. § 2000d.

10.     This Court has subject matter jurisdiction over Plaintiffs' Declaratory

Judgment Act claim under 28 U.S.C. §§ 2201, 2202.

11.     This Court has subject matter jurisdiction over Plaintiffs' Freedom Of

---

[8] *See Contact Us*, U.S. Dep't of Agric., https://www.usda.gov/contact-us.

[9] *About USDA*, U.S. Dep't of Agric., https://www.usda.gov/our-agency/about-usda.

Information Act claim under 28 U.S.C. §§ 1331, 1343, 1346(b)(1), 1361 and 5 U.S.C. § 552(a)(4)(B).

## PERSONAL JURISDICTION AND VENUE

12. This Court has personal jurisdiction over this matter because the USDA is headquartered in Washington, D.C., many of the discriminatory and unlawful acts alleged herein occurred in Washington, D.C., and all Defendants acting in their official capacities did so from Washington, D.C.

13. Venue is appropriate in this Court under 28 U.S.C. § 1391(b) and (e)(1) because USDA headquarters are in Washington, D.C. *See also* 5 U.S.C. § 703; 15 U.S.C. § 1691e(f).

## FACTUAL BACKGROUND

### I.   THE USDA'S PATTERN AND PRACTICE OF RACIAL DISCRIMINATION

14. The USDA was established in the middle of the Civil War, in 1862, "to acquire and to diffuse among the people of the United States useful information on subjects connected with agriculture, rural development, aquaculture, and human nutrition, in the most general and comprehensive sense of those terms, and to procure, propagate, and distribute among the people new and valuable seeds and plants." 7 U.S.C. § 2201.  President Abraham Lincoln once called it "The People's Department."[10]   Historically, however, the USDA has functioned as The *White*

---

[10] *See* https://www.usda.gov/media/blog/2012/05/11/secretarys-column-peoples-department-150-years-usda.

People's Department and has been dubbed "the last plantation." *Pigford v. Glickman*, 185 F.R.D. 82, 85 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000).[11]

15.    Since its inception, the USDA has privileged White farmers over everyone else, a byproduct of "longstanding and widespread discrimination" against racial and ethnic minorities.  H.R. Rep. No. 117-7, at 12 (2021).  "Despite multiple lawsuits, numerous government reports, and the limited programs created by Congress since the 1980's attempting to address the disproportionately low rates of agricultural spending on socially disadvantaged groups, USDA farm loan and payment programs continue to disproportionately benefit farmers who are not racial or ethnic minorities." *Id.*

16.    As Representative David Scott, Chairman of the Committee on Agriculture, put it: "Black farmers and other farmers of color have received a small share of the USDA farm loans and payments as a result of discrimination." 167 Cong. Rec. H762, H765 (daily ed. Feb. 26, 2021).  "When these producers did receive loans or payments, many of them were not provided timely or proper loan servicing options due to discrimination, which led to producers of color losing their land and operations." *Id.*  "The systemic discrimination against Black farmers and other farmers of color by USDA is longstanding and well-documented and continues to present barriers for these producers to participate in the agricultural economy." *Id.*

---

[11] *See also* https://www.npr.org/2021/06/04/1003313657/the-usda-is-set-to-give-black-farmers-debt-relief-theyve-heard-that-one-before.

17.     As Senator Debbie Stabenow said: "One-fifth of all rural Americans—10.5 million people—are people of color."  167 Cong. Rec. S1219, S1262 (daily ed. Mar. 5, 2021).  But "[f]or Black, Native American, Hispanic and Latinx, and Asian American farm families, their experience in the agricultural economy is markedly different than their White counterparts."  *Id.*  "This has been particularly true when it comes to the interactions between farmers of color and the U.S. Department of Agriculture."  *Id.*

18.     The USDA was one of the last agencies to racially integrate and the last to include minorities in leadership.  USDA, *Civil Rights at the United States Department of Agriculture: A Report by Civil Rights Action Team*, February, 1997 (hereinafter "USDA, *Civil Rights at the United States Department of Agriculture*") (https://acresofancestry.org/wp-content/uploads/2021/01/CRAT-Report-.pdf).

    a.     In 1965, the U.S. Commission on Civil Rights found that the USDA discriminated against its minority employees and discriminated while delivering its programs.  Jody Feder and Tadlock Cowan, CRS, *Garcia v. Vilsack: A Policy and Legal Analysis of a USDA Discrimination Case* 2, February 2013 (https://nationalaglawcenter.org/wpcontent/uploads/assets/crs/R40988.pdf).

    b.     In the 1970s, the USDA was seen as deliberately using predatory loan practices to force minority farmers off their land.  *Id.*

    c.     In 1982, a Civil Rights Commission report found that the Farmers Home Administration, a precursor to the Farm Service Agency,

"***may be involved in the very kind of racial discrimination that it should be seeking to correct***."  USDA, *Civil Rights at the United States Department of Agriculture* (emphasis added).

19.     The discriminatory practices accomplished a systematic dispossession and decimation of Black farmers.  According to the 1920 Census, there were "6,448,343 farms in the United States in 1920, 5,498,454 or 85.3 per cent, were operated by white farmers, and 949,889, or 14.7 per cent, by colored farmers, including 925,708 Negroes, 16,680 Indians, 6,892 Japanese, and 609 Chinese."[12]  "A century later, data from the 2017 Census of Agriculture indicated that Black farmers own fewer than 2.9 million acres, less than a fifth of what they owned in 1920."  167 Cong. Rec. S1219, S1262.  "A Tufts University analysis estimated the value of that lost farmland at more than $120 billion in lost opportunities."  *Id.*; *see also id.* at S1265 (acknowledging that minority farmers lost "hundreds of billions of dollars of generational wealth").  **Figure 1** shows that as Black ownership of farmland has drastically declined over the past century, White ownership has been relatively consistent.[13]

---

[12] U.S. Dept' of Commerce: Bureau of the Census, FOURTEENTH CENSUS OF THE UNITED STATES TAKEN IN THE YEAR 1920, 293 (1920), https://books.google.com/books?id=6tLrAAAAMAAJ&pg=PA293&lpg=PA293&dq=%22number+of+farm+operators+in+the+united+states,+with+per+cent+distribution,+by+race,+1900+to+1920%22&source=bl&ots=NHvvXE2W1O&sig=ACfU3U2pp7PgGiB-tMCU9zsq6JNMn70Pyw&hl=en&sa=X&ved=2ahUKEwjbxoe-9YP7AhUEJEQIHWRICVYQ6AF6BAgJEAM#v=onepage&q=%22number%20of%20farm%20operators%20in%20the%20united%20states%2C%20with%20per%20cent%20distribution%2C%20by%20race%2C%201900%20to%201920%22&f=false.

[13] https://www.motherjones.com/food/2021/04/black-land-matters-farmers-

(*continued on the next page*)





**Figure 1: Chart from Mother Jones Analysis of Census and USDA Data**

justice-leah-penniman-fannie-lou-hamer-cory-booker-land-tenure/.

20.     "Congress recognizes the longstanding systemic discrimination against farmers of color by USDA."   167 Cong. Rec. S1219, S1264.   But Congressional remedies to end USDA discrimination against Black and other minority farmers "are still not enough as there is still ongoing and pervasive discrimination leaving socially disadvantaged farmers significantly behind."   *Id.*   Likewise, "[s]ettlements resulting from the *Pigford* and *Keepseagle* lawsuits . . . have not provided the relief necessary for these farmers of color to participate fully in the American agricultural economy."   *Id.*   It is the U.S. government's own admission that over a century of USDA discrimination continues to this day.

### A.     USDA Discrimination in Federal Loan Programs

21.     For decades, the USDA has guaranteed farm loans for qualifying farmers.   These loans are administered by the Farm Service Agency ("FSA").   *See generally* Guaranteed Farm Loans, USDA FARM SERVICE AGENCY, https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/guaranteed-farm-loans/index.   Broadly speaking, under this program, the USDA guarantees up to a certain amount (presently, $2,236,000) of a farm loan by a qualifying lender.   *See id.*   Should a farmer default on the loan, the USDA will reimburse the lender according to the terms of the guaranteed loan.   *See id.*   Under the guaranteed loan program, the FSA offers ownership and operating loans.   *See id.*; *see also* Farm Loans Overview, USDA FARM SERVICE AGENCY, https://www.fsa.usda.gov/Assets/USDA-FSAPublic/usdafiles/FactSheets/2023/202310_fsa_farm_loans_overview.pdf.

22.     Farm ownership loans may be used to purchase a farm or additional farmland, pay closing costs, construct new buildings and/or improve existing structures, and promote soil and water conservation protection.  *See* Farm Loans Overview, USDA FARM SERVICE AGENCY, https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/2023/202310_fsa_farm_loans_overview.pdf.

23.     Farm operating loans may be used for operating expenses, machinery, equipment, minor estate repairs, and refinancing debt.[14]  *See id.*  Repayment terms vary.  *See id.*

24.     Before guaranteeing a loan, federal regulations require the USDA to consider the "financial feasibility" of a proposed loan.  *See generally* 37 C.F.R. § 762.125.  That is, any "proposed operation must project a feasible plan" based on projections that are "reasonable and defensible."  *Id.* § 762.125(a)(2) & (7). "Sources" for these projections "must be documented by the lender and acceptable to the Agency."  *Id.* § 762.125(a)(7).  The USDA is not supposed to guarantee infeasible loans.  *See id.*

25.     The USDA also administers direct loan programs, including operating loans,[15] farm ownership loans,[16] and emergency loans.[17]  Generally speaking, direct

---

[14] The necessity of such loans for capital costs—and the dangers of foreclosure and default—remain familiar to non-farmers thanks to Steinbeck's THE GRAPES OF WRATH taking its place in the American canon of literature.

[15] *See* https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/farm-operating-loans/index; *see also* 7 U.S.C. §§ 1941-1949.

[16] *See* https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/farm-ownership-loans/index; *see also* 7 U.S.C. §§ 1922-1936c.

[17] *See* https://www.fsa.usda.gov/programs-and-services/farm-loan-

(*continued on the next page*)

loans are designed to serve farmers who, for whatever reason, cannot obtain reasonable commercial credit, including through guaranteed programs.[18]

26.     The FSA also offers microloans, which are either operating or ownership loans, designed to meet the needs of small farmers or non-traditional and specialty operations.  Microloans Fact Sheet, USDA FARM SERVICE AGENCY, https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/2019/microloans-fact_sheet-aug_2019.pdf.  Microloans are more flexible with simplified applications that require less paperwork.  *Id.*  Eligible farmers can receive up to $50,000 through an FSA microloan, which are secured via liens on farm property or agricultural equipment.  *Id.*

27.     Both guaranteed and direct USDA loans are at issue in this case.  The USDA's long history of discrimination against Black farmers in loan administration through the FSA has been well documented.[19]  Given this lengthy history, Congress

---

programs/emergency-farm-loans/index; *see also* 7 U.S.C. §§ 1961-1970.

[18] For more information about USDA loan programs, Plaintiffs incorporate by reference the April 2019 Your Guide to FSA Farm Loans booklet, https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/Farm-Loan-Programs/pdfs/your_guide_to_farm_loans.pdf.

[19] *See, e.g.*, USDA, *Civil Rights at the United States Department of Agriculture*; Vera J. Banks, U.S.D.A., Rural Development Research Report No. 59, Black Farmers and Their Farms (Jul. 1986) (https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1982_USDA-History.pdf); P. Browning, et al., The Decline of Black Farming in America, Commission on Civil Rights, Washington, D.C. (Feb. 1982) (https://files.eric.ed.gov/fulltext/ED222604.pdf); Bob S. Bergland, Secretary of Agriculture, A Time to Choose: Summary Report on the Structure of Agriculture (Jan. 1981) (https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1981_A_Time_to_Choose.pdf); Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture, A

(*continued on the next page*)

has ordered the USDA to "ensure that members of socially disadvantaged groups will receive [USDA] loans . . . ."  7 U.S.C. § 2003(a)(1); *accord id.* § 2003(c)(1).  Despite this directive, the USDA has utterly failed to administer its loan programs equitably.

28.     The USDA tracks what happens with loan applications: whether the loan is approved, rejected, or withdrawn by a farmer who has given up.  The USDA data shows starkly different treatment of White and Black applications.

29.     In 2022, **72%** of White farmers who applied were approved for direct loans.  By contrast, the USDA granted direct loans to **only 36%** of applicants who identified as Black, according to an NPR analysis of USDA data that looked at how many direct loan applications were accepted, rejected or withdrawn per each racial group.[20]  Direct loans are supposed to be among the easiest to get at USDA.  They are meant for farmers who cannot get credit elsewhere and can be used to purchase land or farming equipment, or for other operational costs needed to keep farming businesses afloat.

---

Report of the United States Commission on Civil Rights (1965) (https://files.eric.ed.gov/fulltext/ED068206.pdf).

[20] *See* https://www.npr.org/2023/02/19/1156851675/in-2022-black-farmers-were-persistently-left-behind-from-the-usdas-loan-system.

30.     Perhaps some of the biggest gaps in the loan demographics can be seen in the rejection numbers, where **16%** of Black farmers were rejected—the highest amount—and the corresponding figure for White farmers was only **4 percent**. Additionally, 48% of Black farmers withdrew their applications—also the highest amount—compared to 24% of White-identifying applicants.  By and large, Black-identifying farmers were the least successful in acquiring a direct loan in the 2022 fiscal year, as Figure 2 shows.



**Figure 2: Chart from 2023 NPR Analysis of USDA Data**

31.     Even the few Black farmers who succeed in obtaining a loan have not seen the end of disparate treatment.  USDA records obtained by the journalistic enterprise *The Counter* show that the USDA foreclosed on Black-owned farms at a higher rate than other racial groups between 2006-2016.[21]  Even though Black

---

[21] How USDA Distorted Data to Conceal Decades of Discrimination against
(*continued on the next page*)

farmers made up less than 3% of the USDA's direct-loan recipients for that period, Black farmers made up more than 13% of farmers with USDA-initiated foreclosures.[22]  *The Counter* concluded, based on this data, that the USDA was more than six times as likely to foreclose on a Black farmer as it was to foreclose on a White farmer.[23]

32.     The discrimination Black farmers face results less from top-down direction than from the USDA's decentralized structure, which gives local officials free rein to discriminate.  Instead of administering farm loans centrally, the USDA delegates authority first from the Under Secretary for Farm Production and Conversation to the FSA Administrator, *see* 7 C.F.R. § 2.42(a)(28), then to the Deputy Administrator for Farm Loan Programs, *see id.* § 761.1(a), then to 50 State Executive Directors, *see id.* § 761.1(b)(1), and then to Farm Loan Chiefs, Farm Loan Specialists, District Directors, Farm Loan Managers, Senior Farm Loan Managers, Farm Loan Officers, Loan Analysts, Loan Resolution Specialists, and Program Technicians across the country, *see id.*  These officials are given broad, almost unfettered discretion when it comes to administration of these loans, including when assessing credit worthiness, inability to obtain reasonable credit elsewhere, whether prior debt relief stands in the way of future direct loans from the USDA, farming experience, and other criteria for granting direct loans.  *See* FSA Handbook

---

Black Farmers, THE COUNTER, https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/.

[22] *Id.*

[23] *Id.*

- Direct Loan Making for State and County Offices 3-FLP (Rev. 2),

https://www.fsa.usda.gov/Internet/FSA_File/3-flp_r02_a50.pdf.  Without clear

guidelines, local officials freely exercise their "discretion" to give nearly all available

funds to White farmers, and withhold funding from Black and other minority

farmers in a discriminatory manner, as happened here.

### B.    The USDA's Systemic Racial Discrimination in Civil Rights Investigations

33.    The USDA has never honored its promise to ensure that "no person in

the United States shall, on the ground of race, color, or national origin, be excluded

from participation in, be denied the benefits of, or be otherwise subjected to

discrimination under any program or activity of an applicant or recipient receiving

Federal financial assistance from the Department of Agriculture or any Agency

thereof."  7 C.F.R. § 15.1(a).  As detailed in *Pigford*, in 1983, the "Department of

Agriculture *disbanded* its Office of Civil Rights and stopped responding to claims of

discrimination."  185 F.R.D. at 85 (emphasis added).  "These events were the

culmination of a string of broken promises that had been made to African American

farmers for well over a century."  *Id.*  Things have not materially changed.

34.    Today, the USDA has a nominal civil rights office called the Office of

the Assistant Secretary for Civil Rights ("OASCR").  That is, the USDA *accepts* civil

rights complaints from farmers who have experienced discrimination.  But it then

*dismisses* them, often taking years to do so.  By design, this delay exhausts farmers'

statute of limitations under the Equal Credit and Opportunity Act, as happened to

Mr. and Mrs. Provost.  OASCR accomplishes its goal of dismissing every civil rights

complaint that lands on its door by engaging in a sham investigation process.

35.     As revealed by FOIA records, OASCR does not conduct an independent investigation.  Rather than collecting and examining emails, interviewing witnesses (including victims), and having independent investigators gather evidence, OASCR relies on those accused of wrongdoing to admit they discriminated on the basis of race.  That is, OASCR relies on the alleged *perpetrators* of discrimination to gather evidence for their review, accepts denials of discrimination by those involved without challenge, and relies on broad survey evidence from others in the office at issue.

36.     The absurdity of this process is evident when applied to a different context.  If the OASCR investigation process were applied to a criminal fraud investigation, the police would not make an arrest unless the fraudster turned over the incriminating evidence and made a confession in writing without ever being interrogated.  No one could expect justice with such a process.  So too here.

37.     The OASCR investigation process perpetuates discrimination.  As happened in the Provosts' case, OASCR often does not even *ask* for evidence until *years* after the alleged discrimination occurred, resulting in faded memories and stale evidence—even if OASCR had bothered collecting it itself, instead of relying on the alleged perpetrators.  Accordingly, although OASCR has not been formally disbanded, it essentially functions as a dismissal factory instead of an office dedicated to ensuring farmers' civil rights are not infringed.

C.     **The United States Justice Department Admits to Decades of Discrimination in USDA-Administered Programs**

38.     In 2021, President Biden signed the $1.9 trillion American Rescue Plan, a stimulus law intended to deliver immediate relief to Americans in light of the economic crisis from the COVID-19 pandemic.  Part of the relief included a $4 billion program to help Black and other socially disadvantaged farmers.  It authorized the USDA to pay up to 120% of farmers' indebtedness on direct FSA loans and other loans guaranteed by the department.  A White farmer filed a lawsuit against the $4 billion loan-relief package, arguing that the plan violated constitutional equal protection rights.  As a result, those portions of the American Rescue Plan designed to assist Black and other socially disadvantaged farmers were blocked by a Florida judge, who issued a preliminary injunction.  *See* Order, *Wynn v. Vilsack*, No. 3:21-cv-514-MMH-JRK (M.D. Fla. Jun. 23, 2021), ECF No. 41.

39.     In opposition to the injunction, U.S. Department of Justice attorneys said Congress passed the plan to provide aid to "socially disadvantaged farmers who it determined needed such relief due to decades of discrimination against them in U.S. Department of Agriculture (USDA) programs, the disproportionate impact of COVID-19 on them, and the failure of prior funding to reach them."  Defs' Resp. in Opp. to Pltf's Mot. for Prelim. Inj. at 1, *Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-LLL (M.D. Fla. Jun. 4, 2021), ECF No. 22.  Congress based this relief on "**strong evidence, including testimony and reports spanning decades and up to the enactment of [the plan], documenting discrimination against minority farmers in USDA programs and its lingering effects, thereby necessitating**

**the remedial action in [the plan].**" *Id.* at 1-2 (emphasis added).

40.    The Biden administration tried again to pass relief to farmers in the Inflation Reduction Act.  Sections 22006 and 22007 included provisions offering $5.3 billion of relief for "economically distressed borrowers" and those who have experienced discrimination at the hands of the USDA.  According to recent reports, most of the relief for economically distressed borrowers went to White farmers. Despite the express provisions providing relief to those farmers who have experienced discrimination, the USDA has not allocated any funds to such individuals as of yet.  Given that the *USDA* admits its discriminatory practices have inflicted "**hundreds of billions of dollars**" in damages to Black farmers alone, let alone other socially disadvantaged farmers, even if all $5.3 billion went to Black farmers (which it has not), it would not even approach the massive amount of harm caused by the USDA's discriminatory policies and practices.  *See* Def.'s Br. in Support of Def.'s Mot. for Summ. J. at 14, *Miller v. Vilsack*, No. 4:21-cv-595-O (N.D. Tex. Jul. 18, 2022), ECF No. 221 (citing 167 Cong. Rec. S1219, S1265).

41.    The USDA Equity Commission recently released a report entitled "Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All." [24]  The Commission confirmed that the USDA "failed rural communities resulting in inequality across groups and regions—especially within

---

[24] USDA Equity Commission, *Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All*, Feb. 22, 2024, https://www.usda.gov/sites/default/files/documents/usda-equity-commission-final-report.pdf.

minority populations such as black farmers . . . ."[25]  The Commission further noted that "[e]xisting Farm Service Agency (FSA) loan programs and processes **challenge the ability of underserved individuals to access credit**."[26]  A delayed approval of a crop loan can significantly hinder a farming operation, affecting various essential aspects of the agricultural calendar.  Listening to personal testimonials while developing its report, the Commission heard testimonials from "Black farmers [that] highlighted discrimination severely restricting land ownership and credit access for generations.  Rural Black leaders described how their marginalization in community institutions is exacerbated by federal policy. . . . These voices spotlight nuances within systemic inequality that aggregate statistics alone fail to capture."[27]

## II.     THE PROVOSTS' STORY

42.     Sugarcane farming is in Mr. Provost's blood.  His ancestors hale from Ghana and Benin, where they farmed sugarcane and other subtropical crops.  After being kidnapped and enslaved in the United States, they tended the sugarcane fields of their enslavers in the Grand Marais.  Following emancipation, Mr. Provost's ancestors settled in the New Iberia region of Louisiana and continued farming sugarcane, this time under the Jim Crow indentured servitude system.  Despite facing great adversity, the Provost family persevered over the generations until Mr. Provost's father, Wenceslaus Provost Sr. ("Provost Sr."), managed to build a 4,000+-acre farm primarily in the Vermillion and Iberia Parish areas of

---

[25] *Id.* at 55.

[26] *Id.* at 35 (emphasis added).

[27] *Id.* at 55.



**Louisiana Sugarcane Producing Areas**

Louisiana.

43.     As is true for many Black farmers, the Provost family obtained title to much of their family land in the wake of the Civil War.  After gaining freedom, Mr. Provost's ancestors were bequeathed a small number of acres where for centuries their family had been forced to farm the land for free under inhumane conditions.  But, as has been and still remains the case for most Black farmers, most of the land farmed by the Provost family was and is owned by White landowners.

44.     The Provost family entered into informal, often verbal, agreements with these landowners wherein the Provost family paid land rent and (sometimes) a portion of the profits (typically between 1/5th and 1/6th)[28] in exchange for the right to plant and harvest sugarcane on White landowners' fields.  These agreements were largely informal in nature, allowing landowners maximum flexibility in determining who would farm the land and under what circumstances.  Because of the Provost family's skill, these mostly White landowners chose them as their farm operators,

---

[28] For those landowners who did not obtain a portion of the profits, they received an upfront cash payment due by January 31 of each year.  This is often called "cash rent."

despite fierce (and, at times, illegal) competition from other local White farmers.

45.     Beginning at age six, Mr. Provost joined his father in the sugarcane fields, learning to ride a tractor, plant and cover sugarcane, and care for the land. Mr. Provost fell in love with sugarcane farming.  To this day, it remains his dream job.  After graduating high school, his father gave Mr. Provost a small tract of his own.  That same year, Mr. Provost won the state's high yield award for producing 8,588 pounds of sugar per acre.



Top right picture: USDA official and Mr. Provost

46.     With yields so high, Mr. Provost had every reason to believe that he could not only take over his father's farm one day, but that he could grow that farm to be one of the most successful operations in Louisiana.  After his initial success in 1994, Mr. Provost grew his small farm to 300 acres and also helped co-manage his father's farm. Throughout this period, Mr. Provost's yields met or exceeded Louisiana state averages.

47.     In 2007, after working with his father for over a decade, Mr. Provost

took over the family business.  The future looked bright.  But, as is detailed in two separate lawsuits against a local bank and sugar mill, a series of discriminatory and unlawful acts resulted in massive losses.[29]

48.     The trouble began where it often does for Black farmers: inadequate funding.  Funding is the lifeblood of every farm in America.  "Small farmers operate at the whim of conditions completely beyond their control; weather conditions from year to year and marketable prices of crops to a large extent determine whether an individual farmer will make a profit, barely break even or lose money."  *Pigford*, 185 F.R.D. at 86.  As a result, "many farmers depend heavily on the credit and benefit programs of the United States Department of Agriculture to take them from one year to the next."  *Id.*  "Because of the seasonal nature of farming, it . . . is of utmost importance that credit and benefit applications be processed quickly or the farmer may lose all or most of his anticipated income for an entire year."  *Id.*

49.     In any given year, there must be sufficient funding to purchase seed cane for planting.  There must also be sufficient funding in place to fertilize, spray for pests and weeds, maintain irrigation, and cut and harvest the sugarcane.  Best farming practices mandate that these activities be performed at specific times of the year, like clockwork.  For example, it is difficult—if not impossible—to plant sugarcane after the first frost.  The ideal time to plant cane is in the month of August.  To do so, farmers must have funds to purchase seed cane early in the year.

---

[29] *See* Second Amended Complaint, *Provost v. First Guaranty Bank*, No. 2:18-cv-08845-JCZ-DPC (E.D. La. May 2, 2019), ECF No. 40 (hereinafter "*Provost* SAC").

They must also apply fertilizer and pesticides to prepare the land for planting.  The vast majority of farmers use special equipment to perform these tasks, and the purchase and maintenance of that equipment must also be financed.  Because no income comes in until harvest season, farmers must receive a stipend to cover their living expenses throughout the year.  Finally, most landowners expect to receive payment from the farmer for the entire year in January.  As a result, the ideal time to receive a crop loan for the year is in January.  Any later and the farming operation is compromised by not being able to take a necessary step—*i.e.*, fertilize, spray, cut, irrigate, plant, pay rent, etc.—at the necessary time.  For example, as the District Court in *Pigford* said, "[i]t does a farmer no good to receive a loan to buy seeds after the planting season has passed." *Pigford*, 185 F.R.D. at 86.  Because sugarcane is a four- to five-year perennial crop, failure to meet these schedules affects not only the crop for that year, but also the next few years.

50.     Every year, the Louisiana State University Department of Agricultural Economics & Agribusiness ("LSU Ag") releases projections for the amount of funding per acre necessary to operate a successful sugarcane farm.  These estimates include the typical expenses for a 1,000 acre sugarcane farm on a 4-year, 5-year, or 6-year rotation schedule.[30]  As reflected in **Table 1** below, on average, LSU Ag estimated the costs of running a successful sugarcane operation to be anywhere

---

[30] Sugarcane is a perennial rotation crop, with the initial year (called "seed cane") typically producing the most sugar.

between $500 to $900 per acre.[31]

| Table 1.  LSU Ag Sugarcane Projected Costs for a 5-Year Rotation | | | | |
|---|---|---|---|---|
| **Year** | **Variable Production Expenses** | **Fixed Production Expenses** | **Overhead Expenses** | **Total Per Acre LSU Ag Funding Recommendation** |
| 2005 | $446.70 | N/A | $84.53 | $531.23 |
| 2006 | $407.13 | $120.18 | $28.56 | $555.87 |
| 2007 | $416.72 | $148.76 | $30.00 | $595.48 |
| 2008 | $476.00 | $138.99 | $30.00 | $644.99 |
| 2009 | $481.28 | $154.35 | $30.00 | $665.63 |
| 2010 | N/A[32] | N/A | N/A | $605.16 |
| 2011 | $457.92 | $135.08 | $30.00 | $623.00 |
| 2012 | $504.57 | $139.66 | $30.00 | $674.23 |
| 2013 | $480.49 | $148.50 | $30.00 | $658.99 |
| 2014 | $471.51 | $145.82 | $30.00 | $647.33 |
| 2015 | $420.45 | $137.23 | $30.00 | $587.68 |
| 2016 | $404.01 | $145.96 | $30.00 | $579.97 |
| 2017 | $376.46 | $142.62 | $30.00 | $549.08 |
| 2018 | $386.34 | $135.24 | $30.00 | $551.58 |

---

[31] LSU Ag's estimates do not include living expenses or debt repayment.  Land rent is calculated separately from production expenses.

[32] The 2010 LSU Ag sugarcane enterprise budget does not appear to be available online, *see* https://www.lsuagcenter.com/portals/our_offices/departments/ag-economics-agribusiness/extension_outreach/budgets/2010, but the listed total cost was included within the Provosts' federal complaint against a local bank.  *See Provost* SAC ¶ 55.

| Table 1.  LSU Ag Sugarcane Projected Costs for a 5-Year Rotation | | | | |
|---|---|---|---|---|
| Year | Variable Production Expenses | Fixed Production Expenses | Overhead Expenses | Total Per Acre LSU Ag Funding Recommendation |
| 2019 | $421.63 | $150.96 | $30.00 | $602.59 |
| 2020 | $432.81 | $155.76 | $30.00 | $618.57 |
| 2021 | $382.10 | $142.23 | $30.00 | $554.33 |
| 2022 | $476.97 | $154.41 | $30.00 | $661.38 |
| 2023 | $616.77 | $211.92 | $30.00 | $858.69 |
| 2024 | $565.18 | $251.84 | $30.00 | $847.02 |

51.     The Provost family *never* received the recommended levels of funding—not from the USDA or any bank.  Instead, year after year, the Provost family made do with anywhere from 25% to 75% of the recommended LSU Ag funding.  Despite that, the Provost family still managed to break even, win awards, and grow their operation to a 4,000+ acre farm.  Doing so required the assumption of significant debt on awful terms under which the USDA and the local bank collateralized everything that Mr. Provost owned: his land, his property, and even his home.

52.     In less than a decade, Mr. Provost lost nearly everything.  He and his wife, Mrs. Provost, were unceremoniously evicted from their home, as documented by NBC Left Field in 2019.[33]  Much of his farmland was forcibly liquidated.  The Provosts fought back and ultimately settled litigation against the private entities

---

[33] This documentary is available online.  *See* What Happened to All the Black Farmers?, https://www.youtube.com/watch?app=desktop&v=q-VWIZIL4ag&feature=youtu.be#dialog (Feb. 5, 2019).

and individuals involved.[34]   But these private parties did not act alone.   At every step of the way, the USDA refused to fulfill its duty to ensure that *all* farmers—including Black farmers like the Provosts—received "fair and equitable treatment," irrespective of their race.[35]   *See also* 7 U.S.C. §§ 2003(e)(1)-(2), 2279(a)(5)-(6).   As detailed below, these discriminatory acts continue to this day.

### A.   2007:  The USDA Forces Mr. Provost To Begin His Independent Farming Career By Assuming His Father's $800,000+ Debt.

53.   Mr. Provost's father (Provost Sr.) had his first heart attack in October 1992 after returning from the fields.   Mr. Provost was just two years away from graduating from high school.   Doctors diagnosed Provost Sr. with a heart condition.   By 2006, Provost Sr. had endured multiple heart stint surgeries and a double bypass.   At only 64, he simply could no longer farm.   Provost Sr. decided to pass his legacy to his son.   At that time, Provost Sr.'s farming operation spanned over 4,000 acres.   It also included a lot of debt.

54.   Like so many other Black farmers, Provost Sr. had never obtained enough operating loans for his sugarcane operations to thrive.   He could not secure direct funding from the USDA.   Provost Sr. would wait at the Iberia Parish FSA Office only for Farm Loan Manager No. 1 to deny nearly every application that

---

[34] *See, e.g.*, Order of Dismissal, *Provost v. First Guaranty Bank*, No. 2:18-cv-08845-JCZ-DPC (E.D. La. Jun. 4, 2021), ECF No. 95.

[35] Office of the Assistant Secretary for Civil Rights, https://www.usda.gov/oascr/home.

Provost Sr. submitted.[36]  As a result, Provost Sr. had to borrow money from other banks on bad terms.  On average, Provost Sr. managed his operation with only 50% to 75% of the LSU Ag recommended funding for any given year.  Yet, his farming practices and skill managed to attract enough landowners for him to manage a 4,000+ acre operation.  Still, this growth came with a cost.

55.     Provost Sr. had to take out loans to purchase harvesting and other expensive equipment.  Due to events outside of Provost Sr.'s control, he also had to obtain an emergency loan from the USDA.  These debts were collateralized with nearly all of Provost Sr.'s possessions: his house, all of the land he owned, all of the equipment he owned, and practically all his other assets.  By the time Provost Sr.'s health had deteriorated to the point that he simply could not continue farming, Provost Sr. owed a local bank and the USDA over $800,000.

56.     After consulting with the USDA, Mr. Provost was informed that taking over his father's farm meant he would have to assume all of these debts.  Otherwise, his parents would lose everything.  Additionally, instead of having the rights to use his father's equipment, he would have to lease that equipment to a local mill on highly unfavorable terms in order to secure a temporary operating loan for the 2007 harvest season.  Thus, in order to save his parents from financial ruin at a time when Provost Sr.'s health was rapidly deteriorating, Mr. Provost had to assume around $800,000 in debts that did *not* include the operating loan Mr. Provost would

---

[36] In an abundance of caution, the names of USDA officials and several third parties have been replaced with titles in this Complaint.  The names of USDA officials are provided to this Court provisionally under seal.  *See* **Exhibit 1**.

need for the 2007 growing season.

57.     Beginning his independent farming career in that much debt was not something Mr. Provost wanted to do.  But establishing a relationship with his father's bank was not an option.  On or about 2006, that bank gave notice that it was no longer offering loans to farmers in the area.  *See* **Exhibit 2**.

58.     Mr. Provost could not find another lender to close the gap or that would address the issue of his father's outstanding debts.  Accordingly, Mr. Provost's only option was to seek a loan from either the USDA or another bank. The USDA refused to grant a direct loan, but pushed Mr. Provost to seek a loan (on highly unfavorable terms) from a different bank, which the USDA said it would guarantee notwithstanding the infeasibility of the offered loan.  LSU Ag guidelines are meant to ensure that farmers have a chance at building a profitable operation— *i.e.*, that there is enough money to fertilize, weed, spray, plant, and harvest the sugarcane at the right time so as to maximize yields.  The local bank's offered terms were *far* from these guidelines, which put Mr. Provost's operation in a precarious position were he to farm all of the acres he had leased, as planned.  In other words, the loan was infeasible, but the USDA guaranteed it anyway.  *See supra* ¶ 24.

59.     When Mr. Provost expressed his concerns with this arrangement, FSA Farm Loan Manager No. 2 said, "Your dad spent too much money on his farm" even though Provost Sr. only received 50 to 75% of LSU Ag funding levels.  USDA officials reminded Mr. Provost that unless he agreed to this guaranteed loan arrangement and assumed his father's debt, the USDA would initiate foreclosure

proceedings for his parents' childhood home and destroy the 4,000 acre farm his father had built.

60.     The USDA did not offer Provost Sr. debt forgiveness, even though such programs were available and, on information and belief, Provost Sr. would have likely qualified for them given his severe health conditions and inability to continue farming.  Provost Sr. later passed in November 2008.

61.     So, shortly before his father died, Mr. Provost assumed his father's debt and prayed he would have better luck in securing adequate operating loans with the help of USDA officials—loans that needed to fund sugarcane operations that would return a high enough profit not only to break even so as to repay the operating loan for that year, but also to pay down the $800,000+ debt that Mr. Provost was forced to assume.

62.     When documenting these transactions, the USDA did not faithfully record what had actually transpired.  In a handwritten note dated September 12, 2007 that was placed in Mr. Provost's FSA file and obtained through the assistance of a whistleblower in 2015, Farm Loan Manager No. 2 wrote that "[a]ssumption [of Provost Sr.'s debt] appears to be the only way to meet [Mr. Provost's] needs." **Exhibit 3** at 2.  He also wrote that Mr. Provost "wishes to assume his father's D-EM loan."  *Id.* at 1.  Neither statement was true.

63.     Mr. Provost did not "*wish* to assume" Provost Sr.'s debt; the USDA offered him no other choice.  Such choices did, of course, exist—including a direct loan to carry out farm operations, a direct loan to purchase or lease new farming

equipment, or debt forgiveness for Provost Sr.  They simply were not offered to Mr. Provost.  Instead, the USDA forced him to assume Provost Sr.'s outstanding debts, purchase Provost Sr.'s old farming equipment under the terms of an unfavorable lease to a local sugar mill,[37] and cut into year-end profits by paying past-due amounts that the USDA contended Provost Sr. owed despite receiving infeasible loans for *years*.  *See supra* ¶ 24.

64.     Mr. Provost was also forced to refinance his home mortgage, allowing the selected bank to obtain a first lien position on the mortgage.  Mr. Provost was not in default on his home mortgage, nor did he wish to refinance.  However, the USDA allowed the local bank in question to impose this requirement in order to secure a lien position on Mr. Provost's home.  The USDA allowed this requirement even though, on information and belief, White farmers in the area were not forced to collateralize their assets in this manner.

65.     The USDA also allowed the bank to force Provost Sr. to sell 140 acres of land to a local sugar mill as part of the deal.  The bank refused to offer Mr. Provost a guaranteed farm ownership loan to purchase the 140 acres of land.  The USDA did not intervene even though, on information and belief, similar loans were offered to White farmers in similar circumstances.  The USDA also did not offer a direct farm ownership loan to purchase the 140 acres.  On information and belief,

---

[37] Under the lease terms, Mr. Provost had to lend the farming equipment to the local sugar mill but was only paid when the equipment was used to harvest sugarcane on Mr. Provost's land as opposed to when it was used to harvest sugarcane on other farmers' land (the bulk of the equipment's use).  Moreover, any payments under the lease were made to a bank, not Mr. Provost.

similar loans were offered to White farmers in similar circumstances.

66.     The USDA also allowed the bank absolute oversight and control over any loan proceeds.  Thus, before Mr. Provost could purchase fertilizer, fuel, seeds, chemicals, equipment, farm labor, or cover any operating expenses, Mr. Provost had to obtain approval from representatives of the bank, unable to care for his crop for however long that approval took.  Such requirements were not imposed on local White farmers.  And the USDA did not intervene even though these requirements affected the feasibility of the loan.

67.     Finally, instead of repaying the crop loans with crop sale proceeds, the USDA allowed the bank to unlawfully divert future crop loan amounts to pay the prior year's crop loan, leaving little for Mr. Provost to actually *farm* with.  Thus, instead of the already inadequate crop loan amounts that the bank offered, Mr. Provost was left with even *less* to farm with every year.

68.     All of these restrictions had the combined effect of dooming Mr. Provost's 4,000+ acre family farm to a slow death.  And, despite multiple opportunities to intervene or change course, the USDA did nothing to stop this death spiral notwithstanding USDA officials' knowledge that these burdens were not placed on White farmers.

**B.      2008 - 2012: The USDA Departed From Its Regulations And Guaranteed Infeasible Loans, Which Had The Effect Of Setting Up Mr. Provost's Farm For Failure.**

69.     Beginning in 2008, Mr. Provost worked with USDA officials to secure guaranteed operating loans for his farm.  Those loans were supposed to be "feasible" according to USDA guidelines.  *See supra* ¶ 27.  They were not.  For *years*, the

USDA guaranteed operating loans to Mr. Provost and other Black farmers that were *far* lower than LSU Ag guidelines, effectively rubber-stamping infeasible loans.

70.     Mr. Provost had little to no say in the loan amounts he was given.  As detailed in Mr. Provost's federal lawsuit against the bank, every year, Mr. Provost asked for loans consistent with LSU Ag guidelines.[38]  And every year, the bank forced Mr. Provost to sign blank operating loan applications that the bank would then fill out as it saw fit.  The bank then took these applications and submitted them to the USDA without first showing them to Mr. Provost.[39]  At times, the bank even *photocopied* Mr. Provost's signature without his permission.[40]

71.     As is illustrated in **Table 2** below, the amounts the bank chose (and the USDA blessed) were far from enough to fund Mr. Provost's planned farming operations and not at all consistent with LSU Ag guidelines.[41]

| Table 2.  Breakdown of Mr. Provost's Actual Loans vs. LSU Ag Guidelines | | | | | |
|---|---|---|---|---|---|
| **Year** | **Planned Acres** | **Loan Amount** | **Loan Amount / Acre** | **LSU Ag Guidelines** | **LSU Ag Guidelines / Acre** |
| **2008** | 4,326 | $841,000 | $194 / acre | $2,790,270 | $645 / acre |
| **2009** | 4,295 | $826,500 | $192 / acre | $2,860,470 | $666 / acre |
| **2010** | 4,046 | $827,000 | $204 / acre | $2,447,830 | $605 / acre |
| **2011** | 3,769 | $841,200 | $223 / acre | $2,348,087 | $623 / acre |

---

[38] *See Provost* SAC ¶ 35.

[39] Indeed, as alleged in Mr. Provost's suit against the bank, "the first time that Mr. Provost ever saw his completed crop loan applications was when a whistleblower at FSA provided him access to those documents beginning in April 2015."  *See Provost* SAC ¶ 36.

[40] *See, e.g.*, *infra* ¶¶ 149-151.

[41] *See Provost* SAC ¶¶ 53-57.

| Table 2.  Breakdown of Mr. Provost's Actual Loans vs. LSU Ag Guidelines | | | | | |
|---|---|---|---|---|---|
| Year | Planned Acres | Loan Amount | Loan Amount / Acre | LSU Ag Guidelines | LSU Ag Guidelines / Acre |
| **2012** | 3,373 | $1,066,000 | $316 / acre | $2,273,402 | $674 / acre |

72.     As **Table 2** illustrates, Mr. Provost received between 29% to 47% of the LSU Ag recommended amounts for his sugarcane farming operations from 2008 to 2012.  Because Mr. Provost was forced to assume Provost Sr.'s outstanding debts, Mr. Provost had to use a portion of these funds to repay the outstanding $800,000+ loans as well.  And, to make matters worse, these infeasible loans did not come on time.  Instead of providing these funds at the beginning of the year when Mr. Provost at least had a chance of doing the right things at the right time, the USDA and local bank routinely refused to approve Mr. Provost's loans until well into the growing season.

73.     Because of this decreased funding, Mr. Provost was forced to farm fewer acres than he planned (and had leased the rights to farm) each year, which further compromised his ability to not only pay debts, but to build a thriving and successful farming operation.  *See, e.g.*, **Exhibit 4**.  Unsurprisingly, Mr. Provost's inability to farm all of the leased acres contributed to landowners' decisions to terminate their lease agreements with Mr. Provost and, instead, permit White farmers with secure funding to take over each year.

74.     When Mr. Provost expressed dismay that his funding levels were not adequate to sustain the size of his father's 4,000+ acre operation, FSA Farm Loan Manager No. 2 and FSA Farm Loan Officer No. 1 would say: "You farm too much"

or "You farm too many acres for one person."  Farm Loan Manager No. 2 and Farm Loan Officer No. 1, of course, knew that Mr. Provost did not literally farm 4,000+ acres and, like other farmers, including White farmers with similar size farms, hired others to perform a lot of the labor.  Thus, their statement, which they repeated many times over the years, could only mean that there was something "wrong" with *Mr. Provost* owning such a large farming operation.  Farm Loan Manager No. 2 repeatedly insisted that Mr. Provost did not deserve additional funding because his farm should be smaller and Mr. Provost should not "fall into [Provost Sr.'s] trap" of "spending too much money on the farm."  Notably, neither Farm Loan Manager No. 2 nor Farm Loan Officer No. 1 had any issue with White farmers owning similar size operations and, on information and belief, never encouraged such farmers to downsize their operations or attempted to *force* a downsize of operations by offering infeasible loans.

75.    Farm Loan Manager No. 2's belief that Mr. Provost simply did not deserve funds was further illustrated in or about 2009 after Mr. Provost received notice that he would receive disaster relief through the FSA's SURE Program.[42] Mr. Provost was awarded $100,000, which would come in the form of a check made out to both Mr. Provost and the bank.  Rather than recognizing this as an instance of Mr. Provost putting his farm on stronger financial footing, to the benefit of his creditor, Farm Loan Manager No. 2 reacted by treating it as an unwarranted attempt by Mr. Provost to enrich himself.  Without any basis for believing that Mr.

---

[42] *See* https://www.fsa.usda.gov/Internet/FSA_File/sure_bkgder_122309.pdf.

Provost would misuse the funds, Farm Loan Manager No. 2 called Mr. Provost and accused him of misappropriating these relief funds.  This was baseless.  As Mr. Provost pointed out, the check was made out to both Mr. Provost *and* the bank, and that Farm Loan Manager No. 2 had no basis to assume he would misuse funds. Farm Loan Manager No. 2 ended the call without an apology for his unfounded suspicions.  Notably, Mr. Provost's applications for SURE Program funds every year thereafter—from 2010 to 2013—were denied.

76.     In or about 2010, Farm Loan Manager No. 2 called Mr. Provost and said: "I hear you're trying to finagle money again."  Mr. Provost asked: "What do you mean?"  Farm Loan Manager No. 2 said, "Well, you have something out there called Big Country Farm."  Mr. Provost said, "This has nothing to do with the farm." Mr. Provost was part-owner of family land that had been rented to Bayou Pipe. Bayou Pipe stored their pipes used for offshore drilling on that family land.  Bayou Pipe would rent the Provost family's trucks to move these stored pipes from one lot to another, paying $80 per hour for use of the truck.  Mr. Provost reinstated this truck leasing business to rent the family trucks when he could not secure enough money for his farm through guaranteed or direct loans.  Farm Loan Manager No. 2 forbade Mr. Provost from running that operation without providing any explanation as to why.  On information and belief, nothing in any loan or any requirement forced Mr. Provost to use his equipment only for farming or otherwise forbade this operation.  On information and belief, to this day, a White farmer in the same parish receiving the same sort of USDA loan uses his farm trucks for decidedly non-

farming purposes, *e.g.*, to maintain a private golf course owned by the White farmer.

77.     Notwithstanding this discriminatory treatment, Mr. Provost ceased renting his trucks to Bayou Pipe as ordered by Farm Loan Manager No. 2.  Mr. Provost was afraid he would lose his loans entirely if he did not accede to Farm Loan Manager No. 2's demands.  As a result, Mr. Provost was deprived of additional revenue that could have helped supplement his farming operations, which were already suffering from the inadequate and untimely loans that the USDA approved.  Indeed, before Farm Loan Manager No. 2 put an end to this rental arrangement, Mr. Provost had used the proceeds from Bayou Pipe to supplement the grossly inadequate operating funds provided by the local bank and guaranteed by the USDA.

78.     These examples demonstrate that Mr. Provost was held to a different standard than other White farmers.  Instead of receiving equal treatment and respect under the law, Mr. Provost was viewed with suspicion.  Instead of giving Mr. Provost a chance to do the right things and at the right time for his farm, the USDA forced Mr. Provost to operate under the bank's supervision and then complained about the results.  Instead of giving Mr. Provost enough funds to care for his crop, USDA officials decided Mr. Provost could not run such a large operation even though they had no issues with individual White farming families doing so.

79.     Despite this extreme adversity, Mr. Provost managed to persevere—at least, for a time.  In 2008, Mr. Provost received the "Young Farmers and Ranchers Achievement Award" in recognition of his



"Outstanding Contribution to Agriculture" from the Farm Bureau of Louisiana.  In the same year, Mr. Provost also received the "Iberia Parish Farm Bureau Farmer of the Year" award.  In 2010 and 2012, he won awards for "Outstanding Accomplishments in the Conservation of Soil, Water, and Related Natural Resources" from the Iberia Soil and Water Conservation District.  Also in 2010, he was elected to Vermillion Parish's Sugarcane Advisory Committee.  But skill cannot



take the place of the funding necessary to operate a successful sugarcane farm.

80.     As **Table 3** illustrates, when co-managing his father's operations from 2004

through 2006 (and obtaining anywhere from 50% to 75% of LSU Ag funding

recommendations), Mr. Provost met or exceeded county yield averages.  But once

Mr. Provost transitioned from the non-guaranteed loans Provost Sr. was able to

obtain from a different local bank to guaranteed loans blessed by the USDA (all of

which were dramatically *below* LSU Ag recommended funding guidelines), Mr.

Provost's yields declined precipitously.  Although Mr. Provost was able to pay all

but the 2012 operating loan in full despite these declining yields, Mr. Provost could

not escape from debt peonage.  *See, e.g.*, **Exhibit 5**.

| Table 3.  Mr. Provost's Yields Compared to the County Average[43] | | |
|---|---|---|
| Year | Mr. Provost's Yields | County Average Yields |
| 2004 (USDA-free loan) | 5,778 | 4,140 |
| 2005 (USDA-free loan) | 5,521 | 3,990 |
| 2006 (USDA-free loan) | 4,713 | 4,259 |
| 2007 (short-term loan from mill) | 4,118 | 5,995 |
| 2008 (USDA guaranteed loan) | 3,024 | 5,812 |
| 2009 (USDA guaranteed loan) | 3,017 | 6,106 |
| 2010 (USDA guaranteed loan) | 2,159 | 7,014 |
| 2011 (USDA guaranteed loan) | 1,783 | 6,980 |
| 2012 (USDA guaranteed loan) | 1,701 | 6,970 |

81.    This indebtedness was worsened by the bank and USDA's refusal to

allow Mr. Provost to operate under a limited liability corporation called Wenceslaus

Provost Jr. Farms LLC, instead insisting that everything Mr. Provost personally

owned had to be at risk in order to continue farming.  On information and belief,

White farmers in the area with similar credit and less farming experience were

allowed to farm and obtain similar loans through limited liability corporations.

---

[43] The figures in this table were prepared by the Provosts' expert in litigation
against the bank and taken from documents provided by Farm Loan Officer No. 1.

82.     On information and belief, the USDA did not guarantee infeasible loans for White farmers in the area.  Rather, the USDA worked with local lenders to ensure that the loans given to White farmers met LSU Ag guidelines for funding. Moreover, on information and belief, the USDA did not delay processing White farmers' loans.  Rather, the USDA worked to process White farmers' loans expeditiously so they could do the right things at the right time.  The USDA crippled Mr. Provost's farm by denying him the same treatment they offered White farmers.

83.     In the space of five short years, Mr. Provost's 4,000+ acre operation transformed from one that almost always met or exceeded county average yields to one struggling to make ends meet.  The reasons for this transformation were obvious.  Although Mr. Provost was a very experienced, award-winning farmer, he simply could not generate an "average" crop with 25 to 50% of the LSU Ag recommended funding, and certainly not when those funds did not come at the right moment in the growing season.  As a result, by the end of 2012, 4,000+ acres dropped to around 2,400 as landowners decided to enter into agreements with White farmers able to secure adequate funding, including FSA County Committee Member No. 1 and FSA County Committee Member No. 2.



**C.    2013 - 2015:  After Years Of Infeasible Loans, Mr. Provost
Loses His Farm.  Mrs. Provost Tries To Pick Up The Pieces
But Faces The Same Headwinds Of Discrimination.**

84.    On or about November 27, 2012, Mr. Provost met with a representative

from the bank about a crop loan for the 2013 season.  During that conversation, the

bank's representative suggested that Mr. Provost reduce his farm to roughly 1,000

acres and allow someone else to take over the abandoned acres.  By March 2013, the

bank informed Mr. Provost they would not offer a loan.

85.    Without an operating loan, Mr. Provost knew he was on the verge of

bankruptcy.  As had been true for Provost Sr., Mr. Provost was forced to

collateralize *everything* to secure these yearly operating loans: his home, his land, and his equipment.  In desperation, he asked the local FSA office for help working out a plan to save his farm.

86.     On or about March 11, 2013, Mr. Provost wrote to the bank's representative and Farm Loan Officer No. 1 with a plan to reduce his 1,700 acres to 1,250 in order to obtain funding.  *See* **Exhibit 6**.  In that email, Mr. Provost warned that "[a]lmost all landlords threatened to take land this week if land rent is not paid."  *Id.*  He continued: "Also I will not get paid for the selling of any cane if I do not pay land rent."  *Id.*  "In fact, as I am writing this letter six landlords have called this morning."  *Id.*

87.     Farm Loan Officer No. 1 indicated he was amenable to this plan, which was not surprising as he had long pushed Mr. Provost to decrease acreage, but the bank did not.  *See id.*  Instead, the bank and the USDA ultimately decided that Mr. Provost could access approximately $300,000 from his line of credit approved in 2012.[44]  These funds could only be used to care for the crop planted in 2012, which further placed Mr. Provost's farm in a precarious position.

88.     As the year proceeded, multiple landowners terminated their leases with Mr. Provost, which was not surprising given that he did not have the funds to cultivate crops or pay land rents on time.  Not willing to give up, Mr. Provost sought assistance from the Southern University Agricultural Research and Extension

---

[44] Because of this $300,000 guaranteed loan, Mr. Provost was informed by an FSA official that he was not eligible to seek a direct USDA loan for 2013.

Center, a Historically Black University in the area.  Mr. Provost also sought
assistance from the LSU Ag department.

89.     On or about January 2014, with land rent due and no operating loan
secured, the Provosts met with Dr. Dawn Mellion-Patin and Ms. Zanetta Augustine
from Southern University.  Dr. Mellion-Patin and Ms. Augustine connected the
Provosts with Dr. Kurt Guidry from LSU Ag, who agreed to help the Provosts come
up with a plan to secure an operating loan for the 2014 season.

90.     The Provosts also sought assistance from Farm Loan Manager No. 4,
who worked in a different parish.  Farm Loan Manager No. 4 suggested that Mr.
and Mrs. Provost enter into a post-nuptial agreement so that Mrs. Provost could
obtain a direct operating loan from the USDA since Mr. Provost could not.  Farm
Loan Manager No. 4 advised that Mrs. Provost would not be able to obtain a direct
operating loan from the USDA unless she legally separated from Mr. Provost—at
least financially.  Dr. Mellion-Patin connected the Provosts with a local family
lawyer who could assist with these efforts.

91.     On or about February 24, 2014, the Provosts sent Farm Loan Officer
No. 1 a signed post-nuptial agreement effecting a financial separation for the
purposes of Mrs. Provost securing a direct operating loan from the USDA.  Around
the same time, Mr. Provost attempted once again to obtain a guaranteed loan from
the bank, this time with the plan for Mrs. Provost to purchase roughly a third of his
sugarcane in hand, as suggested by Farm Loan Manager No. 4.

92.     On or about March 4, 2014, Dr. Guidry from LSU Ag prepared and

sent 21 funding scenarios for Mr. Provost's farm to Mr. Provost's local bank and FSA official.  Dr. Guidry told Mr. Provost that he had assisted other farmers in recovering from worse financial circumstances, but that cooperation from the lender would be required.  Dr. Guidry made the obvious conclusion that Mr. Provost needed to "increase production levels," which was "likely associated with [Mr. Provost] being able to get enough financing to spend the needed money on inputs." **Exhibit 7**.  Dr. Guidry also noted that Mr. Provost needed "some re-structuring of [his] existing farm debt." *Id.*  These funding scenarios did not include the circumstance in which Mrs. Provost purchased 500 acres of Mr. Provost's sugarcane to start a separate operation.

93.     On or about March 10, 2014, Dr. Guidry modified his proposal to include scenarios wherein Mrs. Provost purchased 500 acres of Mr. Provost's sugarcane.  *See* **Exhibit 8**.  Under Dr. Guidry's guidance, Mrs. Provost would purchase stubble and seed cane from Mr. Provost and would pay Mr. Provost a custom fee rate for conducting "all farming activities." *Id.*  Dr. Guidry's plan resulted in net profits, notwithstanding Mr. Provost's outstanding debts.  *See id.*  But, as he stated on March 5, 2014, all required adequate funding to invest in the sugarcane crop to increase yields.  *See id.*

94.     On or about March 11, 2014, Mr. Provost met with the bank's representative regarding the proposed debt restructuring and operating plan proposed by Dr. Guidry.  *See* **Exhibit 9**.  During that conversation, the bank's representative "was not open to any suggestions about restructuring" the farm or

loan, as Dr. Guidry had suggested.  *Id.*  Instead, the bank's representative indicated that he was only interested in "a complete liquidation of Provost Farm in order to pay off outstanding unsecured debt."  *Id.*

95.     In response to the bank's insistence on complete liquidation of the family farm, the Provosts scheduled another meeting with a more senior bank official.  On or about March 17, 2014, the Provosts met with this bank official to discuss Dr. Guidry's restructuring proposal.  During that conversation, that official communicated that the bank would restructure the debt only if Mr. Provost offered an additional $400,000 of collateral on an outstanding USDA-guaranteed loan with a balance of, at that time, approximately $144,000.  This loan balance came from a loan Mr. Provost was forced to assume in 2007 in order to save his parents' home.  *See supra* ¶¶ 55-67.  Mr. Provost asked for a list of the assets that had already been collateralized, but the bank would not provide it.  Instead, the bank informed Mr. Provost that it intended to liquidate Mr. Provost's farm and all collateralized assets (which it would not specify).

96.     On or about March 25, 2014, on information and belief, the bank's representative had a conversation with Farm Loan Officer No. 1 regarding the restructuring of Mr. Provost's debt so as to secure an operating loan for 2014.  On information and belief, during this conversation Farm Loan Officer No. 1 communicated to the bank that restructuring Mr. Provost's debt should not be an issue.  That spring, Farm Loan Officer No. 1 told Mr. Provost that he believed racial discrimination might be at play in the bank's interactions and also suggested that

certain USDA officials might also have been influenced by Mr. Provost's race.  He also informed Mr. Provost that Farm Loan Manager No. 2 obtained personal insurance for discrimination claims.

97.     On or about April 3, 2014, the bank informally agreed to restructure Mr. Provost's debt in some fashion, but took no steps to do so.  Mr. Provost asked the USDA for assistance, but received none.

98.     On or about May 8, 2014, Mr. Provost sent an email to FSA State Outreach Coordinator No. 1 asking for assistance in securing a loan from the bank.  *See* **Exhibit 10**.  In that email, Mr. Provost recounted a previous conversation he had with the bank's representative, as follows:

> I want to improve my working relationship with . . . the local Vice-President of Abbeville, but he once said to me that he cannot do anything for a "black" man that he doesn't do for a "white" man, when I never asked what he could do for me regarding my ethnicity.  I wonder if I'm given a fair chance or if race is the issue.

*Id.* Mr. Provost also noted that third parties—with whom he had not shared his troubles obtaining a loan—had indicated that they knew of his financial difficulties, indicating someone with access to his private information had been spreading damaging information about his farming operation and harming his reputation.  *See id.* Mr. Provost asked FSA State Outreach Coordinator No. 1 to intervene and assist him in obtaining a loan on fair terms, irrespective of race.  *See id.*

99.     The next day, on or about May 9, 2014, Mr. Provost sent an email to a broader set of FSA officials, including: State Executive Director No. 1, State Outreach Coordinator No. 1, Farm Loan Officer No. 1, and Farm Loan Program

Specialist No. 1.  *See* **Exhibit 11**.  In this same email, Mr. Provost again raised the possibility that his difficulties obtaining a farm loan stemmed from his race.  *See id.* He also informed the USDA about the real-time harm his farm suffered from not being able to obtain adequate funding:

> Landlords are threatening to break lease agreements with me, due to the delay in rent payments.  Grass is over taking my fields.  Please respond via email or by phone regarding this matter as soon as possible.  Your response is appreciated!

*Id.*  That same day, as predicted, one landowner terminated a verbal lease agreement.  *See* **Exhibit 12**.  Ironically, the land at issue was land Mr. Provost had been denied the opportunity to purchase from his father in 2007.  *See supra* ¶ 33. With termination of the lease, the Provosts would not even be able to *work* the land they had long *owned*.

100.    Around this same period, Vice Chancellor John Pierre of Southern University contacted both the USDA and the bank and advocated for Mr. Provost to receive a crop loan, arguing that denial of a loan was a strong indication of racial discrimination.  Dr. Pierre also contacted Joe Leonard, who was then the Assistant Secretary for Civil Rights at the USDA from April 2009 through January 2017.

101.    After learning that Mr. Provost was considering filing a civil rights complaint against both his local bank and the USDA, Mr. Leonard "reached out [to the bank] regarding its failure to provide a crop loan to Mr. Provost in 2014 as well as its general reluctance to provide crop loans to other black sugarcane farmers." *See* **Exhibit 13**.  At that point, the bank agreed to provide a loan to Mr. Provost. Mr. Leonard later wrote:

> It is my understanding that, as a result of Dr. Pierre and me contacting [the bank] on behalf of Mr. Provost, [the bank] subsequently provided a crop loan to Mr. Provost in 2014.  I do not believe [the bank] would have provided a crop loan to Mr. Provost in 2014 had I not contacted [the bank] to advocate on his behalf.

*Id.*  On information and belief, Mr. Leonard did *not* require the loan to be feasible, however, which was inconsistent with LSU Ag guidelines.

102.    On or about May 13, 2014, Mrs. Provost learned that the separation agreement they had notarized in February 2014 was not sufficient.  *See* **Exhibit 14**. This was *months* after the Provosts had submitted the February 2014 separation agreement to FSA and well into the growing season.  *See supra* ¶ 45.  The Provosts promptly acted to correct the situation, but communicated their frustration this hurdle had not been identified earlier in an email to State Executive Director No. 1, State Outreach Coordinator No. 1, Farm Loan Officer No. 1, and Farm Loan Program Specialist No. 1, as follows:

> I am writing in regards to the marital agreement signed by my husband and me.  I've become aware that the post-nuptial is required to be petitioned before judge in accordance with FSA regulations.  I was unaware of this when the contract was developed by my attorney.  I am very saddened to learn of these restrictions, fearing I may lose every single potential landlord, forced to file bankruptcy due to money spent into the crop, and fields beyond the point of repair.

Accordingly, the Provosts petitioned for an order of separation promptly on or about May 14, 2014.

103.    On or about May 14, 2014, the  finally sent the loan packet to the FSA for approval, but all living expenses for 2014 had been removed.  Mr. Provost sought

assistance from the FSA, but the FSA refused to intervene.

104. On or about May 16, 2014, the state FSA office approved Mr. Provost's guaranteed loan. At this point, Mr. Provost was *months* behind schedule, but hoped he could at least start to prepare the land for planting. Despite this approval, the loan was still not ready for closing.

105. On or about May 16, 2014, the Court granted the Provosts' separation petition. The Provosts promptly provided this signed order to FSA officials. On or about May 21, 2014, Mrs. Provost again emailed FSA officials State Executive Director No. 1 and State Outreach Coordinator No. 1 regarding progress on her loan application:

> I spoke with [State Outreach Coordinator No. 1] and he says there is no word on the marital agreement. I must regretfully inform the Farm Service Agency that waiting on this loan process has caused major problems for me. I know the Louisiana State Office is anticipating written confirmation from [OGC Attorney Supervisor No. 1 of OGC] on the approval of the marital agreement between my husband and I, before I am allowed to close on the crop loan. Even if I close tomorrow, the funds may not be available until the middle of next week. I'm not sure of the process it takes to render a formal legal opinion, but waiting may prove to be devastating to my crop and livelihood. The overwhelming stress and mounting debt of unpaid land rent, wondering how I am going to pay labor, and other expenses is taking its toll. I truly hope tomorrow both myself and the state office has good news, so that I know I can proceed with my farming operations. Your knowledge and advice is, once again, appreciated.

*See* **Exhibit 15**.

106. The same day, on or about May 21, 2014, Farm Loan Officer No. 1 provided a projected annual cash flow for Mrs. Provost farm, which listed the

significant operating expenses that needed to be covered in order for her farm to be

| Operating Income | | |
|---|---|---|
| Crop Sales | | 369,230 |
| **Total Operating Income** | | **369,230** |
| GROSS MARGIN | 369,230 | |
| **Operating Expenses** | | |
| Chemicals | | 44,483 |
| Custom Hire Exp. | | 56,525 |
| Fertilizers & Lime | | 44,876 |
| Gas / Fuel / Oil | | 26,552 |
| Insurance Exp. | | 4,000 |
| Labor Hired | | 13,697 |
| Rent - Mach / Equip / Vehicle | | 41,000 |
| Rent - Land / Animals | | 34,886 |
| Seeds & Plants | | 50,000 |
| Other Expenses | | 2,989 |
| **Total Oper. Expenses (Less Interest & Depr.)** | | **319,008** |
| NET OPER. INFLOWS | | 50,222 |
| **Non-Operating** | | |
| Owner Withdrawal | | 20,000 |
| Income Taxes | | 1,000 |
| **Capital** | | |
| Capital Expenditures | | 23,300 |
| **Financing** | | |
| Term Debt - Payments | | 3,600 |
| Principal- | 3,134 | |
| Interest- | 466 | |
| New Term Advances | | 23,300 |
| Non-Revolving Oper. Pmt. | | 282,233 |
| Principal- | 276,700 | |
| Interest- | 5,533 | |
| New Oper. Advances | | 276,700 |
| **Total Cash Inflows** | | **669,230** |
| **Total Cash Outflows** | | **649,141** |
| (Before LOC P. & I.) | | |
| **Net Cash Available** | | **20,089** |
| Ending Cash on Hand | | 20,089 |

successful, as reflected in the screenshot. *See* **Exhibit 16**. None of these expenses could be paid until her loan closed.

107. On or about May 22, 2014, the USDA finally approved Mrs. Provost's loan for the 500 acres she purchased from Mr. Provost. *See id.* Unlike Mr. Provost's loans, Mrs. Provost's loan was largely consistent with LSU Ag recommendations. That is, the USDA's direct operating loan to Mrs. Provost allocated $319,008 for approximately 500 acres of farmland, which translates to approximately $638 per acre. *See* **Exhibit 16**. This amount was just a little less than the LSU Ag recommendation of $647 per acre. *See supra* ¶ 49, **Table 1**. When the Provosts asked FSA officials how Mr. Provost's loans could be deemed "feasible" when they were not consistent with LSU Ag guidelines, FSA officials said, "the bank is *our* customer and you are the *bank's* customer." In other words, FSA officials viewed their responsibilities as rubberstamping whatever terms local banks generated, whether feasible or not, whether discriminatory or not.

108.    As was the case for Mr. Provost's loan, the USDA supervised Mrs.

Provost's account.  This meant that all farming activities and spending had to be

approved by the USDA, just like all farming activities and spending had to be

approved by the bank and the USDA for Mr. Provost's loans.  This created a Catch-

22 situation in which the USDA and the bank criticized Mr. and Mrs. Provost for

their "farming practices" when those farming practices were *dictated* by the USDA

and the bank.  This vexing circumstance is best captured in the common complaint

heard by many members of the Black farming community:  "They're telling me I

don't know how to farm when they're *telling* me how to farm."  Nevertheless, Mrs.

Provost agreed to a supervised account after Farm Loan Officer No. 1 told her this

would increase the likelihood that the USDA would approve the loan.  Farm Loan

Officer No. 1 specifically asked Mrs. Provost to request a supervised account in

writing, which she did according to his instructions.  On information and belief,

White farmers in the areas were not expected to have supervised accounts, nor were

they instructed to ask for supervised accounts by FSA officials.

109.    On or about May 29, 2014, Mr. Provost emailed both the bank and

Farm Loan Officer No. 1 regarding their failure to close on his farm loan:

> Please, can I close tomorrow morning?  I know that [local
> bank representative] said she has other loans to work on,
> but I will [lose] [landowner's] property if I don't give him
> some land rent money tomorrow afternoon.  It is 160 acres
> of 540 and 226 cane.  I need to get in the fields.

**Exhibit 17**.  The bank refused to prepare the documents for closing immediately

despite the emergent circumstances.  *See id.*  The USDA did nothing.

110.    On or about June 2, 2014, Mr. Provost emailed State Executive

Director No. 1 and State Outreach Coordinator No. 1 regarding the lack of funding

notwithstanding approval:

> My issues with my crop loan persist. The state office finally approved the loan on May 16, 2014. It is June 2 and I still have no idea when the loan will close at [the bank]. May 23, [the bank's representative] needed the acreage reports; I completed and turned them in on May 28. We have been working on this loan since late February and acreage reports were never mentioned. After the reports were delivered, [a different bank representative] called and said I needed to clear two judgments from my name. One judgment has been on my record since 2011 and never interfered with the closing of my loan. They were paid and removed at the clerk of the court's office. Each judgment was old farm bills past due. I have made [the bank] aware of the urgency of my crop loan, and here we are in June and I haven't closed. [. . .]
>
> As in past years, my loan process is ending late. Other farmers are finished fertilizing and [I] haven't even begun to spray herbicides. Furthermore, it is my goal to remain farming and be a successful farmer; overcoming any threats to my business[.]

**Exhibit 18**. Instead of offering assistance, the USDA allowed the bank to conjure

additional hoops through which Mr. Provost was forced to jump, including a list of

insurance policy documents and property records.

111. On or about June 17, 2014, Mrs. Provost sent Farm Loan Officer No. 1

a side-by-side comparison of the difference funding made in terms of crop

production, as shown in the images below.



**Figure 3: Unworked Fields**



**Figure 4: Worked Fields**

*See* **Exhibit 19**.  When sending the photographs, Mrs. Provost wrote: "Praying his

loan closes ASAP!!" *Id.* Her prayers were answered.

112. On or about June 17, 2014, the bank and the USDA finally closed on Mr. Provost's operating loan. The approved amount was for $308,250, which was somehow supposed to cover 1,277 acres of farmland. This translated to only $241 per acre, barely one third of the LSU Ag recommendation of $647 per acre. *See supra* ¶ 49, Table 1.

113. As the harvest season rapidly approached, the Provosts did everything in their power to prepare their separate crops for the 2014 harvesting season. They did so despite attempts to intimidate them into not farming.

114. These intimidation tactics were documented in a 2018 *Guardian* article. *See* **Exhibit 20**. Dead cats were left inside of a tractor parked in the fields, the window of a tractor was shot out, cinderblocks were left in Mrs. Provosts' fields to damage her equipment, "[m]otor oil was repeatedly drained from vehicles," and "[f]uel lines were filled with water." *Id.* The Provosts sought assistance from the police, but were turned away, with one deputy noting: "Someone wants what you have by any means necessary." *Id.*

115. The Provosts also sought assistance from USDA officials, including then-Assistant Secretary for Civil Rights Joe Leonard, State Executive Director No. 1, State Outreach Coordinator No. 1, Farm Loan Manager No. 2, Farm Loan Officer No. 1, Farm Loan Program Specialist No. 1. *See* **Exhibit 21**. None came.

116. Ultimately, despite their hard work during the 2014 growing season, neither Mr. Provost's nor Mrs. Provost's crops were harvested for reasons outside

their control.[45]  As a result, the Provosts were unable to repay their 2014 crop loans.

117.    The USDA forgave Mrs. Provost's 2014 crop loan because she was not to blame for her crop remaining in the fields.  The USDA then approved another loan for the 2015 harvest, although the approved amount was markedly lower than the first, given the debt forgiveness.  The USDA also granted Mrs. Provost an emergency loan given the extreme circumstances.  A different approach was taken for Mr. Provost.

118.    The bank refused to provide any additional loans to Mr. Provost even though he also bore no responsibility for his 2014 crop not being harvested.  Having been turned down by the bank (again), Mr. Provost sought a direct loan from the USDA, which was rejected on July 8, 2015.  **Exhibit 22**.  With no funding options, Mr. Provost lost what little remained of his farm.

119.    In an in-person meeting with Farm Loan Officer No. 1 in or around 2015, the Provosts expressed their concerns about the hardships they had faced.  Mr. Provost observed that he had started off his independent operation with thousands of acres and, as of 2015, had nothing to show for it.  Mr. Provost said as a result of inadequate and untimely loans he had lost millions of dollars of revenue and was at risk of losing everything his family had worked so hard to build.  Farm Loan Officer No. 1 observed that he had a program called "E-Dollars," which could calculate precisely the revenues Mr. Provost *would have* earned had his yields matched parish averages.  Farm Loan Officer No. 1 ran those calculations in the

---

[45] *See Provost* SAC ¶¶ 119-136.

moment and printed off a copy of the results for the Provosts' review, which is attached to this Complaint as **Exhibit 23** and reflected in **Table 4** below.

| Table 4.  Farm Loan Officer No. 1 Revenue Loss Calculations | | | |
|---|---|---|---|
| **Year** | **Actual Revenues** | **Expected Revenues**[46] | **Revenues Lost** |
| **2007** | $2,436,208.80 | $3,396,967.20 | $960,758.40 |
| **2008** | $2,062,368.00 | $3,916,044.00 | $1,853,676.00 |
| **2009** | $2,511,471.48 | $5,887,015.68 | $3,375,544.20 |
| **2010** | $1,806,985.85 | $5,659,489.71 | $3,852,503.87 |
| **2011** | $1,737,540.63 | $6,874,151.22 | $5,136,610.58 |
| **2012** | $1,133,580.42 | $5,283,377.76 | $4,149,797.34 |
| **2013** | $741,458.38 | $2,775,638.25 | $2,034,179.88 |
| | | **Total Lost Revenues** | **$21,363,070.27** |

120.    According to Farm Loan Officer No. 1, Mr. Provost lost approximately $21,363,070.27 in revenues between 2007 and 2013.[47]  *See id.*  These revenues confirm that sugarcane should have been a cash crop for Mr. Provost.  Instead, he was not able to accumulate wealth because Mr. Provost was denied access to feasible, timely funding on account of race.  When Mr. Provost expressed his devastation over this loss, Farm Loan Officer No. 1 told him not to worry because Mr. Provost still had partial ownership of family land in Kaplan and he could "***put a trailer on there and be happy***."

---

[46] These numbers were based on Louisiana state averages.

[47] Notably, these calculations did not factor in the land lost by Mr. Provost over this period.  Had that land not been lost due to low yields, Mr. Provost would have obtained even higher revenues.

121.   Mrs. Provost held on for a little longer.  Given the drastically diminished funding for the 2015 crop, Mrs. Provost's yields were not sufficient to satisfy landowners.  Their dissatisfaction was heightened by the efforts of County Committee Member No. 1's solicitation of the Provosts' landowners, including by denigrating the Provosts' farming acumen.  On information and belief, County Committee Member No. 1 obtained information about which landowners to target by virtue of access to information by virtue of his official position within the FSA.

122.   For example, in 2016, County Committee Member No. 1 convinced a landowner that he should take over 40 acres of land.  And, as evidenced in the text message sent from a landowner to Mrs. Provost, County Committee Member No. 1 convinced the landowner to break her lease agreement with Mrs. Provost and allow him take over the remainder of the property on or about June 6, 2017.

> Angie, I am so sorry to tell you but I went ahead and contacted [County Committee Member No. 1] to farm my property.  I never thought I'd have to tell you that!  It was a very hard decision to make, especially with all of the problems he caused you.  But I had to make a decision for the good of the property and for the neighbors on [location of the land].  I prayed over it so much, and hope you understand!  I still consider you and June as family and hope it can stay that way!  :(

**Exhibit 24**.

123.   As another example, on or about September 21, 2016, County Committee Member No. 1 sent a message to one of Mrs. Provost's landowners in an effort to convince said landowner to break her agreement with Mrs. Provost and, instead, allow County Committee Member No. 1 to farm on her property:

> Mrs. [landowner,] I was just checking in about the land you own on [location]. I passed over there today and noticed that Provost hasn't really done much with it this summer. It has recently been plowed but I can tell it was done in the water. There's a number of holes on the property that needs attention in order to drain the land. We are still interested in the property for next year if possible. Thanks!!! [County Committee Member No. 1].

**Exhibit 25**.

124. Mrs. Provost promptly shared this improper message with OASCR Investigator No. 1, State Executive Director No. 1, and County Executive Director No. 1 on or about September 27, 2016. *See* **Exhibit 26**. On information and belief, including the lack of records produced by the USDA in response to FOIA requests, the USDA largely ignored this complaint. *See supra* ¶¶ 128–139.

125. On information and belief, a significant, if not majority, portion of County Committee Member No. 1's farm came from convincing White landowners to break their lease agreements with Mr. Provost, Mrs. Provost, and other Black farmers in the area.

126. As landowners cancelled their lease agreements with Mrs. Provost, in or around 2017, she sought another loan from the USDA, which was denied. The USDA then rescinded the earlier emergency loan *after* Mrs. Provost had already used the proceeds for her farming operation. The USDA's basis for rescinding this loan was the debt forgiveness offered in 2015. Thus, for the first time, the USDA informed Mrs. Provost that she could not receive an additional loan given the USDA's forgiveness of the 2014 loan. While facing these difficulties, Mrs. Provost's crops were vandalized by unknown parties in or around March 2017. Mrs. Provost

filed a police report, but, to her knowledge, no suspects were identified or charges filed.  *See* **Exhibit 27**.  By the end of the 2017 season, Mrs. Provost had lost her farming operation as well.

127.   In 2016, Mr. Provost filed a Chapter 12 bankruptcy petition.  In 2017 and 2018, both the local bank lender and USDA objected to that petition.  As a result, Mr. Provost's bankruptcy petition was dismissed on February 7, 2018.  Both the bank and USDA then initiated foreclosure proceedings on Mr. Provost's collateralized assets: his home, his land, and his farming equipment.

## D.   2016 - 2018: The Provosts File Formal Civil Rights Complaints Against FSA Officials And Their Local Bank Lender.

128.   In an attempt to vindicate their rights, the Provosts began to file official complaints regarding their mistreatment.  Those complaints were met with a pattern of delay and neglect by the Defendants, who—despite documented proof in support—left the Provosts' complaints lingering for years, with no sign of any resolution.

### 1.   The Provosts' 2016 Civil Rights Complaint Against FSA County Committee Member No. 1

129.   On or about June 29, 2016, the Provosts filed a civil rights complaint with state FSA officials regarding the actions of County Committee Member No. 1. *See* **Exhibit 28**.

130.   In that complaint, both Mr. Provost and Mrs. Provost detailed their understanding that County Committee Member No. 1 had used acreage reports and information gleaned by virtue of his status as a USDA official to learn the identities of the landowners from whom the Provosts leased land and improperly disparage

both Mr. and Mrs. Provost to those individuals, motivating some landowners to break their lease agreements with the Provosts and choose County Committee Member No. 1 instead.  The Provosts attached to this Complaint a screenshot of a Facebook post County Committee Member No. 1 had made about Mr. Provost in November 2014.  At the time, Mr. Provost was challenging County Committee Member No. 1's re-election to the county committee.  When a voter posted that she was "sorry [she] could not vote for [County Committee Member No. 1]," County Committee Member No. 1 responded, saying, in relevant part:

> Also if you voted for the other candidate SHAME on you. He's the worst farmer in Iberia Parish and that's why S&&& is the way it is.  People vote clowns into positions that they are not capable of handling.  This is a Bankrupt farmer that will try to make decisions for SUCCESSFUL farmers!!!

The Provosts also included in their complaint to state officials knowledge they had obtained that County Committee Member No. 1 shared other false statements with landowners, including that operating funds were used to pay gambling or other debts.[48]  Finally, the Provosts included maps depicting the farmland County Committee Member No. 1 had acquired as a result of his defamation campaign.

131.    On or about July 1, 2016, State Executive Director No. 1 responded as follows:

> I am sorry for the delay in responding to your email, I have forwarded your complaint to our State Civil Rights Coordinator for further handling.   Investigation of this

---

[48] Notably, the loans to the Provosts were *supervised* loans, meaning that every dollar spent was approved by either the bank or the USDA.

> matter will be pursued in accordance with Agency policy and all applicable laws and regulations.  Please know that USDA takes the allegations very seriously.  You will be contacted by a representative from the Office of Civil Rights concerning your complaint.

*See* **Exhibit 29**.

132.   On or about July 7, 2016, State Executive Director No. 1 sent a follow-up email, which stated:

> Please ignore my previous message as it was sent incomplete and in error.  I apologize for the incomplete response.  I have forwarded your complaint to our State Civil Rights Coordinator and Human Resources Specialist.  We will pursue investigation of this matter in accordance with Agency policy and all applicable regulations and laws.  The person responsible for investigating your complaint will contact you.

*See* **Exhibit 30.**

133.   On or about August 2, 2016, an official from the OASCR Investigator No. 1 reached out to the Provosts regarding their June 2016 complaint concerning County Committee Member No. 1 efforts to seize their farmland.  *See* **Exhibit 31**.  After their conversation, Mrs. Provost forwarded State Executive Director No. 1's July 1, 2016 email to OASCR Investigator No. 1, explaining, "Here is a copy of the LA State Director's response regarding our complaints and how it initially reached your office."  **Exhibit 32**.  She also informed OASCR Investigator No. 1 that "[State Executive Director No. 1] also sent another email saying he was delivering our concerns to a Human Resources coordinator."  *Id.*

134.   On or about August 10, 2016, OASCR sent an acknowledgment that Mr. and Mrs. Provosts' complaint against County Committee Member No. 1 had

been accepted.  *See* **Exhibit 33**.  This complaint was assigned a case number of 16-7470.  *See id.*  On or about August 16, 2016, Mrs. Provost clarified to OASCR Investigator No. 1 that she was not Mr. Provost's legal representative and, instead, was a co-complainant.  *See* **Exhibit 34**.

135.    As referenced above, on or about September 21, 2016, Mrs. Provost shared with OASCR Investigator No. 1 another example of County Committee Member No. 1's abuse of his position and access to Mrs. Provost's information to convince a landowner to break her lease agreement with Mrs. Provost and allow him to farm on her land instead.  *See supra* ¶ 118.

136.    On or about January 5, 2017, Mrs. Provost asked OASCR for an update on the status of her complaint against County Committee Member No. 1. *See* **Exhibit 35**.

137.    On or about May 2017, OASCR Investigator No. 2 asked Mr. Provost to provide an affidavit regarding his June 2016 complaint.  Mr. Provost asked for an extension, which was granted.  On or about October 23, 2017, Mrs. Provost informed Mr. August that they would be represented by Quinton Robinson for purposes of their civil rights complaint against County Committee Member No. 1. On or about November 20, 2017, OASCR Investigator No. 3 provided a shell for an affidavit to the Provosts' attorney at that time, Mr. Quinton Robinson.

138.    On or about November 29, 2017, Mr. and Mrs. Provost provided an affidavit to OASCR Investigator No. 3.  *See* **Exhibit 36**.  In that affidavit, the Provosts referenced the September 21, 2016 text message that County Committee

Member No. 1 had sent to one of their landowners.  *See id.* at 3-4.[49]  The Provosts further alleged:

> It is believed [County Committee Member No. 1] has taken farm leases from other minority or socially disadvantaged farmers while serving as County Committee Member.  Typically or observantly, Caucasian male growers are not threatened by his behavior in Acadiana.

*Id.* at 7.

139.    On information and belief, including based on the lack of records provided in response to FOIA requests, the USDA never concluded its investigation into these allegations.  On information and belief, this complaint is *still* pending before the USDA, nearly eight years later.

### 2.    Mr. Provost's 2017 Civil Rights Complaint Against the USDA

140.    Defendants' failure to investigate the Provosts' initial complaint was not an isolated incident.  Instead, as shown by Defendants' handling of Mr. Provost's 2017 complaint, Defendants have a pattern of burying credible claims by failing to properly investigate the allegations, including failing to review the Provosts' documentary evidence in support of those allegation—such as when the Provosts showed that Mr. Provost's signature had been *photocopied* onto an unfavorable farm loan.

141.    Specifically, on June 2, 2017, Mr. Provost filed a formal civil rights complaint with the USDA.  *See* **Exhibit 37**.  Mr. Provost alleged that USDA

---

[49] *See also supra* ¶ 123.

officials and others had discriminated against him by, among other things, objecting to his Chapter 12 bankruptcy plan in ongoing bankruptcy proceedings, refusing to grant timely and adequate loans, failing to offer debt forgiveness or other financial assistance, forcing the assumption of parental debt, and approving a loan with an unauthorized, photocopied signature. That is, Mr. Provost alleged:

> Since 2007 to now, the Farm Service agency has never approved or suggested I apply or receive debt forgiveness or other loan servicing that would properly remedy my financial needs; only now, to force me into bankruptcy which may result in the total [sale] of my assets.

142. Mr. Provost continued:

> As a result of foreclosure concerns, on or about April 17, 2017, I visited FSA after I requested a review of my documentation, I discovered a handwritten note by [Farm Loan Manager No. 2], dated September 12, 2007, that falsely stated I wished to assume my father's debt.[50] On the other hand, I never wanted to take on the debt of Wenceslaus Provost Sr., but it was the only option given to me by FSA without any opportunity to apply for better assistance.

143. Mr. Provost's June 2017 civil rights complaint continued:

> For 10 years, I've operated under the coercive tactics of FSA . . ., risking retaliation and complete loss of my assets. Plus, my USDA Guaranteed loans were often late, supervised, and poorly serviced. For example, in 2014 Farm Service Agency Loan [O]fficer [No. 1] and the state office approved a USDA Guarantee of loan containing my unauthorized photo copied signature and adjusted loan amount, which resulted in the taking away of my living allowance.

144. On June 30, 2017, OASCR accepted Mr. Provost's June 2, 2017 civil

---

[50] This allegation concerned the handwritten note referenced in paragraph 62.

rights complaint.  On information and belief, including based on records provided by the USDA as the result of FOIA requests, the FSA completed a fact-finding inquiry report on July 26, 2017.[51]

145.    As part of that inquiry, on or about July 24, 2017, the FSA obtained an unsworn statement Farm Loan Manager No. 2.  *See* **Exhibit 38**.  Farm Loan Manager No. 2's statement did not address Mr. Provost's complaints regarding his treatment by the USDA and [the bank] over the previous decade.  *See id.*  Instead, Farm Loan Manager No. 2 provided excuses for why the USDA refused to give Mr. Provost a direct loan in 2015 and offered reasons why he recommended objecting to Mr. Provost's Chapter 12 bankruptcy plan.  *See id.*  On or about August 7, 2017, OASCR sent a position statement regarding Mr. Provost's Complaint, which again wrongly characterized that Complaint as only concerning the USDA's objection to Mr. Provost's Chapter 12 petition.  *See* **Exhibit 39**.  This position statement also did not address Mr. Provost's other allegations.

146.    On or about August 22, 2017, Mr. Provost amended his June 2, 2017 civil rights complaint.  *See* **Exhibit 40**.  In that amended complaint, Mr. Provost elaborated on the allegations in his June 2, 2017 civil rights complaint regarding the assumption of debt previously owed by his father:

> More specifically, U.S.D.A. Farm Service Agency (FSA) may have participated in the violation of the terms and conditions of the disbursement and closing agreement

---

[51] Because this report includes significant, confidential details regarding Mr. Provost's financial information, it is not attached this Complaint for privacy reasons.

> when the guaranteed lender . . . used the funds on or about March 6, 2009 to pay on the 2007 FSA assumption agreement rather tha[n] allow Mr. Provost, Jr. to use the loan funds as operating capital which was the intended use of the guaranteed loan.

147.   On information and belief, including records provided by the USDA as the result of FOIA requests, the USDA does not appear to have investigated these additional allegations in the Amended Complaint.

148.   On or about August 30, 2017, Mr. Provost sent OASCR Investigator No. 4 a series of emails providing attachments that documented the allegations in Mr. Provost's civil rights complaint.  *See* **Exhibit 41**.[52]  Mr. Provost provided evidence for all claims in his civil rights complaint, not just those concerning the Chapter 12 bankruptcy plan.  In particular, Mr. Provost attached evidence of the photocopied signatures underlying his 2014 farm loan.  *See id.*  As reflected in the screenshots below, the photocopying is obvious.

149.   The first signature page concerns a loan application dated April 17, 2014.  *See id.* at 7-8.  On May 7, 2014, the bank withdrew that application.  *See id.* at 7.  Mr. Provost signed this application.



150.   The second signature page is for a loan application dated May 7, 2014.  *See id.* at 10-11.  The local bank withdrew that application on May 9, 2014.  *See id.*

---

[52] Because some attachments contain private financial information, only excerpts are attached to this Complaint.

at 10.  As is shown in the image below, the second hole punch is in a slightly

different position.  *See id.* at 11.  Notably, the signature is still dated April 14, 2014.

Mr. Provost did not sign a second loan application on May 7, 2014.  This signature

was photocopied without Mr. Provost's permission.



151.   On the third signature page for a loan application dated May 9, 2014,

the hole punches actually cover the signature and the signature box itself is askew

on the page.  *See id.* at 13-14.  Mr. Provost did not sign this application either.  This

signature was photocopied without Mrs. Provost's permission.



152.   On information and belief, including records provided by the USDA as

the result of FOIA requests, the USDA never investigated this issue.  On

information and belief, the USDA only investigated the USDA's objection to Mr.

Provost's Chapter 12 bankruptcy plan.

153.   On or about September 13, 2017, Mr. Provost submitted a second

affidavit to OASCR Investigator No. 4.  *See* **Exhibit 42**.  In that affidavit, Mr.

Provost pointed out that the USDA had relied on LSU Ag recommendations as one

basis for its objection to the feasibility of his Chapter 12 bankruptcy plan, yet the

USDA had *not* used those same LSU Ag recommendations when considering the

feasibility of the loans the local bank had offered. *See id.* at 207.  Mr. Provost also supplied significant additional detail regarding the USDA's pattern and practice of discrimination against him, as evidenced by the USDA's requirement that he assume Provost Sr.'s debt and their administration of guaranteed loans throughout the years. *See id.* at 208-217.

154.    According to OASCR's final decision, it completed an investigation of Mr. Provost's 2017 civil rights complaint in one week: from October 11 through the 18, 2017.  And a "final report" was issued on November 27, 2017.  This report was not shared with Mr. Provost at the time.  On March 20, 2024, OASCR finally released a redacted version of this report to Mr. Provost pursuant to a July 2023 FOIA request. *See* **Exhibit 43**.  The report confirms that the USDA never considered any allegations other than those concerning the bankruptcy objection. *See id.*  The report further confirms that the USDA considered Mr. Provost's complaints regarding the conduct of County Committee Member No. 1 "unrelated" and did not even *include* Mr. Provost's allegations in that regard in their review. *See id.* at 2 (comments regarding Exhibit 3 to the report).

155.    On March 29, 2019, *two years* after investigating Mr. Provost's civil rights claims, the USDA's Office of the Assistant Secretary for Civil Rights denied his complaint. *See* **Exhibit 44**.  In that decision, OASCR concluded that it lacked jurisdiction to address Mr. Provost's allegation that the USDA had discriminated against him by objecting to his Chapter 12 bankruptcy plan.  OASCR did not address or consider any other allegation of discrimination, including concerning the

USDA's failure to service Mr. Provost's loans or offer debt relief, forcing Mr. Provost to assume his father's debt, photocopying his signature on adjusted loan amounts without Mr. Provost's permission, and depriving Mr. Provost of his living allowance. Instead of addressing these allegations, OASCR focused solely on Mr. Provost's complaints about the USDA's intervention in bankruptcy proceedings.  Accordingly, OASCR dismissed Mr. Provost's June 2017 civil rights complaint for "lack of jurisdiction."

156.    At no time did any USDA civil rights investigator interview Mr. Provost regarding his complaint.  On information and belief, including based on records provided by the USDA as the result of FOIA requests, at no time did any USDA civil rights investigator independently collect or review emails from the FSA officials involved in the alleged discriminatory acts or interview or collect information from the private entities involved in the discriminatory acts.  On information and belief, including based on records provided by the USDA as a result of FOIA requests, the entirety of the USDA's "investigation" of Mr. Provost's civil rights complaint focused on Chapter 12 bankruptcy proceedings without any investigation into the other alleged wrongful acts.

### 3.    Mrs. Provost's 2017 Civil Rights Complaint Against the USDA

157.    On October 23, 2017, Mrs. Provost filed a civil rights complaint against the USDA too.  *See* **Exhibit 45**.  In her complaint, Mrs. Provost pointed out that the USDA had not complied with its own regulations concerning debt service margins. She also detailed County Committee Member No. 1's efforts to convince landowners

to break their lease agreements with Mrs. Provost:

> Complainant faced discrimination in the loan making and
> loan servicing process in 2015 and 2016 when a Farm
> Service Agency county committeemen made visits to
> Complainant's sugar cane landlords and provided
> personal information about Complainant's farm
> operation. The information provided to Complainant's
> landlord damaged her relationships and reputation as a
> minority female farmer. As a result of this negativity
> information that was provided by a county
> committeemen, namely [County Committee Member No.
> 1], Complainant lost the following sugarcane leases: (I) In
> January of 2015, Farm number # 1993 owned by [name
> omitted for privacy] consisting of 38 acres of cane; (II) In
> March of 2016, Farm number #739 owned by [name
> omitted for privacy].

158. On October 30, 2017, in an email to Farm Loan Officer No. 1, Farm

Loan Manager No. 2, State Outreach Coordinator No. 1, the OASCR complaint

intake mailbox, and Mrs. Provost's attorney at that time (Quinton Robinson), Mrs.

Provost expressed her ongoing frustrations and provided additional detail of the

discrimination she had faced while farming:

> When will the USDA's, aka "The People's Department,"
> ability to participate in the wipe out of black/minority
> cane farmers stop? Do you know? Are you all going to
> continue to fraudulently claim it's our "farming
> practices?" When you stated in a meeting to [a different
> attorney], [Farm Loan Manager No. 2], [State Outreach
> Coordinator No. 1], and me that there are those who seek
> to drive my husband and myself out of business, who were
> you speaking of? So many questions, due to such poor
> loan servicing.

**Exhibit 46**. She continued:

> As a black female sugarcane farmer in Acadiana, I
> constantly felt the pressure by the agency of behaving like
> a second class citizen just to survive and cultivate land. . .
> "yes sir", "yes Mr." aka "yessa massa."

*Id.* She continued:

> Therefore, I can assure the USDA, your recollection of me is false, and appears to cover up the truth. Also, Wenceslaus Provost Jr. was not a decision maker on my farm. From time to time, he would travel with me for safety reasons, due to the retaliation I was facing while farming sugarcane in this hostile community. Are there running records detailing when I notified your office dead cats were placed in a tractor, cinder blocks placed in my field that damaged the cane cutter, or when [the bank's representative] parked alongside my farmland in a predatory manner? I was/am constantly feeling threatened by this behavior and the agency's & county committee member's complicit acts to conceal what's really going on from Iberia to Vermillion Parishes.

*Id.* On information and belief, including records provided by the USDA as the result of FOIA requests, the USDA never investigated these additional allegations.

159. On or about November 27, 2017, Mrs. Provost's attorney at that time, Quinton Robinson, sent OASCR Investigator No. 5 a supplemental submission to Mrs. Provosts' civil rights complaint. *See* **Exhibit 47**. That supplemental filing included additional detail regarding the alleged discrimination and also cross-referenced the Provosts' pending civil rights complaint against County Committee Member No. 1. *See id.* at 1. On information and belief, including records provided by the USDA as the result of FOIA requests, the USDA never investigated these additional allegations.

160. On information and belief, on February 14, 2018, the FSA completed its fact-finding inquiry for Mrs. Provost's civil rights complaint. *See* **Exhibit 48** (excerpted). In that inquiry, the FSA characterized the question presented as follows:

> Whether on April 28, 2017, Farm Service Agency (FSA)
> Officials discriminated against Complainant on the bases
> of race (African American), sex (female), marital status
> (married) and retaliation (prior civil rights activities),
> when she was determined ineligible for an emergency
> operating loan.

*Id.* at 2.  The FSA did not consider the questions of (1) whether USDA should have forced Mrs. Provost to financially separate from Mr. Provost in order to obtain a loan, (2) the FSA had offered Mrs. Provost infeasible loans, or (3) whether FSA County Committee Member No. 1 had discriminated against Mrs. Provost and breached his conflict of interest obligations by using his position and authority to target and solicit the landowners of Mrs. Provost's farm, even though a different complaint on that front was still pending before the USDA.  *See id.*

161.    On or about April 2, 2018, Mrs. Provost submitted an affidavit in support of her October 2017 civil rights request in response to questions posed by an OASCR investigator.  *See* **Exhibit 49**.  In that affidavit, Mrs. Provost provided additional detail regarding each of the allegations in her October 2018 civil rights complaint.  On or about May 8, 2018, Mrs. Provost provided a supplemental affidavit in response to additional questions.  *See* **Exhibit 50**.  This supplemental affidavit focused on Mrs. Provosts' allegations regarding County Committee Member No. 1.  *See id.*  Specifically, Mrs. Provost wrote:

> During the relevant time of my civil rights complaint,
> which is 2014 to 2016, [County Committee Member No. 1]
> served as a county committeeman.   As an active FSA
> County Committeeman, [County Committee Member No.
> 1], engaged in communications with my land lord . . . for
> the purpose of encouraging landlord . . . to cancel my
> sugar cane land rental lease and to enter into a new sugar
> cane land rental lease with . . . landlord.

*Id.* She continued:

> In 2014, I received a loan from FSA and the rental land in question was used to develop my FSA farm loan plan and farm feasibility plan. FSA employees essentially wrote and developed my loan plan and feasibility plan knowing that the land taken by [County Committee Member No. 1] was a part of my plan and without that land my plan and repayment ability would be jeopardized, leading to the failure of my farm operation. The pattern and practice at FSA of permitting an active county committeeman to ask land lord to cancel an existing lease of a farm loan borrower had and continues to have an adverse disparate impact on black female sugar cane farmer. The FSA pattern and practice of inadequate protection and use of my private land rental agreements and FSA private loan document played a role in a discriminatory system that allowed [County Committee Member No. 1] to know which land for which I had a rental agreement.

*Id.* Mrs. Provost further explained:

> It is important to note that land rental agreements are a major part of farm plan and feasibility plan. After [County Committee Member No. 1] learned about my land rental agreements and financial condition, [County Committee Member No. 1] used my personal information to interfere with my private land rental agreement. The next year of the sugar cane cycle, 2015, [County Committee Member No. 1] became the tenant on the same land for which my land lord canceled the lease. [. . .] During the discovery process which will include the presentation of affidavits, documents, interrogatories and depositions, a determination will be made that the pattern or practice explained above was not made a part of the loan application or loan servicing of [County Committee Member No. 1], a similarly situated White Male Sugar Cane Farmer.

*Id.*

162.   On or about September 20, 2019, a different OASCR investigator reached out to Mrs. Provost and apologized for the long processing delay regarding

her October 2017 complaint.  *See* **Exhibit 51**.  His letter asked Mrs. Provost to complete a consent form that she had already signed in March 2018.  *See* **Exhibit 52.** This OASCR investigator completed his investigation in a mere two days: from November 6 to 7, 2019.  The report was completed on December 12, 2019.  Mrs. Provost was not provided access to that report at that time.  Mrs. Provost only obtained a copy of that report after filing a FOIA request in July 2023.[53]

163.    On information and belief, including based on records provided by the USDA as the result of FOIA requests, the substance of that investigation was woefully inadequate.  On information and belief, including records provided by the USDA as the result of FOIA requests, at no time did any civil rights investigator contact County Committee Member No. 1 regarding Mrs. Provost's allegations that he improperly used his official position as a county committeeman to convince Mrs. Provost's landowners to break their lease agreements with her.  On information and belief, including records provided by the USDA as the result of FOIA requests, at no point did any civil rights investigator independently collect or review emails from the FSA officials involved in the alleged discriminatory acts or interview or collect information from the private entities involved in the discriminatory acts.  Instead, on information and belief, including records provided by the USDA as the result of FOIA requests, the USDA's investigation consisted of unsworn statements from FSA officials (not County Committee Member No. 1) that do not appear to be the

_____

[53] Because the report includes confidential financial information, it is not attached as an exhibit to this Complaint.

product of an interview, let alone any interrogation.

164.    On April 25, 2022, *three years* after investigating Mrs. Provost's civil rights claims and *five years* after Mrs. Provost filed her civil rights complaint, the USDA dismissed her civil rights claims as well.  *See* **Exhibit 53**.  The USDA acknowledged that Mrs. Provost had alleged a prima facie case of discrimination.  *Id.* at 6-7.  Nevertheless, OASCR ultimately credited the FSA officials' denials of wrongdoing in untested statements.  The USDA further acknowledged that Mrs. Provost's allegations regarding County Committee Member No. 1's assumption of her land leases were "troublesome" and promised to investigate this issue further.[54]

---

[54] It is worth noting that the USDA was aware it faced heightened scrutiny of their actions with respect to the Provosts.  Thus, on or about April 3, 2019, the Center for American Progress issued a report concerning the USDA's discriminatory treatment of Black farmers, outlining many of the issues the Provosts faced—*i.e.*, late, inadequate, and overcollateralized loans, among other issues.  *See* **Exhibit 54**.  In addition to describing the USDA's ongoing pattern and practice of racial discrimination against Black farmers, that report documented the discrimination faced by the Provosts specifically, as follows:

> For example, the Provost family, black cane farmers based in Louisiana, said they suffered discrimination, fraud, vandalism, and retaliation after they filed a lawsuit against [the bank] on September 21, 2018.  The Provosts allege that the bank and the USDA denied them necessary crop loans to maintain their sugarcane farm and as a result, they were forced into foreclosure.  Initially, a whistleblower informed the family that staffers within the USDA were forging their signatures to make it seem as if the Provosts had agreed to lower loan amounts.  The Provosts claim that both public and private actors are working to move the family from their farm.  The lawsuit is still ongoing.  Even post-*Pigford*, black farmers such as the Provosts need more protections against discrimination.

*Id.* at 6.  Indeed, the Provosts' story had also captured the attention of reporters from the *New York Times*.  *See* **Exhibit 55**.  When investigating that story, County Committee Member No. 1 told the *New York Times* that Mr. Provost "simply lost

*(continued on the next page)*

Nevertheless, the USDA denied Mrs. Provost's complaint *without* completing that investigation.  Indeed, on information and belief, including the lack of records provided by the USDA as the result of FOIA requests, the USDA *still* has not completed that investigation or closed the Provosts' earlier complaint regarding County Committee Member No. 1.

### E.  2022:  The USDA Refuses to Allow the Provosts To Apply For An Operating Loan

165.   Notwithstanding this extreme adversity, the Provosts have worked hard to rebuild since the loss of their large farming operations.  Although still financially separated from his wife (at the USDA's insistence), Mr. Provost was able to retain partial ownership of around 16 acres of land and, in the past couple of years, has managed to obtain informal agreements with a few landowners to cultivate approximately 100 acres in total.  The only thing standing in the way of the Provosts resuming their farm operations—whether together, or separate—is funding.

166.   In the summer of 2022, the Provosts attempted to apply for a direct operating loan from the USDA.  Under the USDA's own guidelines, "[a]n agency official will . . . not refuse to provide a requested application to any person," will

---

their acreage for one reason and one reason only: They are horrible farmers."  *Id.* at 10.  These and other reports were cited in a footnote of the USDA's decision denying Mrs. Provosts' civil rights complaint along with a promise to investigate Mrs. Provost's allegations regarding County Committee Member No. 1.  *See* **Exhibit 53** at 14-15 nn.14-17.  On information and belief, including based on the lack of records provided by the USDA pursuant to FOIA requests, nothing came of any investigation into County Committee Member No. 1.

"not discourage the prospective applicant to apply for a direct loan even when loan funds are limited or unavailable," will "not make oral or written statements that would discourage any individual from applying for assistance based on any ECOA prohibited basis (race, color, . . .)," and will "provide assistance as necessary to help applicants complete the application."  FSA Handbook - Direct Loan Making for State and County Offices 3-FLP (Rev. 2) at 3-1 ¶ 41.[55]  Despite these strict guidelines, local officials refused to allow either Mr. or Mrs. Provost to apply for a loan.  *See* **Exhibit 56**.[56]

### F.    2023:  The USDA Delayed Processing Mrs. Provost's Loan Application And Then Offered An Infeasible Loan.

167.    Last year, Mrs. Provost used her own meager funds to prepare the land for the planting season, which ends in September of each year.  On or about July 24, 2023, she sought a direct loan from the USDA for the purchase of seed cane so that she could plant her fields in accordance with best practices.  The USDA delayed processing her application for *months*, only agreeing to loan half of the amount requested in December 2023, which was after the first frost.

168.    On information and belief, the USDA routinely processes and approves loans for White farmers in the area within a matter of weeks.  Had Mrs. Provost

---

[55] https://www.fsa.usda.gov/Internet/FSA_File/3-flp_r02_a51.pdf.

[56] **Exhibit 56** is an internal FSA email chain, obtained through a FOIA request, that appear to reflect an effort to mislead and conceal about what was being done to the Provosts in order to avoid scrutiny.  Farm Loan Program Chief No. 1 wrote: "This case is sensitive.  Those are the couple with the lawsuits and were featured on the documentary."  *Id.*  He further directed FSA officials to "take the application" in the future and "[k]eep the conversation very limited."  *Id.*

received the same treatment, she would have obtained a loan in July 2023—with plenty of time to plant cane before August that same year.

169.     Instead, not only was Mrs. Provost's application delayed for approximately ***six months***—well past planting season and thereby making it impossible for her to plant sugar cane that year and yield profitable results—but also the terms she received were impossible to fulfill.  Had Mrs. Provost accepted this untimely and impractical loan, she would have been expected to plant her cane in frozen ground and somehow pay back the loan within twelve months with profits from a harvest that would not materialize.  Mrs. Provost realized she would be unable to secure funding that she could feasibly pay back, and she withdrew her loan application rather than fall into the same trap the USDA had placed for her husband from 2007 to 2014.  *See* **Exhibit 57**.

170.     At that point, the Provosts decided that Mr. Provost would apply for a microloan with the expectation that it would be approved quickly—as these loans typically are approved within a couple of weeks for White farmers—and thus secure the necessary funding to upgrade their equipment and prepare their land in order to plant sugar cane in August 2024.

171.     Before filing the application with the same Iberia and Vermillion Parish FSA Office, the Provosts tried moving their file to a different FSA office. **Exhibit 58**.  On or about December 5, 2023, the Provosts spoke with FSA Farm Loan Chief No. 1 on the phone.  During that conversation, Farm Loan Chief No. 1 explained that he understood there had been "issues" in the past, but claimed that

he had filled the office with younger employees who were more open to change.  He encouraged the Provosts to give the FSA officials in the Iberia and Vermillion Parishes another chance.

172.    On or about December 11, 2023, Mr. Provost submitted a loan application to the Loan Manager at his local FSA office.  Despite Farm Loan Chief No. 1's promises, other than a backdated notice informing Mr. Provost that his application was complete as of December 20, 2023, Mr. Provost did not receive any information regarding the status of his application for weeks.  *See* **Exhibit 59**.

173.    On or about January 17, 2024, Mr. Provost spoke with Farm Loan Manager No. 3, who mentioned that his office was currently facing increased loan volumes, which caused delays in processing Mr. Provost's application.  Mr. Provost suggested he file his application with another parish that was not experiencing similar backlog, but the Loan Manager instructed him not to refile.

174.    On January 22, 2024, Mr. and Mrs. Provost spoke with the FSA Administrator about the delay and their concerns of racial discrimination.  The FSA Administrator told them that their hands were tied without evidence.  The FSA Administrator said that without documentation that shows similar treatment for White farmers versus Black farmers, his hands were tied.  He encouraged the Provosts to ask any "White friends" whether they would be willing to provide documentation, in which case he was willing to open an investigation.  He further told the Provosts they could always file a civil rights complaint, but that USDA regulations were designed to prevent OASCR from comparing White and Black

farmers' files.  Instead, USDA regulations only permitted OASCR to compare the treatment a complainant received to the "standard of care that exists."  The FSA Administrator admitted that the USDA's practices and policies were designed to provide a lot of cover any delays in processing applications.  He concluded the call by acknowledging the "unfortunate reality" that "it takes a lot of time to undo what it took 50 years to create" and that he understood the USDA's "very best" efforts to do so were, "in a lot of cases," not enough.  In other words, the FSA Administrator's solution was for the Provosts to tolerate discrimination for the time being on blind faith that the USDA would change course after 160+ years of institutionalized racism against Black farmers.

175.    Mr. Provost next discovered that his application was delayed for another reason: the bank had told the USDA that Mr. Provost still had unpaid debt from his guaranteed loans.

176.    This was a surprise to Mr. Provost who had been led to believe that debt had been forgiven under the Inflation Reduction Act ("IRA").[57]

---

[57] "On August 16, 2022, President Biden signed the Inflation Reduction Act (IRA) into law.  Section 22006 of the IRA provided $3.1 billion for USDA to provide relief for distressed borrowers with certain Farm Service Agency (FSA) direct and guaranteed loans and to expedite assistance for those whose agricultural operations are at financial risk."  https://www.farmers.gov/loans/inflation-reduction-investments/assistance.  Section 22007 of the IRA provides financial assistance for farmers, ranchers, and forest landowners who experienced discrimination by USDA in USDA's farm lending prior to 2021.  https://www.usda.gov/media/press-releases/2023/03/01/usda-announces-next-steps-providing-financial-assistance-borrowers.

a.    On or about November 16, 2022, the FSA Administrator had

sent a letter to the bank with information about the IRA and to ask for

assistance in making borrower accounts, including Mr. Provost's, current.  In

response to this letter, the bank submitted three status reports in early 2023

with the past due amounts for three loans in Mr. Provost's name.

b.    On or about April 7, 2023, the USDA wrote a letter to the bank

confirming that Mr. Provost met the criteria for loan forgiveness under the

IRA and that the U.S. Treasury had issued a check.  The letter specified that

the "payment [was] intended to ***cure the delinquency on all qualifying***

***loans*** and bring [Mr. Provost's] guaranteed loans current."  **Exhibit 60**

(emphasis added).

c.    On information and belief, the bank did not apply the funds

provided by the USDA to cover the remaining balance on all of Mr. Provost's

qualified loans and instead refunded approximately $1.2 million back to the

USDA.  Mr. Provost was not informed by either the USDA or the bank of this.

As far as Mr. Provost was concerned, his debt had been forgiven.  Indeed, on

August 29, 2023, the USDA confirmed with Mr. Provost that his eligible debt

had been resolved.

d.    It was not until months later, as Mr. Provost was trying to

secure a loan, that he learned from the bank that he still had a debt balance

of approximately $50,000.  On December 22, 2023, the bank explained that

after they refunded the USDA, they applied what was left of the USDA funds

to Mr. Provost's outstanding balances on each of the loans, which left approximately $50,000 unforgiven.  In other words, rather than use the money that the USDA had sent to cure Mr. Provost's unpaid loans, the bank had refunded that money *back* to the USDA and left Mr. Provost still $50,000 in debt.  It is unclear why the bank handled the funds as they did, but once more the bank and the FSA would thwart Mr. Provost's ability to farm.

177.   On or about February 2, 2024, Farm Loan Manager No. 3 informed Mr. Provost that they would not finance his loan because the bank claimed that Mr. Provost had outstanding debt.  In that same email, the FSA admitted how difficult it has been for Mr. Provost to secure a loan, something which should have taken about two weeks: "I recognize that this has taken longer than you had anticipated; as you can see this has been ***multiple complex situations layered upon one another***."  **Exhibit 61** (emphasis added).  On information and belief, the FSA did nothing to confirm the validity of the claimed debt.

178.   On February 6, 2024, having now delayed Mr. Provost's application for months by keeping a debt balance that Mr. Provost had now discovered, the bank abruptly cancelled the debt.  Mr. Provost immediately informed the FSA of this development and asked the USDA to reassess his farm loan application.[58]

179.   On or about February 26, 2024, the USDA mailed a loan approval

---

[58] On or about February 9, 2024, the FSA notified Mr. Provost that he would receive a $20,000 check, payable to him and the bank.  The stated purpose of this check is additional IRA assistance.  Given that the bank cancelled any outstanding debt, Mr. Provost is unsure what to do with these funds and has sought guidance from the USDA.

letter to Mr. Provost.  *See* **Exhibit 62**.  That letter promised that "[l]oan funds will be made available to you within 15 business days of approval."  *Id.*  However, as had been done in the past, the USDA continues to delay processing Mr. Provost's loan well into the growing season.  Despite signing loan documents on March 4, 2024, only $6,000 of funds have been disbursed to-date.  Further, Mr. Provost recently learned that the USDA's loan amounts did not include sufficient funds for land rent, which totals approximately $10,800.  When asked about this omission, on or about March 15, 2024, Farm Loan Manager No. 3 offered no solution and simply wrote: "you will have to come up with the remaining balance to cover the difference." **Exhibit 63**.  The "difference" in question was over $4,000.

180.    Mr. Provost still has not been able to secure necessary financing for his farm operations consistent with LSU Ag guidelines.  This time is crucial to prepare his land for the upcoming planting season.  Preparations include servicing equipment, ensuring proper functioning of implements, and addressing crucial tasks such as changing oil, filters on tractors, and replacing bearings on disks. February marks a critical period when sugarcane farmers focus on chopping headlands, ensuring field drainage, shredding cane, and applying necessary chemicals to the crop.  The urgency of these activities cannot be overstated, as they lay the foundation for a successful harvest.  But February and March have now come and gone.  No matter when the USDA *finally* allows Mr. Provost to begin preparing the land for planting, he is now at a considerable disadvantage.

181.    Delays in obtaining a loan result in postponed spraying, allowing damaging weed seeds to sprout and create an infestation.  The consequence of this is twofold—increased expenses due to the necessity of more costly chemicals, and a domino effect that disrupts the entire farming process.  This includes setbacks in fertilizing, the application of chemicals, and crucial tasks like laybying.[59]  Late fertilizing, especially during a rainy season, can have severe repercussions on crop yield.  Moreover, the absence of timely chemical application and fertilization



jeopardizes the entire harvest.  On top of that, Mr. Provost needs to pay land rent:  if he fails to do so, he risks losing his land leases.  Landowners reliant on timely land rent payments may observe unattended fields, potentially straining Mr. and Mrs. Provost's relationships and reputations within the community.  Timely financial support is essential for maintaining the delicate balance of Mr. and Mrs. Provost's operation and ensuring a successful and sustainable farming season.  On

---

[59] Laybying is the process of applying dirt to help the sugarcane from falling and protect it from cold for the upcoming year.  It is done after the fields are fertilized and immediately before planting.



information and belief, other local farmers have made substantial progress on these activities already, as evidenced by the screenshots from a local farmer concerning his sugarcane farming activities this month included herein.

## III.   THE PROVOSTS' EXPERIENCES ARE NOT UNIQUE.

182.   Since the fall of 2023, the Provosts have met with other Black farmers in the area and from around the country to share their story and hear others' experiences.  The Provosts hosted such meetings at their farm shop on September 16, 2023 and December 16, 2023.  During these meetings, farmers from Iberia, Vermillion, La Fourche, and St. James, and St. Martin parishes gathered and discussed the discrimination they have faced at the hands of USDA officials throughout their farming history.  Over 40 farmers attended these meetings on the Provosts' property.  The Provosts also attended virtual meetings with farmers from around the country who have discussed the discrimination they have faced at the hands of USDA officials over the years.  These meetings were largely facilitated by the Rural Coalition in the context of preparing to apply for relief under Section 22007 of the Inflation Reduction Act.

183.   Most of these farmers once had large farming operations, just like the Provosts.  On information and belief, those who attended the meetings at the Provosts' farm shop once had farms of at least 1,000 acres.  Nearly all of them have

been reduced to a few acres due to the same discriminatory treatment the Provosts faced. Several lost land to FSA County Committee Members in various parishes, including County Committee Member Nos. 1 and 2. The vast majority of farmers who took over the lost land were White males.

184. These farmers shared stories of discriminatory treatment by USDA officials that echoed the Provosts' experiences. All reported loss of farmland due to inadequate and untimely loans, disrespectful interactions with USDA officials, refusals to offer equal treatment, including access to USDA programs and benefits that should be available to all farmers, overcollateralization requirements that put everything at risk, supervised bank accounts, and the USDA's utter failure to investigate civil rights complaints.

185. One farmer shared with the Provosts an interaction with Iberia Parish Farm Loan Manager No. 1, in which he said: "I will never give you a loan. You will never be successful. I don't lend to *your kind*." In another instance, Farm Loan Manager No. 1 told Mr. Provost's first cousins that Farm Loan Manager No. 1 would give them a loan to purchase a sugarcane cutter "*over my dead body*." Farm Loan Manager No. 1 also told another farmer that "you're not gonna succeed" when attempting to apply for a loan. Farm Loan Manager No. 1 told another farmer that he "would not give him another dime," despite the farmer's consistent history of paying farm loans. When another farmer recently tried to obtain his running record from the Vermillion Parish Office in the fall of 2023, an FSA official

said: "We don't have that mess over here.  That junk is gone."[60]

186.    These stories echo the Provosts' experience with the USDA's treatment of them as Black farmers.  Like the Provosts, these were generational Black farmers of significant skill whose families had survived Jim Crow policies.  Yet, their farms could not survive the slow death of infeasible, untimely loans from an agency determined to see them fail.

## IV.    THE USDA INAPPROPRIATELY WITHHELD DOCUMENTS IN RESPONSE TO FREEDOM OF INFORMATION ACT REQUESTS

187.    As their family farm was slowly crushed, Mr. and Mrs. Provost tried to figure out why their cries for equal treatment had gone unanswered.  Here, too, they faced delays and obfuscation.  On July 14, 2023, they submitted a Freedom of Information Act (FOIA) request to the USDA for records pertaining to their 2017 civil rights complaints.  *See* **Exhibit 64** (excerpted).  On July 31, 2023, the USDA processed the request, concluded that the request "reasonably describes the records sought."[61]  *See* **Exhibit 65**.  On August 7, 2023, the USDA promised to produce the requested records on or before September 5, 2023.  *See* **Exhibit 66**.

188.    The USDA failed to produce records as promised by September 5, 2023.  When the Provosts reached out on September 11, 2023, the USDA indicated that the request was taking a "bit longer than the estimated time to provide the records."

---

[60] This same FSA official said to Mr. Provost that "New Orleans needed that clean out" in the wake of Hurricane Katrina.

[61] "Reasonably describes" "means a request [was] described in such a way as to enable component personnel familiar with the subject of the request to locate them with reasonable effort." 7 C.F.R § 1.3(c)(1).

**Exhibit 67**.  The Provosts reached out twice more to request an updated timeline for production.  The USDA did not respond.  *See* **Exhibit 68**.

189.    On September 22, 2023, the USDA made a partial production of documents, around half of which were almost entirely redacted.  On October 10, 2023, counsel for Mr. and Mrs. Provost asked for a timeline of when the USDA would complete its production of documents and asked to discuss the USDA's improper redactions.

190.    On October 11, 2023, counsel for Mr. and Mrs. Provost spoke with the USDA regarding the request.  *See* **Exhibit 69**.  During the conversation, counsel specifically asked the USDA to produce the investigative reports associated with the dismissal of the Mr. and Mrs. Provost's 2017 civil rights complaints.  *See id*.  The USDA indicated that they would be able to produce additional documents in one week.  *See id*.  The USDA further stated that they had around 900 pages of documents in their possession.  *See id*.  On October 16, 2023, counsel for Mr. and Mrs. Provost followed up regarding the USDA's promise to produce documents.  *See id*.  There was no response.  *See id*.  On October, 23, 2023, the Provost's again followed up.  *See id*.  The USDA did not respond.  *See id*.  On October 31, 2023, the Provosts followed up once more.  *See id*.  The USDA indicated that they were available to speak the following day, November 1, 2023.  *See id*.

191.    On November 1, 2023, counsel for Mr. and Mrs. Provost spoke with the USDA regarding the FOIA request.  The USDA said that it might not have permission to produce the requested investigative reports because they were the

"property" of the OASCR.  When asked if the USDA intended to withhold documents on that basis, the USDA indicated they did not.  Nevertheless, in an abundance of caution, Mr. and Mrs.  Provost submitted an online FOIA request to OASCR.  *See* **Exhibit 70**.  Later that day, the USDA promised to produce the remaining documents by November 10, 2023, over two months after the USDA's September 5, 2023 estimate, and nearly three months after the initial request.

192.    On November 2, 2023, the USDA reached out to say that it would not produce the requested investigative reports because they were the property of OASCR.  The USDA further instructed Mr. and Mrs. Provost to submit a FOIA request to OASCR by email, and they promptly did so.  In addition, counsel for Mr. and Mrs. Provost asked the USDA whether any other departments or subdivisions possessed records pertaining to their FOIA request.  *See* **Exhibit 71** (excerpted).

193.    On November 2, 2023, a FOIA analyst wrote back and asked for further clarification on the FOIA request—*i.e.*, the same request the USDA already acknowledged "reasonably describes the records sought."  *See* **Exhibit 72**.  He further asked the Provosts to identify the "one BEST page of record" that could be provided on November 2, 2023.  *Id.*  He then accused Mr. and Mrs. Provost of trying to "skip the line," despite having a pending request for nearly four months.  *Id.* Finally, the FOIA analyst refused to identify any other USDA subdivisions that possessed the sought records.  *See id.*  Counsel for Mr. and Mrs. Provost responded to correct the record, making clear that they have been trying to obtain these records since July 2023, already described the sought records in sufficient detail,

and again reiterated the request for the immediate release of the investigative reports associated with the dismissal of the Provosts' civil rights complaints. *See id.*

194.   Consequently, Mr. and Mrs. Provost were forced to submit multiple, additional requests to different subdivisions of the USDA because of the FOIA analyst's refusal to identify any other USDA subdivisions in possession of records pertaining to Mr. and Mrs. Provost's 2017 civil rights complaints.  Mr. and Mrs. Provost are not in a position to know how the USDA organizes its own records, and the USDA chose to delay production of documents, and refused to cooperate with identifying where records might be found.

195.   On November 8, 2023, another FOIA officer informed the Provosts that the OIG likely had records in response to a portion of the Provosts' FOIA request, particularly a referral by OASCR to OIG to investigate misconduct on the part of County Committee Member No. 1, as alleged in the Provosts' civil rights complaints. On the same day, counsel for the Provosts spoke to a FOIA liaison officer regarding the status of the various FOIA requests.  She indicated that OIG would not formally process the Provosts' FOIA request until they submitted a separate request for documents.  A separate request for documents was submitted on November 8, 2023, which remains pending.  *See* **Exhibit 73**.  The Provosts' FOIA request to OASCR also remains pending.  *See* **Exhibit 74**.

196.   Pursuant to 5 U.S.C. § 552(a)(6)(A)(i), the USDA was required to make a determination within 20 working days of receiving each FOIA request, unless within the 20-day period, pursuant to § 552(a)(6)(B)(i), the USDA provided Plaintiff

written notice that the USDA had determined that "unusual circumstances" apply and was thereby seeking an extension of no more than 10 working days.  5 U.S.C. §§ 552 (a)(6)(A)(i), (a)(6)(B)(i).  The USDA has violated the 20- or 30-working-day deadline to provide a determination for each of the Mr. and Mrs. Provost's requests as required by FOIA.

197.    The USDA's failure to make determinations concerning Mr. and Mrs. Provost's requests within the required time period violates 5 U.S.C. §§ 552(a)(6)(A)(i) and (B)(i), as well as the USDA's own FOIA regulations.  *See* 7 C.F.R. § 1.6(d).  For each of the foregoing requests (or aspects thereof), the USDA has not stated which documents will be produced or withheld, provided reasons for any withholding, or informed Mr. and Mrs. Provost of appellate rights.  The USDA thus has not made a determination as required by FOIA.

198.    As stated above, the 20- or 30-working-day time limit for a determination has expired for each request at issue, and Mr. and Mrs. Provost are therefore "deemed to have exhausted . . . administrative remedies" with respect to the foregoing FOIA violations.  5 U.S.C. § 552(a)(6)(C)(i).  FOIA thus authorizes Mr. and Mrs. Provost to bring suit in this District to compel prompt production and enjoin continued wrongful withholding of records responsive to their requests. 5 U.S.C. § 552(a)(4)(B).

## **CLASS ALLEGATIONS**

199.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the first class is defined as follows:

> All Black farmers whose farm loan applications were delayed and/or denied on account of race within the last five years.

200. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the second class is defined as follows:

> All Black farmers whose civil rights complaints regarding discriminatory acts by or with the acquiescence of the USDA have not been timely and adequately investigated in accordance with law within the last six years.

201. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the third class is defined as follows:

> All Black farmers who applied for a federal farm program with the USDA and had their applications denied or reduced within the last five years based on delinquent USDA debts that the USDA has acknowledged should be forgiven on account of past discrimination.

202. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the fourth class is defined as follows:

> All Black farmers who lost land leases to USDA officials—including county committee members—who had access to information provided by socially disadvantaged farmers when applying for federal farm programs with the USDA.

203. **Numerosity**: The Class is so numerous that joinder of all its members is impracticable.  On information and belief, thousands of Black farmers still remain despite the USDA's best attempts to drive them out of the farming business altogether.  Statistical evidence and the USDA's own records support the conclusion that individualized resolution of these issues is impracticable.

204. **Commonality**: Common questions of law and fact exist as to the Class members.  The USDA has acknowledged (repeatedly) that its policies have created a

pattern and practice of racial discrimination against Black farmers since the USDA's inception.  This pattern and practice of discriminatory treatment and discriminatory impact manifests in many forms, such as delayed loans, infeasible loans, denied applications, failure to investigate civil rights complaints, and non-adherence to conflict of interest rules.  The discrimination the Provosts suffered since 2007 (and earlier) are just examples of the discrimination Black farmers have faced at the hands of the USDA for generations.

205.  **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and Class members were denied equal access to credit under the USDA's loan program, fair and impartial civil rights investigations, and were unjustly targeted by USDA officials for personal profit as a result of the USDA's discriminatory conduct as described herein.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members.  The Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

206.  **Adequacy**: Plaintiffs fairly and adequately represent the interests of the Class members.  Plaintiffs' interests do not conflict with the interests of the other Class members they seek to represent.  Plaintiffs have retained competent counsel experienced in the underlying legal issues and complex class action litigation who have agreed to prosecute this case pro bono.  Plaintiffs will prosecute this action vigorously.

207.  **Predominance and Superiority**:  Common issues predominate here

on account of the USDA's admitted racist policies and practices.  Class resolution is superior to individualized actions given the potential for inconsistent results, the USDA's admissions regarding common policies that lead to discriminatory treatment and impact for Black farmers, and the judicial efficiencies to be gained by resolution on a class wide basis.

## FIRST CLAIM FOR RELIEF

(Violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 et seq.)

208.    Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

209.    The Equal Credit Opportunity Act ("ECOA") prohibits creditors from discriminating against applicants on the basis of, among other things, race and color.  15 USC § 1691(a)(1).  To state a claim, a plaintiff must allege: (1) discrimination on the basis of race, color, religion, national origin, sex or marital status, or age (2) by a creditor (3) as to any aspect of a credit transaction.  *See id.* Violations of this mandate can subject creditors to civil liability resulting in actual damages, punitive damages, equitable or declaratory relief, and the prevailing party's recovery of costs and fees.  15 USC §§  1691e(a)-(d).  ECOA anticipates that such actions may be brought by a class.  15 USC 1691e(a).

210.    Plaintiffs and Class members are "applicants" under the ECOA.

211.    The USDA, including the FSA, is a "creditor" under the ECOA and is subject to the ECOA's requirements and prohibitions.

212.    The ECOA creates a private right of action against a creditor who

violates its anti-discrimination provisions.  Specifically, the ECOA provides that a

"creditor who fails to comply with any requirement imposed under this subchapter

shall be liable to the aggrieved applicant for any actual damages sustained by such

applicant acting either in an individual capacity or as a member of a class."

15 U.S.C. § 1691e(a).

213.   The ECOA further authorizes "equitable and declaratory relief as is

necessary to enforce the requirements imposed under this subchapter."  15 U.S.C.

§ 1691e(c).

214.   The USDA has violated the ECOA, 15 USC § 1691(a), by unlawfully

discriminating against Plaintiffs and Class members on the basis of their race.

Specifically, as described herein, the USDA and FSA have discriminated against

Plaintiffs and Class members by, among other things, failing to timely process loan

applications, denying loan applications or causing them to be withdrawn, failing to

conduct due diligence to confirm Plaintiffs' and Class members current debt,

subjecting loans to adverse terms and burdensome supervision, and failing to

properly service loans.

215.   Plaintiffs and Class members seek all monetary, declaratory,

injunctive, and other relief available under the ECOA to remedy the conduct of the

USDA in connection with it discriminatory loan practices as alleged herein.

### SECOND CLAIM FOR RELIEF

(Administrative Procedures Act, 5 U.S.C. §§ 701 et seq.)

216.   Plaintiffs, on behalf of themselves and all other similarly situated,

incorporate by reference the allegations of the foregoing paragraphs as if set forth

fully herein.

217.    The Administrative Procedures Act ("APA") subjects agency action to judicial scrutiny except where specifically precluded by statute or committed to agency discretion by law.  *See* 5 U.S.C. § 701(a).  "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  *Id.* § 702.

218.    "[A]gency action otherwise is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."  5 U.S.C. § 704.

219.    Courts have the power to: "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; . . . and (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."  5 U.S.C. § 706.  "In making the foregoing determinations, the court shall review the whole record or those parts of its cited by a party, and due account shall be taken of the rule of prejudicial error."  *Id.*

220.    The USDA has violated the APA by unlawfully discriminating against Plaintiffs and Class members on the basis of their race.  Specifically, as described

herein, the USDA has discriminated against Plaintiffs and Class members by, among other things, failing to timely process loan applications, failing to conduct due diligence to confirm Plaintiffs' and Class members current debt, subjecting loans to adverse terms and burdensome supervision, failing to properly service loans, failing to investigate civil rights complaints, and failing to enforce its conflict of interest regulations.

221.   Plaintiffs and Class members seek all declaratory, injunctive, and other relief available under the APA to remedy the conduct of the USDA in connection with it discriminatory practices as alleged herein.

### THIRD CLAIM FOR RELIEF

(Due Process under the Fifth Amendment)

222.   Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

223.   The Constitution prohibits the federal government from depriving citizens "of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. 5.  Further, the Constitution forbids the federal government from discriminating on the basis of race.  *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

224.   The USDA's allocation of funds disproportionately favored White farmers, while disadvantaging Black farmers.  The extreme nature of the disparate impact belies and evidence intentional discriminatory motives in the design, implementation, and administration of the program, as supported by the USDA's

admissions that it has discriminated against minority farmers.

225.   Plaintiffs and Class members suffered damages by not receiving funds and by receiving less funds than they would have received.

226.   Plaintiffs and Class members seek all available relief to remedy the equal protection violations associated with the USDA's discriminatory loan practices.

## FOURTH CLAIM FOR RELIEF

(Mandamus Act, 28 U.S.C. § 1361)

227.   Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

228.   "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

229.   Mandamus relief may only issue "to compel the performance of 'a clear nondiscretionary duty.'" *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988) (quoting *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)).  Plaintiffs must also exhaust "all other avenues of relief" in order to qualify for a writ of mandamus.  *Heckler*, 466 U.S. at 616.

230.   No conflicts of interest: "An employee is prohibited by criminal statute, 18 U.S.C. 208(a), from participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he or any person whose interests are imputed to him under this statute has a financial interest, if the

particular matter will have a direct and predictable effect on that interest." 5 C.F.R. § 2635.402(a).

231. Plaintiffs have demonstrated a clear right to an order that the USDA bar County Committee Member No. 1 and all other USDA Committeemen from supervising, reviewing, or participating in decision-making on loan applications where the USDA Committeeman has a demonstrated financial interest in ensuring that the applicant does not receive a loan, or in using confidential information obtained via their position as a USDA Committeeman to further their personal financial interests.

232. As recounted above, the facts establish that County Committee Member No. 1, a White member of the USDA, specifically sabotaged Black farmers' efforts to obtain and pay off their loans. Despite his clear duty not to use his position as a USDA Committeeman to further his personal financial interests, County Committee Member No. 1 used confidential information regarding specific loan applicants, and otherwise acted unlawfully, to ensure that landowners would terminate their business relationships with Black farmers and transfer their business to him, for his personal financial gain. Because those actions violated mandatory USDA rules, mandamus is warranted.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Judgment)

233. Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

234.   An actual controversy exists between Plaintiffs and Class members on one hand, and Defendants on the other, as to their rights with respect to the USDA's loan programs administered by the FSA.

235.   Plaintiffs and Class members pray that this Court declare and determine, pursuant to 28 U.S.C. § 2201, that the USDA and FSA have violated and denied the rights of Plaintiffs and the Class members as to: (a) the statutory right of Plaintiffs and Class members to equal credit under the ECOA, 15 U.S.C. § 1691(a), with respect to USDA's direct loan programs administered by the FSA; and (b) the constitutional right of Plaintiffs and Class members to equal protection under the Fifth Amendment in connection with the distribution of funds.

236.   Plaintiffs and Class members also pray that the Court grant any necessary and appropriate relief as permitted by 28 U.S.C. § 2202.

## SIXTH CLAIM FOR RELIEF

### (Freedom of Information Act)

237.    Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

238.    Plaintiffs properly requested records within the possession, custody, and control of the USDA.  USDA is an agency subject to FOIA.  The USDA was required under 5 U.S.C. § 552(a)(3) to conduct a reasonable search for records responsive to Plaintiffs' FOIA requests.  The time under 5 U.S.C. § 552(a)(6) for the USDA to conduct such a search and make a determination as to each of Plaintiffs' abovementioned FOIA requests, informing Plaintiffs which documents the USDA

intends to produce and withhold, and the reasons for withholding any documents, has expired.

239.   The USDA has wrongfully failed to make and communicate to Plaintiff a determination as to each of Plaintiffs' FOIA requests.  Pursuant to 5 U.S.C. § 552(a)(3)(A), the USDA was required to promptly produce all responsive records that are subject to disclosure under FOIA.  The USDA has wrongfully failed to make such a production as to any of Plaintiffs' FOIA requests.  Plaintiffs have exhausted administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

240.   Plaintiffs are entitled to an order compelling the USDA to conduct reasonable searches sufficient to locate responsive records and to expeditiously produce all responsive records, subject to withholdings agreed to by the parties or approved by the Court.

241.   To facilitate determination of the validity of any withholdings based on FOIA exemptions the USDA may ultimately assert, Plaintiffs seek an order compelling the USDA to produce indexes justifying redactions to or withholding of responsive records.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial of all issues triable by a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that this Court enter judgment against Defendants as follows:

a)  An Order finding and declaring that the USDA has unlawfully discriminated

against Plaintiffs in connection with the USDA's loan program in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a) and the Administrative Procedures Act, 5 U.S.C. § 551;

b) An Order finding and declaring that the USDA's treatment of Plaintiffs in connection with the USDA's loan program violated Plaintiffs' constitutional right to equal protection and due process;

c) Enter a permanent injunction requiring the USDA to enact department-wide change to ensure equitable and timely consideration of Black farmers' loan applications, including an oversight committee to audit the disbursement of USDA program benefits and any other such initiative as articulated in the Equity Commission's *Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All*;

d) Enter a permanent injunction stripping USDA county committee members of access to sensitive information about competitor-farmers and require the USDA to enforce their conflict of interest regulations;

e) Award monetary relief pursuant to 15 U.S.C. §§ 1691e(a) and (c);

f) Award attorney's fees and costs to Plaintiffs under 42 U.S.C. § 1988, 15 U.S.C. § 1691e(d), and 28 U.S.C. §2412, and any other applicable statute or authority; and

g) Such other and further declaratory, injunctive, and monetary relief as the Court may deem just, proper, or equitable.

Dated:  March 29, 2024

Wilson Sonsini Goodrich & Rosati
Professional Corporation


*s/ Robin S. Crauthers*
Robin S. Crauthers (D.C. Bar No. 1659397)
John B. Kenney (D.C. Bar No. 1520911)
(admission to D.D.C. bar pending)
1700 K Street, NW
Washington, DC 20006
Telephone: (202) 973-8800
rcrauthers@wsgr.com
jkenney@wsgr.com

Ariel C. Green Anaba (*pro hac vice* admission forthcoming)
Luis Li (*pro hac vice* admission forthcoming)
Paul Watford (*pro hac vice* admission forthcoming)
Mark Yohalem (*pro hac vice* admission forthcoming)
Matthew Macdonald (*pro hac vice* admission forthcoming)
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
aanaba@wsgr.com
luis.li@wsgr.com
pwatford@wsgr.com
mark.yohalem@wsgr.com
matthew.macdonald@wsgr.com

Deno Himonas (*pro hac vice* admission forthcoming)
15 West South Temple
Gateway Tower West, Suite 1700
Salt Lake City, UT  84101-1560
Telephone: (801) 401-8520
dhimonas@wsgr.com

Luke Liss (*pro hac vice* admission forthcoming)
650 Page Mill Road

Palo Alto, CA 94304
Telephone: (650) 493-9300
lliss@wsgr.com

*Attorneys for Plaintiffs*
*Wenceslaus Provost Jr. and Angela Provost*

**TABLE OF EXHIBITS**

| # | Date | Description | First Reference |
|---|------|-------------|-----------------|
| **1** | N/A | USDA Officials Key | n.36 |
| **2** | 2006-08-30 | Letter from a local bank to Provost Sr. informing | ¶ 57 |
| **3** | 2007-09-12 | Handwritten FSA note re requirement that Mr. Provost assume his father's debts | ¶ 62 |
| **4** | 2014-04-22 | Email from Farm Loan Officer No. 1 to Mr. Provost containing a growers' summary | ¶ 73 |
| **5** | 2015-04-28 | Email from Farm Loan Officer No. 1 to Mr. Provost providing expense/income verification ratios | ¶ 80 |
| **6** | 2013-03-11 | Email from Farm Loan Officer No. 1 to Mr. Provost regarding plan to reduce size of farm | ¶ 86 |
| **7** | 2014-03-04 | Email from Dr. Kurt Guidry to Mr. Provost re potential funding scenarios | ¶ 92 |
| **8** | 2014-03-10 | Email from Dr. Kurt Guidry to Mr. Provost re potential funding scenarios | ¶ 93 |
| **9** | 2014-03-17 | Email from Mr. Provost to Dr. Guidry and Dr. Patin re liquidation concerns | ¶ 94 |
| **10** | 2014-05-08 | Email from Mr. Provost to State Outreach Coordinator No. 1 re discriminatory treatment | ¶ 98 |
| **11** | 2014-05-09 | Email from Mr. Provost to multiple USDA officials re discriminatory treatment | ¶ 99 |
| **12** | 2014-05-09 | Letter from landlord terminating lease agreement with Mr. Provost | ¶ 99 |

| # | Date | Description | First Reference |
|---|------|-------------|-----------------|
| **13** | 2021-04-29 | Declaration of former Assistant Secretary for Civil Rights for the USDA Joe Leonard | ¶ 100 |
| **14** | 2014-05-20 | Email from State Executive Director No. 1 to Mrs. Provost re USDA-mandated post-nuptial agreement | ¶ 102 |
| **15** | 2014-05-23 | Email from State Executive Director No. 1 and other USDA officials to Mrs. Provost re loan application | ¶ 105 |
| **16** | 2014-05-21 | Email from Farm Loan Officer No. 1 to Mrs. Provost providing annual cash flow summary for 2014 | ¶ 106 |
| **17** | 2014-05-29 | Email chain between local bank, Farm Loan Officer No. 1 and Mr. Provost re closing on operating loan | ¶ 109 |
| **18** | 2014-06-02 | Email from Mr. Provost to State Executive Director No. 1 and State Outreach Coordinator No. 1 re loan status and discriminatory treatment | ¶ 110 |
| **19** | 2014-06-17 | Email from the Provosts to Farm Loan Officer No. 1 re status of the fields | ¶ 111 |
| **20** | 2018-10-30 | Debbie Weingarten, 'It's not fair, not right': how America treats its black farmers, The Guardian | ¶ 114 |
| **21** | 2015-01-01 | Mrs. Provost asks multiple USDA officials for assistance with vandalism | ¶ 115 |
| **22** | 2015-07-12 | Mr. Provost emails multiple USDA officials re refusal to give a direct loan and discriminatory treatment | ¶ 118 |
| **23** | 2015 | Farm Loan Officer No. 1's revenue | ¶ 119 |

| # | Date | Description | First Reference |
|---|------|-------------|-----------------|
| | | loss calculations | |
| 24 | 2017-06-06 | Landowner texts Mrs. Provost that County Committee Member No. 1 is taking over property | ¶ 122 |
| 25 | 2016-09-21 | County Committee Member No. 1 texts landowner about taking over Mr. Provost's farm | ¶ 123 |
| 26 | 2016-09-27 | Mrs. Provost emails multiple USDA officials regarding County Committee Member No. 1's attempts to take over Mrs. Provost's farm | ¶ 124 |
| 27 | 2017-03-05 | Mrs. Provost files a police report for vandalism | ¶ 126 |
| 28 | 2016-06-29 | Provosts send complaint re County Committee Member No. 1's farm takeover activities | ¶ 129 |
| 29 | 2016-07-01 | State Executive Director No. 1 email to Provosts' re complaint re County Committee Member No. 1 | ¶ 131 |
| 30 | 2016-07-07 | State Executive Director No. 1 follow-up email to Provosts' re complaint re County Committee Member No. 1 | ¶ 132 |
| 31 | 2016-08-02 | Mrs. Provost's email to OASCR Investigator No. 1 | ¶ 133 |
| 32 | 2016-08-02 | Mrs. Provost's email to OASCR Investigator No. 1 | ¶ 133 |
| 33 | 2016-08-10 | OASCR sends a response to the Provosts' complaint re County Committee Member No. 1 | ¶ 134 |
| 34 | 2016-08-16 | Mrs. Provost clarifies that she is not Mr. Provost's counsel for purposes of the complaint against County | ¶ 134 |

| # | Date | Description | First Reference |
|---|---|---|---|
| | | Committee Member No. 1 | |
| 35 | 2017-01-05 | Mrs. Provost asks for an update regarding complaint against county Committee Member No. 1 | ¶ 136 |
| 36 | 2017-11-29 | Provosts' affidavit regarding complaint against County Committee Member No. 1 | ¶ 138 |
| 37 | 2017-06-02 | Mr. Provost files a civil rights administrative complaint against FSA officials | ¶ 141 |
| 38 | 2017-07-24 | Farm Loan Manager No. 2 statement re Mr. Provost's civil rights complaint | ¶ 145 |
| 39 | 2017-08-07 | OASCR position statement re Mr. Provost's civil rights complaint | ¶ 145 |
| 40 | 2017-08-22 | Mr. Provost files an amended civil rights administrative complaint against FSA officials | ¶ 146 |
| 41 | 2017-08-30 | Mr. Provost emails OASCR Investigator No. 4 re Mr. Provost's civil rights complaint | ¶ 148 |
| 42 | 2017-09-13 | Mr. Provost provides a second affidavit in support of his civil rights complaint | ¶ 153 |
| 43 | 2017-11-27 | OASCR's Report of Investigation for Mr. Provost's civil rights complaint | ¶ 154 |
| 44 | 2019-03-29 | USDA's dismissal of Mr. Provost's civil rights complaint | ¶ 155 |
| 45 | 2017-10-27 | Mrs. Provost files an administrative civil rights complaint against FSA officials | ¶ 157 |
| 46 | 2017-10-30 | Mrs. Provost emails multiple USDA | ¶ 158 |

| # | Date | Description | First Reference |
|---|---|---|---|
| | | officials regarding discriminatory acts | |
| 47 | 2017-11-27 | Mrs. Provost supplements her civil rights complaint | ¶ 159 |
| 48 | 2018-02-14 | Excerpts from FSA fact-finding inquiry report for Mrs. Provost's civil rights complaint | ¶ 160 |
| 49 | 2018-04-02 | Mrs. Provost provides an affidavit to support her civil rights complaint | ¶ 161 |
| 50 | 2018-05-08 | Mrs. Provost provides a supplemental affidavit to support her civil rights complaint | ¶ 161 |
| 51 | 2019-09-20 | OASCR investigator asks Mrs. Provost to fill out a form she already filled out and apologizes for the long delay | ¶ 162 |
| 52 | 2018-03-14 | Mrs. Provost's records consent form | ¶ 162 |
| 53 | 2022-04-25 | OASCR decision on Mrs. Provost's civil rights complaint | ¶ 164 |
| 54 | 2019-04-03 | Center for American Progress, Progressive Governance Can turn the Tide for Black Farmers | n.54 |
| 55 | 2019-08-14 | Khalil Gibran Muhammad, The sugar that saturates the American diet has a barbaric history as the 'white gold' that fueled slavery, The New York Times (Aug. 14, 2019) | n.54 |
| 56 | 2022-05-27 | Email chain between USDA officials re denial of service to the Provosts | ¶ 166 |
| 57 | 2023-12-03 | Mrs. Provost rescinds farm loan application after the USDA offers an infeasible loan | ¶ 169 |

| # | Date | Description | First Reference |
|---|------|-------------|-----------------|
| **58** | 2023-12-05 | Mr. Provost exchanges text message with Farm Loan Program Chief No. 1 | ¶ 171 |
| **59** | 2024-01-02 | Farm Loan Manager No. 3 emails regarding the status of Mr. Provost's loan application | ¶ 172 |
| **60** | 2023-04-07 | USDA letter to local bank re IRA payments | ¶ 176(b) |
| **61** | 2024-02-06 | Farm Loan Manager No. 3 emails regarding status of Mr. Provost's loan application | ¶ 178 |
| **62** | 2024-02-26 | Notification of loan approval | ¶ 179 |
| **63** | 2024-03-15 | Farm Loan Manager No. 3 emails regarding inadequacy of Mr. Provost's loan | ¶ 179 |
| **64** | 2023-07-14 | Provosts' FOIA request | ¶ 187 |
| **65** | 2023-07-31 | USDA acknowledges the FOIA request reasonably described the sought after records | ¶ 187 |
| **66** | 2023-08-07 | USDA promises to produce requested FOIA records by September 5, 2023 | ¶ 187 |
| **67** | 2023-09-11 | USDA says their FOIA response is delayed | ¶ 188 |
| **68** | 2023-09-19 | The Provosts' counsel asks for an update on the FOIA request | ¶ 188 |
| **69** | 2023-11-01 | Email chain with USDA FOIA officer re the Provosts' FOIA request | ¶ 190 |
| **70** | 2023-11-01 | OASCR acknowledgment of FOIA request | ¶ 191 |
| **71** | 2023-11-02 | Correspondence between the Provosts' counsel and the USDA re | ¶ 192 |

| # | Date | Description | First Reference |
|---|------|-------------|-----------------|
| | | the Provosts' FOIA request | |
| **72** | 2023-11-02 | Correspondence between the Provosts' counsel and the USDA re the Provosts' FOIA request | ¶ 193 |
| **73** | 2024-03-19 | OIG status update on FOIA request | ¶ 195 |
| **74** | 2024-03-28 | OASCR's interim FOIA response | ¶ 195 |