# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WENCESLAUS PROVOST JR**. and **ANGELA PROVOST,** both individually and on behalf of all others similarly situated, | **Case No.:  1:24-cv-0920-TJK** |
| | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| **THOMAS J. VILSACK**, in his official capacity as the SECRETARY OF AGRICULTURE and his successors in interest, 1400 Independence Avenue, S.W. Washington, D.C. 20250, | |
| *and* | |
| **THE UNITED STATES DEPARTMENT OF AGRICULTURE**, 1400 Independence Avenue, S.W. Washington, D.C. 20250, | |
| Defendants. | |

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................. 1

THE PARTIES ............................................................................................... 5

SUBJECT MATTER JURISDICTION ............................................................ 9

PERSONAL JURISDICTION AND VENUE ................................................. 9

FACTUAL BACKGROUND ......................................................................... 10

    I.    The USDA's Systemic, Racial Discrimination Against Black
        Farmers ......................................................................................... 10

        A.    The Widespread Practice of USDA Discrimination in
               Federal Loan Programs .............................................. 17

        B.    The Widespread Practice of Ignoring USDA Policy When
               Investigating Black Farmers' Civil Rights Complaints ............ 21

        C.    The Widespread Practice of Ignoring Conflict of Interest
               Regulations for County Committee Members ........................... 25

    II.    The Provosts' generations of farming sugarcane in the face of
        racial discrimination ..................................................................... 27

        A.    The Provosts Lose Their 4,000+ Acre Family Farm
               Because of Widespread Discrimination in USDA
               Guaranteed and Direct Loan Administration ........................... 33

        B.    The Provosts' Civil Rights Complaints Are Ignored
               Because of the USDA's Widespread Practice of Ignoring
               Its Own Rules for Processing Complaints and Enforcing
               Conflict of Interest Restrictions. ................................................. 46

        C.    The Provosts' Efforts to Rebuild Are Hampered by the
               USDA's Continued Widespread Discrimination When
               Administering Direct Loans. ........................................................ 56

        D.    The USDA Arbitrarily and Capriciously Calculated the
               Provosts' Awards Under Section 22007 ..................................... 66

    III.    The Provosts' Experiences Are Not Unique. ......................................... 67

CLASS ALLEGATIONS ............................................................................... 70

    I.    Proposed Class Definitions: ................................................................. 70

    I.    Numerosity: ........................................................................................... 73

    II.    Commonality / Predominance: ............................................................. 74

A.   Disparate Treatment (Equal Credit Opportunity Act and Due Process Claims) ............................................... 74

B.   Disparate Impact (Equal Credit Opportunity Act claim) .......... 82

C.   Civil Rights Investigations (Administrative Procedures Act claims) ............................................................ 86

D.   Conflict of Interest Violations (Administrative Procedures Act Claims) ........................................................ 87

E.   Discrimination Financial Assistance Program (Administrative Procedures Act claim) ....................... 88

III.   Typicality: ............................................................. 88

IV.   Adequacy: ............................................................. 89

V.   Superiority: ........................................................... 89

VI.   Rule 23(b)(2): ......................................................... 90

VII.   Rule 23(c)(4): ......................................................... 91

FIRST CLAIM FOR RELIEF ....................................................... 91

SECOND CLAIM FOR RELIEF ................................................... 93

THIRD CLAIM FOR RELIEF ...................................................... 95

FOURTH CLAIM FOR RELIEF .................................................. 99

FIFTH CLAIM FOR RELIEF ..................................................... 102

SIXTH CLAIM FOR RELIEF .................................................... 104

SEVENTH CLAIM FOR RELIEF ............................................... 107

EIGHTH CLAIM FOR RELIEF .................................................. 108

DEMAND FOR JURY TRIAL .................................................... 109

PRAYER FOR RELIEF ............................................................. 109

## NATURE OF THE CASE

1.      The United States Department of Agriculture ("USDA") has never

given Black farmers a fair deal.  It has engaged in widespread discrimination

against Black farmers for over a *century*.  As Congress explained, "during the past

century, Black farmers have lost between 15 and 20 million acres of land and the

***hundreds of billions of dollars*** of generational wealth that land represented."

167 Cong. Rec. S1219, S1265 (Mar. 5, 2021) (emphasis added).[1]  "The cause of the

loss of so much Black-owned farmland and the loss of so many Black farmers is not

a mystery."  *Id.*  "Federal court decisions, the U.S. Commission on Civil Rights, and

the USDA itself have all told us that a primary cause of that loss was long standing,

pervasive discrimination by the USDA."  *Id.*

2.      But, despite acknowledging this racist history and the USDA's

continued preference for White farmers over Black and other minority farmers, and

despite Secretary Vilsack's recent acknowledgement before Congress of the USDA's

"systemic racism and discrimination"[2] and the USDA's need to change its practices,

the USDA has not changed.  It has not changed its discriminatory policies and

practices, retrained the personnel who implemented them, or done ***anything*** to

---

[1] To be clear, "the past century" is not the recidivist post-Reconstruction era in
which freed slaves were systematically dispossessed of the limited rights and
resources they had gained following the Civil War, nor was it the centuries of
slavery that preceded the Civil War.  The Congress was addressing living
memory—the present more than the past.

[2] Agriculture Secretary Thomas J. Vilsack, Opening Statement Before the
House Committee on Agriculture – Remarks as Prepared (Mar. 25, 2021),
https://www.usda.gov/media/press-releases/2021/03/25/opening-statement-thomas-
j-vilsack-house-committee-agriculture (hereinafter "*Vilsack Statement*").

stop widespread discrimination against Black farmers. Instead, it maintained those same policies, empowered the same people to do the same things, and continued the same practices that led to admission after admission of racial discrimination against Black farmers. In other words, the USDA **knowingly** chose to keep discriminating. As a result, the USDA continues to treat Black farmers like Wenceslaus ("June") Provost Jr. and Angela Provost less favorably than White farmers in virtually all of Black farmers' dealings with the USDA and its local official agents.

3.     For over a decade, Mr. and Mrs. Provost (collectively, "Plaintiffs" or the "Provosts") applied for and were denied equal access to federal farm loan programs on account of their race. Consistent with the USDA's longstanding and pervasive policy and practice of discriminating against Black farmers, USDA officials refused to process the Provosts' loans in a timely manner. Under these same discriminatory policies, USDA officials decided Mr. Provost should make do with 25 to 50% of the funding White farmers were given for the same number of acres. These discriminatory policies and practices blessed officials' insistence that the Provosts should have supervised loan accounts where official signoff was required before a single dollar could be spent. And the USDA's discriminatory policies placed White, competitor County Committee Members in positions of authority despite obvious conflicts of interest, positions they used to enrich themselves by targeting and taking over the Provosts' land. And when the Provosts did not have the funds to fertilize, weed, spray, water, plant, and harvest at the right time because of the

USDA's untimely and inadequate loans, USDA officials said the Provosts were just "bad farmers."

4.      Mr. Provost is, in fact, an award-winning farmer whose family has farmed sugarcane in Louisiana for generations.



5.      The Provosts did not just accept this discriminatory treatment. Starting in 2016, the Provosts filed formal civil rights complaints asking the USDA to investigate and correct the discriminatory practices of its empowered local officials.  The USDA, contrary to its own timing requirements for processing

complaints,[3] sat on those complaints for *years*.  When it finally investigated *some* of the allegations, its investigations were far from fair, impartial, and diligent.  These "investigations" flew in the face of the then-governing departmental manual's requirements of "impartiality," thorough evidence collection and analysis, and application of a preponderance of the evidence standard.[4]  Indeed, the Provosts' earliest civil rights complaint *still* has not been resolved eight years later.

6.    This, too, is a discriminatory policy and practice that traces back decades.  The USDA has a longstanding and pervasive practice of failing to investigate the civil rights complaints of Black farmers, as is required by the *USDA's own regulations*.  Thus, the USDA not only maintained its policy of discrimination in the first instance (*i.e.*, discriminatory treatment in the loan application process), it also discriminated against Black farmers like the Provosts when investigating those civil rights violations.

7.    The Provosts did not want to file suit.  They only want to work their family farm with the same government provided resources and opportunities given

---

[3] *See* USDA Departmental Manual 4330-1, §§ 6.II.2 & App'x B (Oct. 18, 2000), https://perma.cc/EP44-8NC5 (hereinafter "USDA DM 4330-1") (requiring investigation to be completed within 120 days and final agency decision to be provided to complainant within 180 days); USDA Departmental Regulation 4330-002, § 10(f)(4) (Mar. 3, 1999) (hereinafter "USDA DM 4330-002") (requiring investigation to be complete within 180 days); Office of the Inspector General, *USDA Oversight of Civil Rights Complaints* 7, Audit Report 60601-0001-21, Sept. 2021 (hereinafter, "OIG, *USDA Oversight of Civil Rights Complaints*") (noting USDA's directives set a 180-day complaint processing time limit that "the public may reasonably expect that USDA officials [we]re following" because "the directives [we]re publicly available on USDA's website" and "there was no evidence that OASCR officials canceled the directives").

[4] *See* USDA DM 4330-1 §§ 3.II.3, 3.III, & 4.

FIRST AMENDED CLASS ACTION          -4-
COMPLAINT

to others.  For the past two years they met with USDA officials, including officials in the national office in Washington, D.C.  To date those outreach efforts have failed.  The USDA *still* refuses to give the Provosts adequate, timely, and feasible farm loans.

8.      Connecting with other Black farmers, both in Louisiana and across the nation, the Provosts discovered their experiences with the USDA were far from unique.  Other Black farmers shared remarkably similar stories of inadequate and untimely loans, unequal treatment by USDA officials, refusals of service, overcollateralization requirements, supervised bank accounts, and the USDA's delays and utter failures in investigating Black farmers' civil rights complaints.

9.      Accordingly, the Provosts bring this lawsuit on behalf of themselves and all similarly situated Black farmers to stop the USDA's widespread discriminatory practices and to obtain compensation for the significant harm they have suffered due to these practices.

## **THE PARTIES**

10.     Plaintiff Wenceslaus Provost Jr. ("Mr. Provost" or "June Provost") is a Black farmer who has been denied equal treatment under the law by the USDA.  He is a resident of the state of Louisiana.  For decades, USDA officials have discriminated against Mr. Provost when administering federal loan programs.  Worse still, USDA officials also targeted his farm to enrich themselves—despite,

and in violation of, conflict-of-interest regulations meant to prevent such self-dealing behavior.  Mr. Provost tried to avail himself of the USDA's administrative process to stop this discrimination, but the USDA refused to investigate and properly and timely resolve his complaints—treatment that is itself discriminatory, arbitrary, capricious, and in violation of the USDA's regulations and departmental



directives.

11.     Plaintiff Angela Provost ("Mrs. Provost" or "Angie Provost") is a Black farmer who has been denied equal treatment under the law by the USDA.  She is a resident of the state of Louisiana.  For the past decade, USDA officials have discriminated against Mrs. Provost when administering

federal loan programs.  USDA officials also targeted her farm to enrich themselves in violation of conflict-of-interest regulations preventing such self-dealing behavior.  Like her husband, Mrs. Provost also tried to avail herself of the USDA's administrative process to stop this discrimination, but the USDA refused to timely investigate and properly resolve her complaints—treatment that itself is discriminatory, arbitrary, capricious, and in violation of the USDA's regulations and

departmental directives.

12.     The Provosts have
struggled to maintain their sugarcane
farm in Louisiana.  Like many Black
farmers in the area and throughout
the country, they have personally
borne the discriminatory impact of
the USDA's long history of racist
policies and practices that resulted
and continue to result in the unequal
treatment of Black farmers when
compared to their White



counterparts.  This happened despite the fact that the Provosts are award-winning
farmers and public figures.[5]  Their story has been covered widely by *The New York
Times*,[6] *The Guardian*,[7] NBC Left Field,[8] and other media outlets.[9]  In 2022, the

---

[5] *See* https://www.provostfarmllc.com/.

[6] *See* https://www.nytimes.com/2019/10/04/podcasts/1619-slavery-sugar-farm-land.html; *see also* https://www.nytimes.com/interactive/2019/08/14/magazine/sugar-slave-trade-slavery.html; https://podcasts.apple.com/us/podcast/1619/id1476928106?i=1000452394193.

[7] *See* https://www.theguardian.com/world/2018/oct/30/america-black-farmers-louisiana-sugarcane.

[8] *See* https://www.youtube.com/watch?app=desktop&v=q-WIZIL4ag&feature=youtu.be#dialog.

[9] *See, e.g.*, https://www.youtube.com/watch?v=pQmaxB9MwfI; https://civileats.com/2020/02/28/resistance-served-2020-centers-the-power-of-black-women-in-food/; https://talkpoverty.org/2019/05/01/case-reparations-black-farmers/;

(*continued on the next page*)

Provosts received the 2022 Illuminating Injustice Award by the nonprofit organization Public Justice.[10]  Even this public spotlight did not put a stop to the discrimination they and other Black farmers face.



13.     Defendant Thomas James Vilsack is the Secretary of Agriculture and is sued in his official capacity.  Mr. Vilsack performs his duties as the Secretary of

---

https://crooked.com/podcast/we-deserve-better-with-angie-june-provost/;
https://www.thenorthstar.com/p/black-farmers-are-americas-future;
https://offkiltershow.medium.com/the-hidden-racism-on-americas-farms-254b0a0ad64c; https://www.americanprogress.org/issues/economy/reports/2019/04/03/467892/progressive-governance-can-turn-tide-black-farmers/.

[10] *See* https://www.youtube.com/watch?v=DYoq7mM3XZg&t=20s.

Agriculture from USDA headquarters in Washington, D.C.

14.     Defendant the United States Department of Agriculture ("USDA") is an executive department of the United States headquartered in Washington, D.C. It is "made up of 29 agencies and offices with nearly 100,000 employees . . . at more than 4,500 locations across the country and abroad."[11]  Subject to amendment following discovery, the subagencies most relevant to this case are the Farm Service Agency ("FSA"), the Office of the Assistant Secretary for Civil Rights ("OASCR"), and the Office of the Inspector General ("OIG").

## SUBJECT MATTER JURISDICTION

15.     This Court has subject matter jurisdiction over Plaintiffs' Equal Credit Opportunity Act Claim under 15 U.S.C. § 1691e(f), 28 U.S.C. §§ 1331, 1343, 1346(b)(1), 1361 and 42 U.S.C. § 2000d.

16.     This Court has subject matter jurisdiction over Plaintiffs' Administrative Procedure Act claim under 5 U.S.C. § 706, 28 U.S.C. §§ 1331, 1343, 1346(b)(1), 1361 and 42 U.S.C. § 2000d.

17.     This Court has subject matter jurisdiction over Plaintiffs' Fifth Amendment claim under 28 U.S.C. §§ 1331, 1343, 1346(b)(1), 1361 and 42 U.S.C. § 2000d.

## PERSONAL JURISDICTION AND VENUE

18.     This Court has personal jurisdiction over this matter because the USDA is headquartered in Washington, D.C., many of the discriminatory and

---

[11] *About USDA*, U.S. Dep't of Agric., https://www.usda.gov/our-agency/about-usda.

unlawful acts alleged herein occurred in Washington, D.C., and all Defendants acting in their official capacities did so from Washington, D.C.

19.     Venue is appropriate in this Court under 28 U.S.C. § 1391(b) and (e)(1) because USDA headquarters are in Washington, D.C.  *See also* 5 U.S.C. § 703; 15 U.S.C. § 1691e(f).

## FACTUAL BACKGROUND

## I.     THE USDA'S SYSTEMIC, RACIAL DISCRIMINATION AGAINST BLACK FARMERS

20.     The USDA was established in the middle of the Civil War, in 1862, "to acquire and to diffuse among the people of the United States useful information on subjects connected with agriculture, rural development, aquaculture, and human nutrition, in the most general and comprehensive sense of those terms, and to procure, propagate, and distribute among the people new and valuable seeds and plants." 7 U.S.C. § 2201.  President Abraham Lincoln once called it "The People's Department."[12]  Historically, however, the USDA has functioned as The *White* People's Department and has been dubbed "the last plantation." *Pigford v. Glickman*, 185 F.R.D. 82, 85 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000).[13]

21.     Over the past century, the USDA's discriminatory practices accomplished a systematic dispossession and decimation of Black farmers. According to the 1920 Census, of the "6,448,343 farms in the United States . . . ,

---

[12] *See* https://www.usda.gov/media/blog/2012/05/11/secretarys-column-peoples-department-150-years-usda.

[13] *See also* https://www.npr.org/2021/06/04/1003313657/the-usda-is-set-to-give-black-farmers-debt-relief-theyve-heard-that-one-before.

5,498,454 or 85.3 per cent, were operated by white farmers, and 949,889, or 14.7 per cent, by colored farmers, including 925,708 Negroes, 16,680 Indians, 6,892 Japanese, and 609 Chinese."[14]  "A century later, data from the 2017 Census of Agriculture indicated that Black farmers own fewer than 2.9 million acres, less than a fifth of what they owned in 1920."  167 Cong. Rec. S1219, S1262.  "A Tufts University analysis estimated the value of that lost farmland at more than $120 billion in lost opportunities."  *Id.*; *see also id.* at S1265 (acknowledging that minority farmers lost "hundreds of billions of dollars of generational wealth").  **Figure 1** shows that as Black ownership of farmland has drastically declined over the past

---

[14] U.S. Dept' of Commerce: Bureau of the Census, FOURTEENTH CENSUS OF THE UNITED STATES TAKEN IN THE YEAR 1920, 293 (1920), https://books.google.com/books?id=6tLrAAAAMAAJ&pg=PA293&lpg=PA293&dq=%22number+of+farm+operators+in+the+united+states,+with+per+cent+distribution,+by+race,+1900+to+1920%22&source=bl&ots=NHvvXE2W1O&sig=ACfU3U2pp7PgGiB-tMCU9zsq6JNMn70Pyw&hl=en&sa=X&ved=2ahUKEwjbxoe-9YP7AhUEJEQIHWRICVYQ6AF6BAgJEAM#v=onepage&q=%22number%20of%20farm%20operators%20in%20the%20united%20states%2C%20with%20per%20cent%20distribution%2C%20by%20race%2C%201900%20to%201920%22&f=false.

century, White ownership has been relatively consistent.[15]



**THE LOST AGRARIANS**
The number of Black farmers has dropped precipitously over the past century.



**BOOM AND BUST**
While white ownership of farmland held steady relative to 1910, Black ownership dropped by 90 percent.

Source: Land Loss and Reparations Project analysis of US Census Bureau and USDA data

**Figure 1: Chart from Mother Jones Analysis of Census and USDA Data**

---

[15] https://www.motherjones.com/food/2021/04/black-land-matters-farmers-justice-leah-penniman-fannie-lou-hamer-cory-booker-land-tenure/.

22.     This decline is not surprising.  Per Congress's own findings, the USDA has, since its inception, favored White farmers, a byproduct of "longstanding and widespread discrimination" against racial and ethnic minorities.  H.R. Rep. No. 117-7, at 12 (2021).  "Despite multiple lawsuits, numerous government reports, and the limited programs created by Congress since the 1980's attempting to address the disproportionately low rates of agricultural spending on socially disadvantaged groups, USDA farm loan and payment programs continue to disproportionately benefit farmers who are not racial or ethnic minorities."  *Id.*

23.     As Representative David Scott, Chairman of the Committee on Agriculture, put it: "Black farmers and other farmers of color have received a small share of the USDA farm loans and payments as a result of discrimination."  167 Cong. Rec. H762, H765 (daily ed. Feb. 26, 2021).  "When these producers did receive loans or payments, many of them were not provided timely or proper loan servicing options due to discrimination, which led to producers of color losing their land and operations."  *Id.*  "The systemic discrimination against Black farmers and other farmers of color by USDA is longstanding and well-documented and continues to present barriers for these producers to participate in the agricultural economy."  *Id.*

24.     As Senator Debbie Stabenow explained, America's millions of farmers of color have faced persistent discrimination, including from the USDA.  "One-fifth of all rural Americans—10.5 million people—are people of color."  167 Cong. Rec. S1219, S1262 (daily ed. Mar. 5, 2021).  But "[f]or Black, Native American, Hispanic and Latinx, and Asian American farm families, their experience in the agricultural

economy is markedly different than their White counterparts." *Id.* "This has been particularly true when it comes to the interactions between farmers of color and the U.S. Department of Agriculture." *Id.* Indeed, decade after decade, the USDA was found to engage in pervasive discrimination.

25.    In 1965, the U.S. Commission on Civil Rights found that the USDA discriminated against its minority employees and discriminated while delivering its programs. Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture, A Report of the United States Commission on Civil Rights (1965) (https://files.eric.ed.gov/fulltext/ED068206.pdf).

26.    "In the early 1970s, USDA was also regarded by some observers as an agency deliberately working to force minority and socially disadvantaged farmers off their land through its loan practices." Jody Feder and Tadlock Cowan, CRS, *Garcia v. Vilsack: A Policy and Legal Analysis of a USDA Discrimination Case* 2, February 2013 (https://nationalaglawcenter.org/wpcontent/uploads/assets/crs/R40988.pdf).

27.    In 1982, a Civil Rights Commission report found that the Farmers Home Administration, a precursor to the Farm Service Agency, "***may be involved in the very kind of racial discrimination that it should be seeking to correct***." P. Browning, et al., The Decline of Black Farming in America 186, Commission on Civil Rights, Washington, D.C. (Feb. 1982) (https://files.eric.ed.gov/fulltext/ED222604.pdf) (emphasis added).

28.     In 1997, a report by the Civil Rights Action Team found that "[d]espite the fact that discrimination in [USDA's] program delivery and employment has been documented and discussed, it continues to exist to a large degree unabated." USDA, *Civil Rights at the United States Department of Agriculture: A Report by Civil Rights Action Team* 2, February, 1997 (hereinafter "USDA, *Civil Rights at the United States Department of Agriculture*") (https://acresofancestry.org/wp-content/uploads/2021/01/CRAT-Report-.pdf).

29.     In 2011, a Civil Rights Assessment completed by Jackson Lewis LLP on behalf of the USDA "substantiated claims of denial of equal program access and continuing institutional discrimination." Jackson Lewis LLP, *Independent Assessment of the Delivery of Financial and Technical Assistance ("Civil Rights Assessment")*, viii, March 31, 2011 (hereinafter, "Jackson Lewis Assessment") (https://perma.cc/8X6Q-GZ5V).

30.     Between 1999 and 2012, the USDA settled class actions brought by Black farmers (*Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) and *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1 (D.D.C. 2011)), Native American farmers (*Keepseagle v. Johanns*, 236 F.R.D. 1 (D.D.C. 2006)), Hispanic farmers (*Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009)), and female farmers (*Love v. Connor*, 525 F. Supp. 2d 155 (D.D.C. 2007)) alleging rampant discrimination by the department. *See* Stephen Carpenter, *The USDA Discrimination Cases:* Pigford, In Re Black Farmers, Keepseagle, Garcia, *and* Love, 17 Drake J. Agric. L. 1, 13-34 (2012).

31.     By the U.S. government's own admission, over a century of USDA discrimination continues to this day.  "Congress recognizes the longstanding systemic discrimination against farmers of color by USDA."  167 Cong. Rec. S1219, S1264 (Mar. 5, 2021).  But Congressional remedies to end USDA discrimination against Black and other minority farmers "are still not enough as there is still ongoing and pervasive discrimination leaving socially disadvantaged farmers significantly behind."  *Id.*  Likewise, "[s]ettlements resulting from the *Pigford* and *Keepseagle* lawsuits . . . have not provided the relief necessary for these farmers of color to participate fully in the American agricultural economy."  *Id.*

32.     In March 2021, Agriculture Secretary Vilsack recognized that the USDA and Congress "must redress the discrimination that has proven to be systemic, evidently reflecting the way [the USDA and Congress] have designed or implemented [their] programs, laws, and regulations."  *See Vilsack Statement.*

33.     Secretary Vilsack admitted that "past actions . . . focus[ed] on determining whether producers can prove specific, individualized discrimination . . . have failed to do the necessary work tailored to addressing the systemic discrimination socially disadvantaged producers face."  *Id.*

34.     FSA Administrator Zach Ducheneaux further "recognize[d] that socially disadvantaged farmers and ranchers have faced systemic discrimination with cumulative effects that have, among other consequences, led to a substantial loss in the number of socially disadvantaged producers, reduced the amount of farmland they control, and contributed to a cycle of debt that was exacerbated

during the COVID-19 pandemic." FSA Administrator Zach Ducheneaux, *American Rescue Plan Socially Disadvantaged Farmer Debt Payments* (Mar. 26, 2021), https://www.farmers.gov/blog/american-rescue-plan-socially-disadvantaged-farmer-debt-payments.

35.     Despite admitting that Black farmers face *systemic* discrimination in the USDA's administration of loans "reflecting the way [the USDA and Congress] have designed or implemented [their] programs, laws, and regulations," the USDA continues to rely upon the same discriminatory systems. *See Vilsack Statement.*

36.     There are many instances of widespread discrimination against Black farmers by USDA officials. This First Amended Complaint focuses on three: (A) the widespread practice of discrimination when administering direct and guaranteed farm loan programs; (B) the widespread practice of ignoring USDA policy when investigating civil rights complaints of Black farmers; and (C) the widespread practice of ignoring conflict of interest regulations for county committee members. Each is discussed below.

### A.     The Widespread Practice of USDA Discrimination in Federal Loan Programs

37.     The USDA administers both guaranteed and direct farm loan programs for farmers. It has a long, well-documented history of discriminating against Black farmers when doing so.[16] Given this lengthy history, Congress

---

[16] *See, e.g.*, USDA, *Civil Rights at the United States Department of Agriculture*; Vera J. Banks, U.S.D.A., Rural Development Research Report No. 59, Black Farmers and Their Farms (Jul. 1986) (https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1982_USDA-History.pdf); P. Browning, et al.,

(<em>continued on the next page</em>)

ordered the USDA to "ensure that members of socially disadvantaged groups will receive [USDA] loans . . . ." 7 U.S.C. § 2003(a)(1); *accord id.* § 2003(c)(1).  Despite this directive, the USDA has utterly failed to administer its loan programs equitably.

38.     As is discussed in more detail later, there have long been stark disparities between the treatment that Black and White farmers receive when seeking USDA guaranteed or direct loans.  As the USDA's own experts have acknowledged, these differences cannot be explained away by race-neutral factors. *See, e.g.*, Declaration of Alicia M. Robb, Ph.D., *Miller v. Vilsack*, No. 4:21-cv-595-O (N.D. Tex. Mar. 11, 2022), ECF No. 168-2 (hereinafter "*Robb Declaration*").

39.     Indeed, in 2021, President Biden signed the $1.9 trillion American Rescue Plan, a stimulus law intended to deliver immediate relief to Americans in light of the economic crisis from the COVID-19 pandemic, which included a $4 billion program to help Black and other socially disadvantaged farmers.  When litigating the constitutionality of that program, the USDA argued this relief for Black farmers was necessary because of "***strong evidence***, including testimony and reports spanning decades and up to the enactment of [the plan], documenting

---

The Decline of Black Farming in America, Commission on Civil Rights, Washington, D.C. (Feb. 1982) (https://files.eric.ed.gov/fulltext/ED222604.pdf); Bob S. Bergland, Secretary of Agriculture, A Time to Choose: Summary Report on the Structure of Agriculture (Jan. 1981) (https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1981_A_Time_to_Choose.pdf); Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture, A Report of the United States Commission on Civil Rights (1965) (https://files.eric.ed.gov/fulltext/ED068206.pdf).

discrimination against minority farmers in USDA programs and its lingering

effects, thereby necessitating the remedial action in [the plan]."  Defs' Resp. in Opp.

to Pltf's Mot. for Prelim. Inj. at 1-2 (emphasis added), *Wynn v. Vilsack*, No. 3:21-cv-

00514-MMH-LLL (M.D. Fla. Jun. 4, 2021), ECF No. 22.

40.    These disparities stem both from the deeply rooted culture of

discrimination across the organization and the USDA's policies governing the

approval and administration of loans and review of civil rights complaints.

Specifically, as outlined below, USDA directs its local officials through Handbooks,

which include Eligibility Requirements governing loan approval and provide

common direction on the administration of loans.  Despite repeated recognition that

the USDA's loan approval and administration policies and practices discriminate

against Black farmers, the USDA continues to rely on these same policies and

practices, with predictable results.

41.    The USDA directs its local officials through FSA Handbooks, which set

out the requirements for loan eligibility, approval, and administration.  *See, e.g.*,

FSA Handbook – Guaranteed Loan Making and Servicing 2-FLP (Rev. 1, Amend.

62) (hereinafter "FSA Handbook – Guaranteed Loan Making and Servicing"),

https://www.fsa.usda.gov/Internet/FSA_File/2-flp_r01_a62.pdf; FSA Handbook -

Direct Loan Making.[17]

---

[17] These handbooks have not materially changed over time and their
discriminatory policies constitute continuing violations.  *See, e.g.*, FSA Handbook –
Guaranteed Loan Making and Servicing 2-FLP (Rev. 1, Amend. 6) (Oct. 9, 2008),
https://www.fsa.usda.gov/Internet/FSA_File/2-flp.pdf; FSA Handbook – Direct
(*continued on the next page*)

42.     Through these Handbooks, and the requirements therein, the USDA sets a common policy for how its local officials make decisions regarding both guaranteed and direct loans, including loan eligibility and the use of conditions such as requiring recipients to agree to supervised bank accounts.  These Handbooks have not materially changed over time, and the USDA ***knows*** their application has led to widespread discrimination against Black farmers.  By refusing to implement any material change to the policies contained therein, or to process loan applications centrally, the USDA continues to engage in a pattern and practice of discrimination against Black farmers, as evidenced by the stark disparity in approval rates, loan amounts, processing times, terms, and servicing options—disparities that cannot be explained by race-neutral factors.

43.     For example, and as is discussed further later, *see infra*, Class Allegations, § II, the USDA knows that Black farmers' credit histories are impacted negatively by losses caused by past and ongoing discrimination at the hands of USDA officials.  *See, e.g.*, Declaration of William D. Cobb at 27, ¶ 84, *Miller v. Vilsack*, No. 4:21-cv-595-O (N.D. Tex. Mar. 11, 2022), ECF No. 168-1 (hereinafter "*Cobb Declaration*").  Yet, the USDA still *requires* USDA officials to take credit history into account and has a widespread practice of not adjusting or mitigating poor histories on the part of Black farmers.  *See* FSA Handbook – Direct Loan Making, Part 4, Section 1; FSA Handbook – Guaranteed Loan Making and

---

Loanmaking 3-FLP (Rev. 1, Amend. 3) (Jan. 6, 2009), https://www.fsa.usda.gov/Internet/FSA_File/3-flp-r1.pdf.

Servicing, Part 8, section 1.  This widespread pattern and practice bakes in discrimination against Black farmers.

> **B.** **The Widespread Practice of Ignoring USDA Policy When Investigating Black Farmers' Civil Rights Complaints**

44.     The USDA has never honored its promise to ensure that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity of an applicant or recipient receiving Federal financial assistance from the Department of Agriculture or any Agency thereof."  7 C.F.R. § 15.1(a).  As detailed by the Court in *Pigford*, in 1983, the "Department of Agriculture *disbanded* its Office of Civil Rights and stopped responding to claims of discrimination."  185 F.R.D. at 85 (emphasis added).  "These events were the culmination of a string of broken promises that had been made to African American farmers for well over a century."  *Id.*  Things have not materially changed.

45.     Today, the USDA has a nominal civil rights office called the Office of the Assistant Secretary for Civil Rights ("OASCR").  That is, the USDA *accepts* civil rights complaints from farmers who have experienced discrimination.  But it then *dismisses* them, often after years of delay.  OASCR accomplishes its goal of dismissing civil rights complaints that land on its door by engaging in a sham investigation process designed to drag out for years.  This delay is intended to exhaust farmers' statute of limitations under the Equal Credit and Opportunity Act, and OASCR would succeed in doing so were it not for equitable tolling.

46.     During all relevant periods, the USDA's civil rights complaint investigation and resolution process was governed by Departmental Manual 4330-1, "Procedures for Processing Discrimination Complaints and Conducting Civil Rights Compliance Reviews in USDA Conducted Programs and Activities."  The Departmental Manual established that in order to enforce the USDA's policy prohibiting discrimination, the USDA must "[f]airly and efficiently respond[] to discrimination complaints filed against [it]." *See* USDA DM 4330-1 § 2.

47.     The Departmental Manual was publicly available on the USDA's website, causing complainants to reasonably expect the USDA would follow its own policies for processing discrimination complaints.  *See Review of the Office of the Inspector General Report on USDA Oversight of Civil Rights Complaints* 32, Hearing Before the Subcommittee on Nutrition, Oversight, and Department Operations of the Committee on Agriculture, House of Representatives, Serial No. 117-30 (February 15, 2022).  Through the Departmental Manual, the USDA met its regulatory requirement to "establish and publish in [its] guidelines procedures for the prompt processing and disposition of complaints."  28 C.F.R § 42.408(a).

48.     The Departmental Manual required USDA to complete its intake process for complaints within 30 days, complete an investigation within 120 days of when intake was completed, and issue a final agency decision within 180 days.  *See* USDA DM 4330-1 §§ 6.II.2 & App'x B.  It also mandated that an investigator be impartial and "conduct himself or herself in such a manner that he or she does not represent any party to the complaint – neither the complainant nor the agency."  *Id.*

§ II.3.d.  It further provided detailed directions of how investigators were to collect, process, and evaluate evidence; analyze claims applying a preponderance of the evidence standard; and document final decisions.  *See generally id.*

49.     As revealed by FOIA records, OASCR did not (and does not) conduct an independent investigation as mandated by Departmental Manual 4330-1.  Rather than collecting and examining emails, interviewing witnesses (including victims), and having independent investigators gather evidence, OASCR relied on those accused of wrongdoing to admit they discriminated on the basis of race.  That is, OASCR relied on the alleged *perpetrators* of discrimination to gather evidence for their review, accepted denials of discrimination by those involved without challenge, and relied on broad survey evidence from others in the office at issue.

50.     The absurdity of this process is evident when applied to a different context.  If the OASCR investigation process were applied to a criminal fraud investigation, the police would not make an arrest unless the fraudster turned over the incriminating evidence and made a confession in writing without ever being interrogated.  No one could expect justice with such a process.  So too here.

51.     As the Provosts' experiences illustrate, *see infra* ¶¶ 102-129, OASCR's investigation process during the relevant periods plainly did not comply with the detailed directions for impartial investigations set out in Departmental Manual 4330-1, which, for example, required that "[t]he weight given to any evidence will be based" in part "on the interest (or disinterest) of the source."  USDA DM 4330-1 § III.4.C.

-23-

52.     Consistent with the Provosts' experiences, an audit conducted by the Office of the Inspector General in 2021 found that OASCR failed to timely process complaints and that nearly one in three of complaint determinations and closures it reviewed "were not adequately supported and processed."  Office of the Inspector General, *USDA Oversight of Civil Rights Complaints*, Audit Report 60601-0001-21, Sept. 2021 (hereinafter, "OIG, *USDA Oversight of Civil Rights Complaints*"), https://www.oversight.gov/sites/default/files/oig-reports/USDAOIG/60601-0001-21FR508FOIAredactedpublic930-signed.pdf.[18]

53.     The OASCR's sham investigation process perpetuates discrimination. As happened in the Provosts' case, OASCR often does not even *ask* for evidence until *years* after the alleged discrimination occurred, resulting in faded memories and stale evidence—even if OASCR had bothered collecting it itself, instead of relying on the alleged perpetrators.  Accordingly, although OASCR has not been formally disbanded, it essentially functions as a complaint dismissal factory instead of an office dedicated to ensuring that farmers' civil rights are not infringed.

54.     By refusing to actually investigate civil rights complaints, OASCR fails to abide by USDA regulations that require OASCR to "investigate the complaints"

---

[18] The 2021 OIG Report was just the most recent of a string of reports since 1997 which have "consistently found issues such as slow processing of complaints, lack of recordkeeping and tracking of complaints, and lack of accountability for USDA employees found to have discriminated against applicants or program participants." Congressional Research Service, Racial Equity in U.S. Farming: Background in Brief 7 (Nov. 19, 2021), https://crsreports.congress.gov/roduct/pdf/R/R46969; *see, e.g.*, U.S. Gov't Accountability Off., *USDA: Management of Civil Rights Efforts Continues to Be Deficient Despite Years of Attention* (May 14, 2008), https://www.gao.gov/assets/gao-08-755t.pdf.

and "make final determinations as to the merits of complaints . . . and as to the corrective actions required to resolve program complaints."  7 C.F.R § 15d.5(b).

55.    At all times Departmental Manual 4330-1 remained in effect, OASCR failed to abide by its own publicly promulgated policy for processing civil rights complaints, including both the time limits and the standards for an adequate investigation.  Instead, OASCR has implemented a widespread and common policy of delaying investigations, failing to collect evidence, and dismissing complaints based on biased, unreliable evidence.

56.    OASCR's policy of delaying and failing to conduct even minimal investigations exacerbates the disparate impact of USDA's loan approval and administration policies by blocking what otherwise would serve as at least a partial check on discrimination implemented by local officials.  Considering the lengthy delay in processing of civil rights complaints, "individuals who have a legitimate claim of discrimination and would otherwise be eligible for USDA programs may not continue to pursue their complaint or not file a complaint at all."  OIG, *USDA Oversight of Civil Rights Complaints* at 5.  Even if individuals do continue to file and pursue civil rights complaints, OASCR's practice of closing out these complaints without meaningful investigation allows systemic discrimination to continue unimpeded.

**C.    The Widespread Practice of Ignoring Conflict of Interest Regulations for County Committee Members**

57.    The USDA's County Committees have long been recognized as one of the sources of the USDA's discrimination against Black farmers.  These County

Committees are filled with mostly White farmers who have historically used their position to discriminate against Black farmers—including by abusing their authority to access information about Black farmers' farms for competitive advantage.[19]  Rather than enforce clear conflict of interest regulations that would at least alleviate *some* of these concerns given the admitted past discrimination by County Committees against Black farmers, the USDA continues to ignore their own regulations.

58.     In July 2023, the USDA's own Advisory Committee on Minority Farmers reported committee members' and stakeholders' experience of "being treated poorly with obvious bias, scorn, or condescension" by "FSA County Committee offices."  Advisory Committee on Minority Farmers, *Recommendations Report July 2023*, https://www.usda.gov/sites/default/files/documents/acmfr-recommendations-20230708.pdf.  The Committee expressed that "[i]t strains credulity as to why these offenses remain pervasive and only sporadically have been addressed."  *Id.*

---

[19] *See, e.g.*, USDA Equity Commission, *Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All*, 14, Feb. 22, 2024 (noting County Committees historically "by and large were composed of white farmers who had little to no interest in supporting Black farmers"), https://www.usda.gov/sites/default/files/documents/usda-equity-commission-final-report.pdf; Jackson Lewis Assessment at xi (identifying the County Committee system as a "*key* barrier[] to equitable program delivery," noting that it was "regarded as discriminatory by many socially disadvantaged groups" who reported that Committee members were "untrained, biased, and disconnected from [their] concerns"); *see also id.* at 90 (noting participants in focus groups further reported "a conflict of interest . . . between the large farmers on the [County] Committee[s] and the [Socially Disadvantaged Group] farmers who are applying for benefits").

59.     Most recently, the USDA Equity Commission determined in 2024 that, "[d]espite the many past recommendations and attempts to alleviate the documented inequities associated with the County Committee's election process and power, addressing County Committees continues to be a critical step in advancing equity in USDA's programs and services."  USDA Equity Commission, *Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All*, 38, Feb. 22, 2024, https://www.usda.gov/sites/default/files/documents/usda-equity-commission-final-report.pdf.

## II.     THE PROVOSTS' GENERATIONS OF FARMING SUGARCANE IN THE FACE OF RACIAL DISCRIMINATION

60.     Sugarcane farming is in Mr. Provost's blood.  His ancestors hale from Ghana and Benin, where they farmed sugarcane and other subtropical crops.  After being kidnapped and enslaved in the United States, they tended the sugarcane fields of their enslavers in the Grand Marais.  Following emancipation, Mr. Provost's ancestors settled in the New Iberia region of Louisiana and continued farming sugarcane, this time under the Jim Crow indentured servitude system.  Despite facing great adversity, the Provost family persevered over the generations until Mr. Provost's father, Wenceslaus Provost Sr. ("Provost Sr."), managed to build a 4,000+-acre farm primarily in the Vermillion and Iberia Parish areas of Louisiana.

61.     As is true for many Black farmers, the Provost family obtained title to much of their family land in the wake of the Civil War.  After gaining freedom, Mr. Provost's ancestors were bequeathed a small number of acres where for centuries

their family had been forced to farm the land as slaves under inhumane conditions. But, as has been and still remains the case for most Black farmers, most of the land farmed by the Provost family was and is owned by White landowners.

62.    The Provost family entered into informal, often verbal, agreements with these landowners wherein the Provost family paid land rent and (sometimes) a portion of the profits (typically between 1/5th and 1/6th)[20] in exchange for the right to plant and harvest sugarcane on White landowners' fields.  These agreements were largely informal in nature, allowing landowners maximum flexibility in determining who would farm the land and under what circumstances.  Because of the Provost family's skill, these mostly White landowners chose them as their farm operators, despite fierce (and, at times, illegal) competition from other local White farmers.

63.    Beginning at age six, Mr. Provost joined his father in the sugarcane fields, learning to ride a tractor, plant and cover sugarcane, and care for the land. Mr. Provost fell in love with sugarcane farming.  To this day, it remains his dream job.  After graduating high school, his father gave Mr. Provost a small tract of his own.  That same year, Mr. Provost won the state's high yield award for producing 8,588 pounds of sugar per acre.

64.    With yields so high, Mr. Provost had every reason to believe that he could not only take over his father's farm one day, but that he could grow that farm

---

[20] For those landowners who did not obtain a portion of the profits, they received an upfront cash payment due by January 31 of each year.  This is often called "cash rent."

FIRST AMENDED CLASS ACTION
COMPLAINT

-28-



Top right picture: USDA official and Mr. Provost

to be one of the most successful farms in Louisiana.  After his initial success in 1994, Mr. Provost grew his small farm to 300 acres and also helped co-manage his father's farm. Throughout this period, Mr. Provost's yields met or exceeded Louisiana state averages.

65.    In 2007, after working with his father for over a decade, Mr. Provost took over the family business.  The future looked bright.  But, as is detailed in two separate lawsuits against a local bank and sugar mill, a series of discriminatory and unlawful acts resulted in massive losses.[21]

66.    The trouble began where it often does for Black farmers: inadequate funding.  Funding is the lifeblood of every farm in America.  "Small farmers operate at the whim of conditions completely beyond their control; weather conditions from year to year and marketable prices of crops to a large extent determine whether an individual farmer will make a profit, barely break even or lose money."  *Pigford*, 185

---

[21] *See* Second Amended Complaint, *Provost v. First Guaranty Bank*, No. 2:18-cv-08845-JCZ-DPC (E.D. La. May 2, 2019), ECF No. 40 (hereinafter "*Provost* SAC").

F.R.D. at 86.  As a result, "many farmers depend heavily on the credit and benefit programs of the United States Department of Agriculture to take them from one year to the next."  *Id.*  "Because of the seasonal nature of farming, it . . . is of utmost importance that credit and benefit applications be processed quickly or the farmer may lose all or most of his anticipated income for an entire year."  *Id.*

67.     In any given year, there must be sufficient funding to purchase seed cane for planting.  There must also be sufficient funding in place to fertilize, spray for pests and weeds, maintain irrigation, and cut and harvest the sugarcane.  Best farming practices mandate that these activities be performed at specific times of the year, like clockwork.

68.     For example, it is difficult—if not impossible—to plant sugarcane after the first frost.  The ideal time to plant cane is in the month of August.  To do so, farmers must have funds to purchase seed cane early in the year.  They must also apply fertilizer and pesticides to prepare the land for planting.  The vast majority of farmers use special equipment to perform these tasks, and the purchase and maintenance of that equipment must also be financed.  Because no income comes in until harvest season, farmers must receive a stipend to cover their living expenses throughout the year.  Finally, most landowners expect to receive payment from the farmer for the entire year in January.  As a result, the ideal time to receive a crop loan for the year is in January.  Any later and the farming operation is compromised by not being able to take a necessary step—*i.e.*, fertilize, spray, cut, irrigate, plant, pay rent, etc.—at the necessary time.

69.     As the District Court in *Pigford* said, "[i]t does a farmer no good to receive a loan to buy seeds after the planting season has passed." *Pigford*, 185 F.R.D. at 86.  Because sugarcane is a four- to five-year perennial crop, failure to meet these schedules affects not only the crop for that year, but also the next few years.

70.     Every year, the Louisiana State University Department of Agricultural Economics & Agribusiness ("LSU Ag") releases projections for the amount of funding per acre necessary to operate a successful sugarcane farm.  These estimates include the typical expenses for a 1,000-acre sugarcane farm on a 4-year, 5-year, or 6-year rotation schedule.[22]  As reflected in **Table 1** below, on average, LSU Ag estimated the costs of running a successful sugarcane operation to be anywhere between $500 to $900 per acre.[23]

| Table 1.  LSU Ag Sugarcane Projected Costs for a 5-Year Rotation | | | |
|---|---|---|---|
| Year | Variable Production Expenses | Fixed Production Expenses | Overhead Expenses | Total Per Acre LSU Ag Funding Recommendation |
| 2008 | $476.00 | $138.99 | $30.00 | $644.99 |
| 2009 | $481.28 | $154.35 | $30.00 | $665.63 |
| 2010 | N/A[24] | N/A | N/A | $605.16 |

---

[22] Sugarcane is a perennial rotation crop, with the initial year (called "seed cane") typically producing the most sugar.

[23] LSU Ag's estimates do not include living expenses or debt repayment.  Land rent is calculated separately from production expenses.

[24] The 2010 LSU Ag sugarcane enterprise budget does not appear to be available online, *see* https://www.lsuagcenter.com/portals/our_offices/departments/ag-economics-agribusiness/extension_outreach/budgets/2010, but the listed total
(*continued on the next page*)

| Table 1.  LSU Ag Sugarcane Projected Costs for a 5-Year Rotation | | | |
|---|---|---|---|
| Year | Variable Production Expenses | Fixed Production Expenses | Overhead Expenses | Total Per Acre LSU Ag Funding Recommendation |
| 2011 | $457.92 | $135.08 | $30.00 | $623.00 |
| 2012 | $504.57 | $139.66 | $30.00 | $674.23 |
| 2013 | $480.49 | $148.50 | $30.00 | $658.99 |
| 2014 | $471.51 | $145.82 | $30.00 | $647.33 |

71.     The Provost family *never* received the recommended levels of funding—not from the USDA or any bank.  Instead, year after year, the Provost family made do with anywhere from 25% to 75% of the recommended LSU Ag funding.  Despite that, the Provost family still managed to break even, win awards, and grow their operation to a 4,000+ acre farm.  Doing so required the assumption of significant debt on awful terms under which the USDA and the local bank collateralized everything that Mr. Provost owned: his land, his property, and even his home.

72.     In less than a decade, Mr. Provost lost nearly everything.  He and his wife, Mrs. Provost, were unceremoniously evicted from their home, as documented by NBC Left Field in 2019.[25]  Much of his farmland was forcibly liquidated.  The Provosts fought back and ultimately settled litigation against the private entities

---

cost was included within the Provosts' federal complaint against a local bank.  *See Provost* SAC ¶ 55.

[25] This documentary is available online.  *See* What Happened to All the Black Farmers?, https://www.youtube.com/watch?app=desktop&v=q-VWIZIL4ag &feature=youtu.be#dialog (Feb. 5, 2019).

and individuals involved.[26]  But these private parties did not act alone.  At every step of the way, the USDA refused to fulfill its duty to ensure that *all* farmers— including Black farmers like the Provosts—receive "fair and equitable treatment," irrespective of their race.[27]  *See also* 7 U.S.C. §§ 2003(e)(1)-(2), 2279(a)(5)-(6).  These discriminatory acts continue to this day.

### A.    The Provosts Lose Their 4,000+ Acre Family Farm Because of Widespread Discrimination in USDA Guaranteed and Direct Loan Administration

73.    Shortly after graduating high school, Mr. Provost inherited a 4,000+ acre family farm in distress.  For years, his father, Provost Sr., had struggled to obtain adequate funding—on average, managing with only 50% to 75% of the LSU Ag recommended funding for any given year.  The USDA did not help, denying direct farm loan applications despite Provost Sr.'s qualifications, and forcing him to seek funding elsewhere (on highly unfavorable terms).  So, by the time Mr. Provost took over the family operation, the farm was roughly $800,000 in debt, and nearly all of Provost Sr.'s possessions were collateralized: his house, all of the land he owned, all of the equipment he owned, and practically all his other assets.

74.    After consulting with the USDA, Mr. Provost was informed that taking over his father's farm meant he would have to assume all of these debts.  Otherwise, his parents would lose everything.  Beginning his independent farming career in

---

[26] *See, e.g.*, Order of Dismissal, *Provost v. First Guaranty Bank*, No. 2:18-cv-08845-JCZ-DPC (E.D. La. Jun. 4, 2021), ECF No. 95.

[27] Office of the Assistant Secretary for Civil Rights, https://www.usda.gov /oascr/home.

that much debt was not something Mr. Provost wanted to do.  But establishing a relationship with his father's bank was not an option and the USDA denied Mr. Provost's direct loan application.  Accordingly, Mr. Provost was maneuvered into seeking a guaranteed loan—one that grossly departed from local standards for the amount of funding necessary to run a successful operation, and one that placed Mr. Provost's farm firmly on a path to slow death.

75.    As is illustrated in **Table 2** below, the amounts the bank chose (and the USDA blessed) were far from enough to fund Mr. Provost's planned farming operations and not at all consistent with LSU Ag guidelines.

| Table 2. Breakdown of Mr. Provost's Actual Loans vs. LSU Ag Guidelines | | | | | |
|---|---|---|---|---|---|
| Year | Planned Acres | Loan Amount | Loan Amount / Acre | LSU Ag Guidelines | LSU Ag Guidelines / Acre |
| **2008** | 4,326 | $841,000 | $194 / acre | $2,790,270 | $645 / acre |
| **2009** | 4,295 | $826,500 | $192 / acre | $2,860,470 | $666 / acre |
| **2010** | 4,046 | $827,000 | $204 / acre | $2,447,830 | $605 / acre |
| **2011** | 3,769 | $841,200 | $223 / acre | $2,348,087 | $623 / acre |
| **2012** | 3,373 | $1,066,000 | $316 / acre | $2,273,402 | $674 / acre |

76.    As **Table 2** illustrates, Mr. Provost received between 29% to 47% of the LSU Ag recommended amounts for his sugarcane farming operations from 2008 to 2012.  Because Mr. Provost was forced to assume Provost Sr.'s outstanding debts, Mr. Provost had to use a portion of these funds to repay the outstanding $800,000+ loans as well.  And, to make matters worse, these infeasible loans did not come on

-34-

time.  Instead of providing these funds at the beginning of the year when Mr. Provost at least had a chance of doing the right things at the right time, the USDA and the local bank routinely refused to approve Mr. Provost's loans until well into the growing season.

77.    Because of this decreased funding, Mr. Provost was forced to farm fewer acres than he planned (and had leased the rights to farm) each year, which further compromised his ability to not only pay debts, but to build a thriving and successful farming operation.  Unsurprisingly, Mr. Provost's inability to farm all of the leased acres contributed to landowners' decisions to terminate their lease agreements with Mr. Provost and, instead, permit White farmers with secure funding to take over leased acres that Mr. Provost lacked the funds to farm each year.



78.    Despite this adversity, Mr. Provost managed to persevere—at least, for a time.  In 2008, Mr. Provost received the "Young Farmers and Ranchers Achievement Award" in recognition of his "Outstanding Contribution to Agriculture" from the Farm Bureau of Louisiana.  In the same year, Mr. Provost also received the "Iberia Parish Farm Bureau Farmer of the Year" award.  In 2010 and 2012, he won awards for "Outstanding Accomplishments in the Conservation of Soil, Water, and Related Natural Resources" from the Iberia Soil and Water Conservation District.  Also in 2010, he was elected to Vermillion Parish's Sugarcane Advisory Committee.  But skill cannot take the place of the funding necessary to operate a successful sugarcane farm.

79.    As **Table 3** illustrates, when co-managing his father's operations from 2004 through 2006 (and obtaining anywhere from 50% to 75% of LSU Ag funding recommendations), Mr. Provost met or exceeded



county yield averages.  But once Mr. Provost transitioned from the non-guaranteed loans Provost Sr. was able to obtain from a different local bank to guaranteed loans blessed by the USDA (all of which were dramatically *below* LSU Ag recommended funding guidelines), Mr. Provost's yields declined precipitously.  Although Mr. Provost was able to pay all but the 2012 operating loan in full despite these declining yields, Mr. Provost could not escape debt peonage.[28]

| Table 3.  Mr. Provost's Yields Compared to the County Average[29] | | |
|---|---|---|
| **Year** | **Mr. Provost's Yields** | **County Average Yields** |
| 2004 (USDA-free loan) | 5,778 | 4,140 |

---

[28] This indebtedness was worsened by the bank and USDA's refusal to allow Mr. Provost to operate under a limited liability corporation called Wenceslaus Provost Jr. Farms LLC, instead insisting that everything Mr. Provost personally owned had to be at risk in order to continue farming.  White farmers in the area with similar credit and less farming experience were allowed to farm and obtain similar loans through limited liability corporations.

[29] The figures in this table were prepared by the Provosts' expert in litigation against a bank and taken from documents provided by Farm Loan Officer No. 1.

| Table 3.  Mr. Provost's Yields Compared to the County Average[29] | | |
|---|---|---|
| **Year** | **Mr. Provost's Yields** | **County Average Yields** |
| 2005 (USDA-free loan) | 5,521 | 3,990 |
| 2006 (USDA-free loan) | 4,713 | 4,259 |
| 2007 (short-term loan from mill) | 4,118 | 5,995 |
| 2008 (USDA guaranteed loan) | 3,024 | 5,812 |
| 2009 (USDA guaranteed loan) | 3,017 | 6,106 |
| 2010 (USDA guaranteed loan) | 2,159 | 7,014 |
| 2011 (USDA guaranteed loan) | 1,783 | 6,980 |
| 2012 (USDA guaranteed loan) | 1,701 | 6,970 |

80.     Additionally, the USDA did not guarantee infeasible loans for White farmers in the area.  Rather, the USDA worked with local lenders to ensure that the loans given to White farmers met LSU Ag guidelines for funding.  Moreover, the USDA did not delay processing White farmers' loans.  Rather, the USDA worked to process White farmers' loans expeditiously so they could do the right things at the right time.  The USDA crippled Mr. Provost's farm by denying him the same treatment they offered White farmers.

81.     In the space of five short years, Mr. Provost's 4,000+ acre operation transformed from one that almost always met or exceeded county average yields to one struggling to make ends meet.  The reasons for this transformation were obvious.  Although Mr. Provost was a very experienced, award-winning farmer, he simply could not generate an "average" crop with 25 to 50% of the LSU Ag

recommended funding, and certainly not when those funds did not come at the right time in the growing season. As a result, by the end of 2012, Mr. Provost's 4,000+ acres dropped to around 2,400, as landowners decided to enter into agreements with White farmers able to secure adequate funding, including FSA County Committee Member No. 1 and FSA County Committee Member No. 2.[30]

82.    Things took a turn for the worse in 2013, when Mr. Provost was denied a guaranteed operating loan. Without an operating loan, Mr. Provost knew he was on the verge of bankruptcy. As had been true for Provost Sr., Mr. Provost was forced to collateralize *everything* to secure these yearly operating loans: his home, his land, and his equipment. By this point, land rent was due and landlords threatened to terminate their agreements if rent was not paid. In desperation, Mr. Provost asked the local FSA office for help working out a plan to save his farm. Ultimately, after much back and forth, Mr. Provost was able to secure $300,000, but this was late in the season and far from enough to support a 2,400-acre operation. Mr. Provost lost more land, and 2,400 acres turned into 1,200.

83.    By 2014, the situation was dire, with land rent due and no operating loan secured. The Provosts sought help from multiple sources: local university professors and USDA officials. Ultimately, Farm Loan Manager No. 5, who worked in a different parish, suggested that *Mrs. Provost* might secure a direct loan, but only if the Provosts got a financial divorce through a post-nuptial agreement. Farm

---

[30] In an abundance of caution, aliases have been given to local and state USDA officials. The true names of these individuals are provided to the Court in the docket entry ECF 1-1, Exhibit 1, sealed per Minute Order on April 2, 2024.

Loan Manager No. 5 made clear that Mrs. Provost would not be able to obtain a direct operating loan from the USDA unless she legally separated from Mr. Provost—at least financially.

84.   Desperate, the Provosts agreed to this plan, financially separated, and relied on an operations plan prepared by an LSU Ag professor to submit a guaranteed loan application to the USDA and Mr. Provost's local bank.  Under this plan, Mrs. Provost would purchase stubble and seed cane from Mr. Provost and would pay Mr. Provost a custom fee rate for conducting all farming activities. Assuming adequate funds were provided in time, the plan estimated resulting net profits, notwithstanding Mr. Provost's outstanding debts.

85.   Despite following the plan, the USDA did not give Mrs. Provost a direct loan until May 2014—well into the season.[31]  Mr. Provost was not able to secure a loan until mid-June 2014.  This was only *after* the then-Assistant Secretary for Civil Rights at the USDA pressured USDA officials and the local bank to approve a loan—albeit, an infeasible one.  This long delay had significant effects on the Provosts' crop, as shown in the images that follow.

---

[31] As was the case for Mr. Provost's loan, the USDA supervised Mrs. Provost's account.  This meant that all farming activities and spending had to be approved by the USDA, just like all farming activities and spending had to be approved by the bank and the USDA for Mr. Provost's loans.  Mrs. Provost only agreed to a supervised account after Farm Loan Officer No. 1 told her this would increase the likelihood that the USDA would approve the loan.  White farmers in the areas were not expected to have supervised accounts, nor were they instructed to ask for supervised accounts by FSA officials.

 

86.     But even if these loans had not been delayed, the amounts were grossly inadequate to support 1,277 acres of farmland.  The approved amount was for $308,250, which translated to only $241 per acre, barely one third of the LSU Ag recommendation of $647 per acre.  *See supra* ¶ 70, Table 1.

87.     As the 2014 harvest season rapidly approached, the Provosts did everything in their power to prepare their separate crops for the 2014 harvesting season.  They did so despite attempts to intimidate them into not farming.

88.     These intimidation tactics were captured in a 2018 *Guardian* article. Dead cats were left inside of a tractor parked in the fields, the window of a tractor was shot out, cinderblocks were left in Mrs. Provosts' fields to damage her equipment, "[m]otor oil was repeatedly drained from vehicles," and "[f]uel lines were filled with water."  The Provosts sought assistance from the police, but were turned away, with one deputy noting: "Someone wants what you have by any means necessary."

89.     The Provosts also sought assistance from USDA officials, including then-Assistant Secretary for Civil Rights Joe Leonard, State Executive Director No.

1, State Outreach Coordinator No. 1, Farm Loan Manager No. 2, Farm Loan Officer No. 1, and Farm Loan Program Specialist No. 1.  None came.

90.     Ultimately, despite their hard work during the 2014 growing season, neither Mr. Provost's nor Mrs. Provost's crops were harvested for reasons outside their control.[32]  As a result, the Provosts were unable to repay their 2014 crop loans.

91.     The USDA forgave Mrs. Provost's 2014 crop loan because she was not to blame for her crop remaining in the fields.  The USDA then approved another loan for the 2015 harvest, although the approved amount was markedly lower than the first.  The USDA also granted Mrs. Provost an emergency loan given the extreme circumstances.  A different approach was taken for Mr. Provost.

92.     The bank refused to provide any additional loans to Mr. Provost even though he also bore no responsibility for his 2014 crop not being harvested.  Having been turned down by the bank (again), Mr. Provost sought a direct loan from the USDA, which was rejected on or about July 8, 2015.  With no funding options, Mr. Provost lost what little remained of his farm.

93.     In an in-person meeting with Farm Loan Officer No. 1 in or around 2015, the Provosts expressed their concerns about the hardships they had faced.  Mr. Provost observed that he had started off his independent operation with thousands of acres and, as of 2015, had nothing to show for it.  Mr. Provost said as a result of inadequate and untimely loans he had lost millions of dollars of revenue and was at risk of losing everything his family had worked so hard to build.  Farm

---

[32] *See Provost* SAC ¶¶ 119-136.

Loan Officer No. 1 observed that he had a program called "E-Dollars," which could calculate precisely the revenues Mr. Provost *would have* earned had his yields matched parish averages.  Farm Loan Officer No. 1 ran those calculations in the moment and printed off a copy of the results for the Provosts' review, which is reflected in **Table 4** below.

| Table 4.  Farm Loan Officer No. 1 Revenue Loss Calculations | | | |
|---|---|---|---|
| **Year** | **Actual Revenues** | **Expected Revenues**[33] | **Revenues Lost** |
| **2007** | $2,436,208.80 | $3,396,967.20 | $960,758.40 |
| **2008** | $2,062,368.00 | $3,916,044.00 | $1,853,676.00 |
| **2009** | $2,511,471.48 | $5,887,015.68 | $3,375,544.20 |
| **2010** | $1,806,985.85 | $5,659,489.71 | $3,852,503.87 |
| **2011** | $1,737,540.63 | $6,874,151.22 | $5,136,610.58 |
| **2012** | $1,133,580.42 | $5,283,377.76 | $4,149,797.34 |
| **2013** | $741,458.38 | $2,775,638.25 | $2,034,179.88 |
| | | **Total Lost Revenues** | **$21,363,070.27** |

94.     According to Farm Loan Officer No. 1, Mr. Provost lost approximately $21,363,070.27 in revenues between 2007 and 2013.[34]  *See id.*  These revenues confirm that sugarcane should have been a cash crop for Mr. Provost.  Instead, he was not able to accumulate wealth because Mr. Provost was denied access to

---

[33] These numbers were based on Louisiana state averages.

[34] Notably, these calculations did not factor in the land lost by Mr. Provost over this period.  Had that land not been lost due to low yields, Mr. Provost would have obtained even higher revenues.

feasible, timely funding on account of his race.  When Mr. Provost expressed his devastation over this loss, Farm Loan Officer No. 1 told him not to worry because Mr. Provost still had partial ownership of family land in Kaplan and he could "***put a trailer on there and be happy***."

95.     Mrs. Provost held on for a little longer.  Given the drastically diminished funding for the 2015 crop, Mrs. Provost's yields were not sufficient to satisfy landowners.  Landowners' dissatisfaction was heightened by the efforts of County Committee Member No. 1, who solicited the Provosts' landowners and denigrated the Provosts' farming acumen.  On information and belief, County Committee Member No. 1 obtained information about which landowners to target by virtue of access to information he had through his official position within the FSA.

96.     For example, in 2016, County Committee Member No. 1 convinced a landowner that he should take over 40 acres of land.  And, as evidenced in the text message sent from a landowner to Mrs. Provost, County Committee Member No. 1 convinced the landowner to break her lease agreement with Mrs. Provost and allow him to take over the remainder of the property on or about June 6, 2017.

> Angie, I am so sorry to tell you but I went ahead and contacted [County Committee Member No. 1] to farm my property.  I never thought I'd have to tell you that!  It was a very hard decision to make, especially with all of the problems he caused you.  But I had to make a decision for the good of the property and for the neighbors on [location of the land].  I prayed over it so much, and hope you understand!  I still consider you and June as family and hope it can stay that way!  :(

97.     As another example, on or about September 21, 2016, County

Committee Member No. 1 sent a message to one of Mrs. Provost's landowners in an effort to convince said landowner to break her agreement with Mrs. Provost and, instead, allow County Committee Member No. 1 to farm on her property:

> Mrs. [landowner,] I was just checking in about the land you own on [location]. I passed over there today and noticed that Provost hasn't really done much with it this summer. It has recently been plowed but I can tell it was done in the water. There's a number of holes on the property that needs attention in order to drain the land. We are still interested in the property for next year if possible. Thanks!!! [County Committee Member No. 1]

98.     Mrs. Provost promptly shared this improper message with OASCR Investigator No. 1, State Executive Director No. 1, and County Executive Director No. 1 on or about September 27, 2016. The USDA ignored this complaint and never issued a decision. At bottom, a significant, if not majority, portion of County Committee Member No. 1's farm came from convincing White landowners to break their lease agreements with Mr. Provost, Mrs. Provost, and other Black farmers in the area.

99.     As landowners cancelled their lease agreements with Mrs. Provost, in or around 2017, she sought another loan from the USDA, which was denied. The USDA then rescinded the earlier emergency loan *after* Mrs. Provost had already used the proceeds for her farming operation. The USDA's basis for rescinding this loan was the debt forgiveness offered in 2015. Thus, for the first time, the USDA informed Mrs. Provost that she could not receive an additional loan given the USDA's forgiveness of the 2014 loan. While facing these difficulties, Mrs. Provost's crops were vandalized by unknown parties in or around March 2017. Mrs. Provost

filed a police report, but, to her knowledge, no suspects were identified, nor charges filed.  By the end of the 2017 season, Mrs. Provost had lost her farming operation as well.

100.    In 2016, Mr. Provost filed a Chapter 12 bankruptcy petition.  In 2017 and 2018, both the local bank lender and USDA objected to that petition.  As a result, Mr. Provost's bankruptcy petition was dismissed on February 7, 2018.  Both the bank and USDA then initiated foreclosure proceedings on Mr. Provost's collateralized assets: his home, his land, and his farming equipment.

**B.    The Provosts' Civil Rights Complaints Are Ignored Because of the USDA's Widespread Practice of Ignoring Its Own Rules for Processing Complaints and Enforcing Conflict of Interest Restrictions.**

101.    In an attempt to vindicate their rights, the Provosts began to file official complaints regarding their mistreatment.  Those complaints were met with a pattern of delay and neglect by the Defendants, who—despite documented proof in support—left the Provosts' complaints lingering for years, with no sign of any resolution.

**1.    The Provosts' 2016 Civil Rights Complaint Against FSA County Committee Member No. 1**

102.    On or about June 29, 2016, the Provosts filed a civil rights complaint with state FSA officials regarding the actions of County Committee Member No. 1.

103.    In that complaint, the Provosts detailed their understanding that County Committee Member No. 1 had used acreage reports and information gleaned by virtue of his status as a USDA official to learn the identities of the landowners from whom the Provosts leased land.  The complaint also explained how

County Committee Member No. 1 improperly disparaged the Provosts to individual landowners, motivating some of them to break their lease agreements with the Provosts and choose County Committee Member No. 1 instead.  The Provosts attached to their complaint a screenshot of a Facebook post County Committee Member No. 1 had made about Mr. Provost in November 2014.  At the time, Mr. Provost was challenging County Committee Member No. 1's re-election to the county committee.  When a voter posted that she was "sorry [she] could not vote for [County Committee Member No. 1]," County Committee Member No. 1 responded, saying, in relevant part:

> Also if you voted for the other candidate SHAME on you. He's the worst farmer in Iberia Parish and that's why S&&& is the way it is.  People vote clowns into positions that they are not capable of handling.  This is a Bankrupt farmer that will try to make decisions for SUCCESSFUL farmers!!!

The Provosts also included in their complaint to state officials knowledge they had obtained that County Committee Member No. 1 shared other false statements with landowners, including that operating funds were used to pay gambling or other debts.[35]  Finally, the Provosts included maps depicting the farmland County Committee Member No. 1 had acquired as a result of his defamatory campaign.

104.   In response to multiple FOIA requests, the USDA has yet to produce any information suggesting that the USDA processed this complaint in accordance with its own regulations.  To Plaintiffs' knowledge, it remains pending some eight

---

[35] Notably, the loans to the Provosts were *supervised* loans, meaning that every dollar spent was approved by either the bank or the USDA.

years later.

105.    The USDA's delay in completing its investigation of this complaint for over eight years, which is seven-and-a-half years over the 180-day time limitation set in Departmental Manual 4300-1, is unreasonable.

### 2.    Mr. Provost's 2017 Civil Rights Complaint Against the USDA

106.    Defendants' failure to investigate the Provosts' initial complaint was not an isolated incident.  Instead, as shown by Defendants' handling of Mr. Provost's 2017 complaint, Defendants have a pattern of burying credible claims by failing to properly investigate the allegations, including failing to review the Provosts' documentary evidence in support of their allegations—such as when the Provosts showed that Mr. Provost's signature had been *photocopied* onto an unfavorable farm loan.

107.    Specifically, on June 2, 2017, Mr. Provost filed a formal civil rights complaint with the USDA.  Mr. Provost alleged that USDA officials and others had discriminated against him by, among other things, objecting to his Chapter 12 bankruptcy plan in ongoing bankruptcy proceedings; refusing to grant timely and adequate loans; failing to offer debt forgiveness or other financial assistance; forcing the assumption of parental debt; and approving a loan with an unauthorized, photocopied signature.

108.    On June 30, 2017, OASCR accepted Mr. Provost's June 2, 2017 civil rights complaint.  Based on records provided by the USDA in response to FOIA requests, the FSA completed a fact-finding inquiry report on July 26, 2017.

109.   As part of that inquiry, on or about July 24, 2017, the FSA obtained an unsworn statement from Farm Loan Manager No. 2.  Farm Loan Manager No. 2's statement did not address Mr. Provost's complaints regarding his treatment by the USDA and the bank over the previous decade.  Instead, Farm Loan Manager No. 2 provided excuses for why the USDA refused to give Mr. Provost a direct loan in 2015 and offered reasons why he recommended objecting to Mr. Provost's Chapter 12 bankruptcy plan.  On or about August 7, 2017, OASCR sent a position statement regarding Mr. Provost's complaint, which again wrongly characterized that complaint as only concerning the USDA's objection to Mr. Provost's Chapter 12 petition.  This position statement did not address Mr. Provost's other allegations.

110.   On or about August 22, 2017, Mr. Provost amended his June 2, 2017 civil rights complaint.  Based on records provided by the USDA as the result of FOIA requests, the USDA does not appear to have investigated these additional allegations.

111.   The USDA's failure to investigate these allegations for over seven years is an unreasonable delay.

112.   On or about August 30, 2017, Mr. Provost sent OASCR Investigator No. 4 a series of emails providing attachments that documented the allegations in Mr. Provost's civil rights complaint.  Mr. Provost provided evidence for all allegations in his civil rights complaint, not just those concerning the Chapter 12 bankruptcy plan.  In particular, Mr. Provost attached evidence of the photocopied signatures underlying his 2014 farm loan.  As reflected in the screenshots below,

the photocopying is obvious.



113.    The first signature page concerns a loan application dated April 17, 2014.  On May 7, 2014, the bank withdrew that application.  Mr. Provost signed this application.

114.    The second signature page is for a loan application dated May 7, 2014. The local bank withdrew that application on May 9, 2014.  As is shown in the image below, the second hole punch is in a slightly different position.  Notably, the signature is still dated April 14, 2014.  Mr. Provost did not sign a second loan application on May 7, 2014.  This signature was photocopied without Mr. Provost's permission.



115.    On the third signature page for a loan application dated May 9, 2014, the hole punches actually cover the signature and the signature box itself is askew on the page.  The signature is still dated April 14, 2014.  Mr. Provost did not sign this application either.  This signature was photocopied without Mr. Provost's



permission.

116. Based on records provided by the USDA as the result of FOIA requests, the USDA never investigated this issue. The USDA only investigated the USDA's objection to Mr. Provost's Chapter 12 bankruptcy plan.

117. Again, taking over seven years to investigate these allegations is an unreasonable delay.

118. On or about September 13, 2017, Mr. Provost submitted a second affidavit to OASCR Investigator No. 4. In that affidavit, Mr. Provost pointed out that the USDA had relied on LSU Ag recommendations as one basis for its objection to the feasibility of his Chapter 12 bankruptcy plan, yet the USDA had *not* used those same LSU Ag recommendations when considering the feasibility of the loans the local bank had offered. Mr. Provost also supplied significant additional detail regarding the USDA's pattern and practice of discrimination against him, as evidenced by the USDA's requirement that he assume Provost Sr.'s debt and their administration of guaranteed loans throughout the years.

119. According to OASCR's final decision, the agency completed an investigation of Mr. Provost's 2017 civil rights complaint in one week: from October 11 through the 18, 2017. A "final report" was issued on November 27, 2017. This report was not shared with Mr. Provost at the time. On March 20, 2024, OASCR finally released a redacted version of this report to Mr. Provost pursuant to a July 2023 FOIA request. The redacted report confirms that the USDA never considered any allegations other than those concerning the bankruptcy objection. The report further confirms that the USDA considered Mr. Provost's complaints regarding the

conduct of County Committee Member No. 1 "unrelated" and did not even *include* Mr. Provost's allegations in that regard in their review.

120.    On March 29, 2019, *two years* after investigating Mr. Provost's civil rights claims, the USDA's Office of the Assistant Secretary for Civil Rights denied his complaint.  In that decision, OASCR concluded that it lacked jurisdiction to address Mr. Provost's allegation that the USDA had discriminated against him by objecting to his Chapter 12 bankruptcy plan.  OASCR did not address or consider any other allegation of discrimination, including concerning the USDA's failure to service Mr. Provost's loans or offer debt relief, forcing Mr. Provost to assume his father's debt, photocopying his signature on adjusted loan amounts without Mr. Provost's permission, and depriving Mr. Provost of his living allowance.  Instead of addressing these allegations, OASCR focused solely on Mr. Provost's complaints about the USDA's intervention in bankruptcy proceedings.  Accordingly, OASCR dismissed Mr. Provost's June 2017 civil rights complaint for "lack of jurisdiction."

121.    At no time did any USDA civil rights investigator interview Mr. Provost regarding his complaint.  Based on records provided by the USDA as the result of FOIA requests, at no time did any USDA civil rights investigator independently collect or review emails from the FSA officials involved in the alleged discriminatory acts or interview or collect information from the private entities involved in the discriminatory acts.  Based on records provided by the USDA as a result of FOIA requests, the entirety of the USDA's "investigation" of Mr. Provost's civil rights complaint focused on Chapter 12 bankruptcy proceedings without any

investigation into the other alleged wrongful acts.

122.    The USDA's sham investigation did not comply with the timing, evidence collection, and claim analysis standards set out in Departmental Manual 4330-1.  *See* USDA DM 4330-1 § II.

### 3.    Mrs. Provost's 2017 Civil Rights Complaint Against the USDA

123.    On October 23, 2017, Mrs. Provost filed a civil rights complaint against the USDA too.  In her complaint, Mrs. Provost pointed out that the USDA had not complied with its own regulations concerning debt service margins.  She also detailed County Committee Member No. 1's efforts to convince landowners to break their lease agreements with Mrs. Provost.

124.    On October 30, 2017, in an email to Farm Loan Officer No. 1, Farm Loan Manager No. 2, State Outreach Coordinator No. 1, the OASCR complaint intake mailbox, and Mrs. Provost's attorney at that time, Mrs. Provost expressed her ongoing frustrations and provided additional detail of the discrimination she had faced while farming.  Based on records provided by the USDA as the result of FOIA requests, the USDA never investigated these additional allegations.

125.    On or about November 27, 2017, Mrs. Provost's attorney at that time sent OASCR Investigator No. 5 a supplemental submission to Mrs. Provost's civil rights complaint.  That supplemental filing included additional detail regarding the alleged discrimination and also cross-referenced the Provosts' pending civil rights complaint against County Committee Member No. 1.  Based on records provided by the USDA as the result of FOIA requests, the USDA never investigated these

additional allegations.

126.   On or about February 14, 2018, the FSA ostensibly completed its fact-finding inquiry for Mrs. Provost's civil rights complaint.  In that inquiry, the FSA characterized the question presented as follows:

> Whether on April 28, 2017, Farm Service Agency (FSA) Officials discriminated against Complainant on the bases of race (African American), sex (female), marital status (married) and retaliation (prior civil rights activities), when she was determined ineligible for an emergency operating loan.

The FSA did not consider (1) whether USDA should have forced Mrs. Provost to financially separate from Mr. Provost in order to obtain a loan, (2) that the FSA had offered Mrs. Provost infeasible loans, or (3) whether FSA County Committee Member No. 1 had discriminated against Mrs. Provost and breached his conflict of interest obligations by using his position and authority to target and solicit the landowners of Mrs. Provost's farm.

127.   Based on records provided by the USDA in response to FOIA requests, the substance of that investigation was woefully inadequate.  At no time did any civil rights investigator contact County Committee Member No. 1 regarding Mrs. Provost's allegations that he improperly used his official position as a county committeeman to convince Mrs. Provost's landowners to break their lease agreements with her.  At no point did any civil rights investigator independently collect or review emails from the FSA officials involved in the alleged discriminatory acts or interview or collect information from the private entities involved in the discriminatory acts.  Instead, based on records provided by the USDA in response to

FOIA requests, the USDA's investigation consisted of unsworn statements from FSA officials (not County Committee Member No. 1) that do not appear to be the product of an interview, let alone any interrogation.

128.   Like its other "investigations," the USDA's investigation into Mrs. Provost's complaint did not comply with the standards set by Departmental Manual 4330-1.  *See* USDA DM 4330-1 § II.

129.   On April 25, 2022, *three years* after investigating Mrs. Provost's civil rights claims and *five years* after Mrs. Provost filed her civil rights complaint, the USDA dismissed her civil rights claims as well.  OASCR ultimately credited the FSA officials' denials of wrongdoing in untested statements.  The USDA further acknowledged that Mrs. Provost's allegations regarding County Committee Member No. 1's assumption of her land leases were "troublesome" and promised to investigate this issue further.[36]  Nevertheless, the USDA denied Mrs. Provost's

---

[36] It is worth noting that the USDA was aware it faced heightened scrutiny of their actions with respect to the Provosts.  Thus, on or about April 3, 2019, the Center for American Progress issued a report concerning the USDA's discriminatory treatment of Black farmers, outlining many of the issues the Provosts faced—*i.e.*, late, inadequate, and overcollateralized loans, among other issues.  In addition to describing the USDA's ongoing pattern and practice of racial discrimination against Black farmers, that report documented the discrimination faced by the Provosts specifically, as follows:

> For example, the Provost family, black cane farmers based in Louisiana, said they suffered discrimination, fraud, vandalism, and retaliation after they filed a lawsuit against [the bank] on September 21, 2018.  The Provosts allege that the bank and the USDA denied them necessary crop loans to maintain their sugarcane farm and as a result, they were forced into foreclosure.  Initially, a whistleblower informed the family that staffers within the USDA were forging their signatures to make it seem as if the Provosts had agreed to lower loan amounts.  The Provosts claim

(*continued on the next page*)

complaint *without* completing that investigation.  Indeed, based on the lack of records provided by the USDA in response to FOIA requests, the USDA *still* has not completed that investigation or closed the Provosts' earlier complaint regarding County Committee Member No. 1.  This also did not comply with the standards set by Departmental Manual 4330-1.  *See* USDA DM 4330-1 § II.

### C. The Provosts' Efforts to Rebuild Are Hampered by the USDA's Continued Widespread Discrimination When Administering Direct Loans.

#### 1. The USDA Refuses to Accept Direct Loan Applications from the Provosts

130.  Notwithstanding the extreme adversity faced by the Provosts, they have worked hard to rebuild from the loss of their large farming operation.  Although still financially separated from Mrs. Provost (at the USDA's insistence), Mr. Provost was able to retain partial ownership of around 16 acres of land and, in the past couple of years, has managed to obtain informal agreements with a few landowners to cultivate approximately 100 acres in total.  The only thing standing

---

that both public and private actors are working to move the family from their farm.  The lawsuit is still ongoing.  Even post-*Pigford*, black farmers such as the Provosts need more protections against discrimination.

*Id.* at 6.

Indeed, the Provosts' story had also captured the attention of reporters from the *New York Times*.  When investigating that story, County Committee Member No. 1 told the *New York Times* that Mr. Provost "simply lost their acreage for one reason and one reason only: They are horrible farmers."  *Id.* at 10.  These and other reports were cited in a footnote of the USDA's decision denying Mrs. Provosts' civil rights complaint along with a promise to investigate Mrs. Provost's allegations regarding County Committee Member No. 1.  Based on the lack of records provided by the USDA pursuant to FOIA requests, nothing came of any investigation into County Committee Member No. 1.

in the way of the Provosts resuming their large farm operation—whether together or separate—is funding.

131.   In the summer of 2022, the Provosts attempted to apply for a direct operating loan from the USDA.  Under the USDA's own guidelines, "[a]n agency official will . . . not refuse to provide a requested application to any person," will "not discourage the prospective applicant to apply for a direct loan even when loan funds are limited or unavailable," will "not make oral or written statements that would discourage any individual from applying for assistance based on any ECOA prohibited basis (race, color, . . .)," and will "provide assistance as necessary to help applicants complete the application."  FSA Handbook - Direct Loan Making at 3-1 ¶ 41.[37]  Despite these strict guidelines, local officials refused to allow either Mr. or Mrs. Provost to apply for a loan.

132.   In an internal FSA email chain, obtained through a FOIA request, USDA officials attempted to paper over what actually occurred to avoid scrutiny and conceal what was being done to the Provosts.  In an email chain from Farm Loan Manager No. 3 to his boss (Farm Loan Program Chief No. 1), Farm Loan Manager No. 3 offered a revisionist history of the Provosts' visit.  Farm Loan Manager No. 3 acknowledged that the Provosts attempted to apply for a loan at the Iberia Parish Office and that they spoke with Farm Loan Manager No. 4 when doing so.  But Farm Loan Manager No. 3 wrongly claimed that Farm Loan Manager No. 4 offered to accept loan applications from the Provosts.  This did not happen.

---

[37] https://www.fsa.usda.gov/Internet/FSA_File/3-flp_r02_a53.pdf.

What *actually* happened was that the Provosts attempted to apply for a loan and were told they could not do so in light of outstanding debts held by the Vermillion Parish USDA office—debts incurred because of repeated, longstanding discriminatory acts against the Provosts.

133.   The Provosts' eligibility for debt relief was not considered (or anything else that *would have* been included in a loan application) because the Provosts *were not allowed to apply for a loan* despite Farm Loan Manager No. 3's false statements to the contrary.  This refusal violated the USDA's own policies.  FSA Handbook - Direct Loan Making at 3-1 ¶ 41.

### 2.     The USDA Delayed Processing Mrs. Provost's Loan Application and Then Offered an Infeasible Loan.

134.   Last year, Mrs. Provost used her own meager funds to prepare the land for the planting season, which ends in September each year.  On or about July 24, 2023, she sought a direct loan from the USDA for the purchase of seed cane so that she could plant her fields in accordance with best practices.  The USDA delayed processing her application for *months*, only agreeing to loan half the amount requested in December 2023, which was after the first frost.

135.   This delay violated 7 U.S.C. § 1983a(a)(1), which requires the USDA to make decisions on loan applications within 60 days.  *See also* 7 C.F.R. § 764.53(c) (setting 60-day time limit for loan decisions).

136.   The USDA routinely processes and approves loans for White farmers in the area within a matter of weeks.  Had Mrs. Provost received the same treatment, she would have obtained a loan in July 2023—with plenty of time to

plant cane before August that same year.

137.   Instead, not only was Mrs. Provost's application delayed for approximately ***six months***—well past planting season and thereby making it impossible for her to plant sugar cane that year and yield profitable results—but also the terms she received were impossible to fulfill.  Had Mrs. Provost accepted this untimely and impractical loan, she would have been expected to plant her cane in frozen ground and somehow pay back the loan within twelve months with profits from a harvest that would not materialize.  Mrs. Provost realized she would be unable to secure funding that she could feasibly pay back, and she therefore withdrew her loan application rather than fall into the same trap the USDA had placed her husband in from 2007 to 2014.

### 3.   The USDA Delayed Processing and Funding Mr. Provost's Direct Loan

138.   On or about December 11, 2023, Mr. Provost submitted a loan application to the Loan Manager at his local FSA office.  Despite Farm Loan Chief No. 1's promises, other than a backdated notice informing Mr. Provost that his application was complete as of December 20, 2023, Mr. Provost did not receive any information regarding the status of his application for weeks.

139.   On or about January 17, 2024, Mr. Provost spoke with Farm Loan Manager No. 3, who mentioned that his office was currently facing increased loan volumes, which caused delays in processing Mr. Provost's application.  Mr. Provost asked if he should file his application with another parish that was not experiencing similar backlog, but the Loan Manager instructed him not to do so.

140.    On January 22, 2024, the Provosts spoke with the FSA Administrator about the delay and their concerns that they were being racially discriminated against.  The FSA Administrator said that without documentation that shows dissimilar treatment for White farmers versus Black farmers, his hands were tied. He encouraged the Provosts to ask any "White friends" whether they would be willing to provide documentation, in which case he was willing to open an investigation.  He further told the Provosts they could always file a civil rights complaint, but that USDA regulations were designed to prevent OASCR from comparing White and Black farmers' files.  Instead, USDA regulations only permitted OASCR to compare the treatment a complainant received to the "standard of care that exists."  The FSA Administrator admitted that the USDA's practices and policies were designed to provide a lot of cover for any delays in processing applications.  He concluded the call by acknowledging the "unfortunate reality" that "it takes a lot of time to undo what it took 50 years to create" and that he understood the USDA's "very best" efforts to do so were, "in a lot of cases," not enough.  In other words, the FSA Administrator's solution was for the Provosts to tolerate discrimination for the time being on blind faith that the USDA would change course after 160+ years of institutionalized racism against Black farmers.

141.    Mr. Provost next discovered that his application was delayed for another reason: the bank had told the USDA that Mr. Provost still had unpaid debt from his guaranteed loans.

142.    This was a surprise to Mr. Provost who had been led to believe that

debt had been forgiven under the Inflation Reduction Act ("IRA").[38]

a.    On or about November 16, 2022, the FSA Administrator had sent a letter to the bank with information about the IRA and to ask for assistance in making borrower accounts—including Mr. Provost's—current. In response to this letter, the bank submitted three status reports in early 2023 with the past due amounts for three loans in Mr. Provost's name.

b.    On or about April 7, 2023, the USDA wrote a letter to the bank confirming that Mr. Provost met the criteria for loan forgiveness under the IRA and that the U.S. Treasury had issued a check.  The letter specified that the "payment [was] intended to *cure the delinquency on all qualifying loans* and bring [Mr. Provost's] guaranteed loans current."  (emphasis added).

c.    The USDA's decision to forgive Mr. Provost's debt was made after USDA officials considered and evaluated Mr. Provost's borrowing history and the USDA's role in blessing what were clearly infeasible loans. Based on contemporaneous conversations with USDA officials at the time,

---

[38] "On August 16, 2022, President Biden signed the Inflation Reduction Act (IRA) into law.  Section 22006 of the IRA provided $3.1 billion for USDA to provide relief for distressed borrowers with certain Farm Service Agency (FSA) direct and guaranteed loans and to expedite assistance for those whose agricultural operations are at financial risk."  https://www.farmers.gov/loans/inflation-reduction-investments/assistance.  Section 22007 of the IRA provides financial assistance for farmers, ranchers, and forest landowners who experienced discrimination by USDA in USDA's farm lending prior to 2021. https://www.usda.gov/media/press-releases/2023/03/01/usda-announces-next-steps-providing-financial-assistance-borrowers.

Mr. Provost was led to believe that this forgiveness was the product of the USDA's determination that he had suffered racial discrimination at the hands of USDA officials and that his past debts should be forgiven as a result.

d.     The bank apparently did not apply the funds provided by the USDA to cover the remaining balance on all of Mr. Provost's qualified loans. Instead, the bank refunded approximately $1.2 million back to the USDA. Mr. Provost was not informed of this by either the USDA or the bank.  As far as Mr. Provost understood, his debt had been forgiven.  Indeed, on August 29, 2023, the USDA confirmed with Mr. Provost that his eligible debt had been resolved.

e.     It was not until months later, as Mr. Provost was trying to secure a loan, that he learned from the bank that he still had a debt balance of approximately $50,000.  On December 22, 2023, the bank explained that after they refunded the USDA, they applied what was left of the USDA funds to Mr. Provost's outstanding balances on each of the loans, which left approximately $50,000 unforgiven.  In other words, rather than use the money that the USDA had sent to cure Mr. Provost's unpaid loans, the bank had refunded that money *back* to the USDA and left Mr. Provost still $50,000 in debt.  Once brought to their attention, instead of clearing up this mistake, the USDA sat on its hands and refused to approve Mr. Provost's loan.  Once more the bank and the USDA thwarted Mr. Provost's ability to farm.

143.   On or about February 2, 2024, Farm Loan Manager No. 3 informed Mr. Provost that they would not finance his loan because the bank claimed that Mr. Provost had an outstanding debt.  In that same email, the FSA admitted how difficult it has been for Mr. Provost to secure a loan, something which should have taken about two weeks: "I recognize that this has taken longer than you had anticipated; as you can see this has been ***multiple complex situations layered upon one another***."  The FSA did nothing to confirm the validity of the debt claimed by the local bank.

144.   On February 6, 2024, having now delayed Mr. Provost's application for months by keeping a debt balance that Mr. Provost had now discovered, the bank abruptly cancelled the debt.  Mr. Provost immediately informed the FSA of this development and asked the USDA to reassess his farm loan application.

145.   On or about February 26, 2024, the USDA mailed a loan approval letter to Mr. Provost.  That letter promised that "[l]oan funds will be made available to you within 15 business days of approval."  *Id.*  This was not just a promise—the USDA is required by statute and regulation to make loan funds available within 15 days unless the funds are not available to the department.  *See* 7 U.S.C. § 1983a(b)(1); 7 C.F.R. § 764.402(e)(1).  However, as had been done in the past, the USDA delayed processing Mr. Provost's loan well into the growing season.  Despite signing loan documents on March 4, 2024, Mr. Provost did not receive the full funds until August 2024.  Further, Mr. Provost learned after the loan was approved that the USDA's loan amounts did not include sufficient funds for land rent, which at the

time totaled approximately $10,800.  When asked about this omission, on or about March 15, 2024, Farm Loan Manager No. 3 offered no solution and simply wrote: "you will have to come up with the remaining balance to cover the difference."  The "difference" in question was over $4,000.

146.    The USDA's delays prevented Mr. Provost from securing necessary financing for his farm operations consistent with LSU Ag guidelines.  Timely loans are crucial to preparing the land.  In February, Mr. Provost should have been able to service equipment, ensure proper functioning of implements, and address crucial tasks such as changing oil, filters on tractors, and replacing bearings on disks. Additionally, in February, Mr. Provost should have been able to focus on chopping headlands, ensuring field drainage, shredding cane, and applying necessary chemicals to the crop.  These activities lay the foundation for a successful harvest. But due to the USDA's delays, Mr. Provost did not receive his full funds until August, placing him at a considerable disadvantage.  Other local farmers made substantial progress on these activities much earlier than Mr. Provost was allowed, as evidenced by the screenshots from a local farmer concerning his sugarcane farming activities in March that follow.

 

147.    Delays in obtaining a loan can result in postponed spraying, which allows weed seeds to sprout and create an infestation.  The consequence is twofold—increased expenses due to the necessity of more costly chemicals, and a domino effect that disrupts the entire farming process.  Such domino effects include setbacks in fertilizing, the application of chemicals, and crucial tasks like laybying.[39]  These setbacks stand to jeopardize the entire harvest.

148.    Mr. Provost did his best with the funds provided by the USDA this season, including funds withheld until August 2024.  He also used funds from the USDA's discrimination financial assistance payment under Section 22007 of the Inflation Reduction Act to complete necessary tasks the USDA's inadequate and untimely direct loan did not cover.

---

[39] "Laybying" is the process of applying dirt to help the sugarcane from falling and protecting it from cold for the upcoming year.  It is completed after the fields are fertilized and immediately before planting.

### D.   The USDA Arbitrarily and Capriciously Calculated the Provosts' Awards Under Section 22007

149.   The Provosts applied for financial assistance under DFAP, which was made available to "farmers . . . who experienced discrimination by USDA in USDA's farm lending programs prior to January 1, 2021."  USDA, *Inflation Reduction Act Assistance for Producers Who Experienced Discrimination in USDA Farm Loan Programs*, https://www.farmers.gov/loans/inflation-reduction-investments/assistance-experienced-discrimination.

150.   The Provosts were both found to be eligible for the program, meaning they "demonstrate[d], in a way that reviewers could reasonably believe . . . that they experienced discrimination by USDA in USDA farm lending."  USDA, *Award Calculations*, Discrimination Financial Assistance Program, https://22007apply.gov./award-calculations.html.

151.   However, the USDA's award calculations for the Provosts are inexplicable when compared with awards granted to other farmers or even when comparing the awards the two individually received.  The award calculations were, at best, arbitrary and capricious.  At worst, the awards were reduced in retaliation against the Provosts for their public attempts to hold the USDA accountable for its acts of discrimination.

152.   Despite Mr. Provost having a much longer history with the USDA's discriminatory lending practices, and having suffered significantly more economic losses than Mrs. Provost, he received only approximately $70,000 out of the potential $500,000 award, while Mrs. Provost received approximately $300,000.

Upon information and belief, most Black farmers who are still actively farming received smaller awards while larger awards went to Black farmers that have already lost their farmland, continuing the USDA's pattern of pushing Black farmers to extinction.

153.   The USDA has denied the Provosts the ability to appeal its determinations, and attempted to prevent them from asking a court to review its decision, by distributing all DFAP funds simultaneously to announcing its decisions and stating it will not accept appeals.  USDA, *Biden-Harris Administration Issues Financial Assistance to More than 43,000 Farmers, Ranchers, and Forest Landowners through the Inflation Reduction Act's Discrimination Financial Assistance Program*, July 31, 2024, https://www.usda.gov/media/press-releases/2024/07/31/biden-harris-administration-issues-financial-assistance-more-43000.

154.   Black and minority applicants across the country who received assistance under Section 22007 are similarly finding that their respective award calculations show no relation to the number of instances in which they were discriminated against by the USDA or their resulting economic losses.

## III.        THE PROVOSTS' EXPERIENCES ARE NOT UNIQUE.

155.   Since the fall of 2023, the Provosts have met with other Black farmers in the area and from around the country to share their story and hear others' experiences.  The Provosts hosted such meetings at their farm shop on September 16, 2023 and December 16, 2023.  During these meetings, farmers from Iberia, Vermillion, La Fourche, St. James, and St. Martin parishes gathered and discussed

the discrimination they have faced at the hands of USDA officials throughout their farming history.  Over 40 farmers attended these meetings on the Provosts' property.  The Provosts also attended virtual meetings with farmers from around the country who have discussed the discrimination they have faced at the hands of USDA officials over the years.  Some of these meetings were facilitated by the Rural Coalition in the context of preparing to apply for relief under Section 22007 of the Inflation Reduction Act.

156.   Most of the farmers with whom the Provosts spoke once had large farming operations, just like the Provosts.  Those who attended the meetings at the Provosts' farm shop once had farms of at least 1,000 acres.  Nearly all of them have been reduced to a few acres due to the same discriminatory treatment the Provosts faced.  Several lost land to FSA County Committee Members in various parishes, including County Committee Members Nos. 1 and 2.  The vast majority of farmers who took over the lost land were White males.

157.   These farmers shared stories of discriminatory treatment by USDA officials that echoed the Provosts' experiences.  All reported loss of farmland due to inadequate and untimely loans; disrespectful interactions with USDA officials; refusals to offer equal treatment, including equal access to USDA programs and benefits that should be available to all farmers; overcollateralization requirements that put everything at risk; supervised bank accounts; and the USDA's utter failure to investigate civil rights complaints.

158.   One farmer shared with the Provosts an interaction with Iberia Parish

Farm Loan Manager No. 1, in which he said: "I will never give you a loan. You will never be successful. I don't lend to **your kind**." In another instance, Farm Loan Manager No. 1 told Mr. Provost's first cousins that Farm Loan Manager No. 1 would give them a loan to purchase a sugarcane cutter "**over my dead body**." Farm Loan Manager No. 1 also told another farmer that "you're not gonna succeed" when attempting to apply for a loan. Farm Loan Manager No. 1 told another farmer that he "would not give him another dime," despite the farmer's consistent history of repaying farm loans. When another farmer recently tried to obtain his running record from the Vermillion Parish Office in the fall of 2023, an FSA official said: "We don't have that mess over here. That junk is gone."[40]

159.    These stories echo the Provosts' experience with the USDA's treatment of them as Black farmers. Like the Provosts, these were generational Black farmers of significant skill whose families had survived Jim Crow policies. Yet, their farms could not survive the slow death of infeasible, untimely loans from an agency determined to see them fail. As outlined above, reporting, investigations, and even admissions from the USDA itself confirm that these farmers' and the Provosts' experiences reflect the reality of Black farmers across the country. Black farmers across the United States are subjected to loan delays and denials, reduced loan awards, infeasible loans, onerous supervision requirements, disrespectful treatment by USDA officials, and overcollateralization requirements as a result of their race.

---

[40] This same FSA official said to Mr. Provost that "New Orleans needed that clean out" in the wake of Hurricane Katrina.

FIRST AMENDED CLASS ACTION                        -69-
COMPLAINT

160.   With respect to civil rights investigations, FOIA records obtained from OASCR concerning the processing of civil rights complaints reflect a remarkable departure from the timing requirements set forth in applicable OASCR policies. The data show that OASCR closed at least 33 civil rights investigations between July 2017 and September 2020.[41]  In that period, only 19 were fully processed by OASCR.  Instead of doing so within 180 days, as agency regulations required, *see supra* ¶¶ 44-56, OASCR took between 229 and 955 days to process these complaints. It did not make a single finding of discrimination.  *See id.*  When considered in light of the Provosts' experiences, these non-findings of discrimination were likely the product of inadequate investigations and will be the subject of further discovery.

## CLASS ALLEGATIONS

161.   Plaintiffs will seek to certify the following classes pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

## I.    PROPOSED CLASS DEFINITIONS:

162.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the first class is defined as follows:

> All Black farmers whose farm loan applications were delayed and/or denied, who were prevented from applying for a loan or loan servicing, who were offered an infeasible

---

[41] It is not clear whether the records produced as a product of FOIA reflect *all* civil rights investigations during this period.  Notably, the Provosts' 2016 complaint (No. 16-7470), *supra* ¶¶ 102-104, and Mr. Provost's 2017 complaint (No. 17-7780), *supra* ¶¶ 106-1221, are not listed.  Based on FOIA records obtained to-date, it seems the Provosts' 2016 complaint was never fully investigated and may still be pending eight years later.  Mr. Provost's 2017 complaint was closed in 2019, but is not listed in the FOIA response for some reason.  Despite being filed in 2017, Mrs. Provost's civil rights complaint was not closed until five years later, in 2022.  *Supra* ¶¶ 1232-1290.

loan, who were subjected to adverse loan terms, or who were required to use a supervised account in order to receive a loan within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

163.   Plaintiffs also seek to represent the following proposed subclasses:

Subclass A: All Black farmers whose direct loan applications were denied within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

Subclass B: All Black farmers whose guaranteed loan applications were denied within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

Subclass C: All Black farmers who did not receive a decision on their loan applications within 60 days within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

Subclass D: All Black farmers who had a loan approved by the USDA but did not receive their funds within 15 days within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

Subclass E: All Black farmers who were offered an infeasible loan within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

Subclass F: All Black farmers who were prevented from applying for a loan within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

Subclass G: All Black farmers who were prevented from applying for loan servicing within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

Subclass H: All Black farmers who were required to use a supervised bank account in order to receive a loan within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged.

164.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the second class is defined as follows:

All Black farmers who submitted civil rights complaints regarding discriminatory acts by or with the acquiescence of the USDA within the last six years or prior to six years ago if the USDA is yet to respond to their complaints or, alternatively, in the time period under which the USDA's civil rights complaint investigation policy remained materially unchanged.

165.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the third class is defined as follows:

All Black farmers who applied for a federal farm program with the USDA and had their applications denied or reduced within the last five years or, alternatively, in the time period under which the USDA's loan approval and administration policies remained materially unchanged based on delinquent USDA debts that the USDA has acknowledged should be forgiven on account of past discrimination.

166.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the fourth class is defined as follows:

All Black farmers who lost land leases to USDA officials— including county committee members—who had access to information provided by socially disadvantaged farmers when applying for federal farm programs with the USDA

within the last six years or, alternatively, in the time period under which the USDA's civil rights complaint investigation policy remained materially unchanged.

167. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the fifth class is defined as follows:

All Black farmers who applied for assistance through the USDA's Discrimination Financial Assistance Program based on discrimination suffered in the last five years or, alternatively, in the time period under which the USDA's discriminatory policies remained materially unchanged and the USDA determined were eligible for an award.

## I.   NUMEROSITY:

168. Each of the Classes is so numerous that joinder of all its members is impracticable. Thousands of Black farmers still remain despite the USDA's best attempts to drive them out of the farming business altogether. The 2022 Census of Agriculture reported 46,738 total Black producers. *See* 2022 Census of Agriculture: Race/ Ethnicity/ Gender Profile, https://www.nass.usda.gov/Publications/ AgCensus/2022/Online_Resources/Race,_Ethnicity_and_Gender_Profiles/cpd99000.p df. A significant percentage of these producers are members of each of the four classes. Even if only two percent of these Black farmers satisfy one of the individual class definitions, that would still equate to over 900 individuals. Indeed, data obtained pursuant to FOIA requests show that hundreds of Black farmers applied for and were denied direct loans in the past five years.

169. Statistical evidence and the USDA's own records support the conclusion that individualized resolution of these issues is impracticable. In administering the DFAP program, the USDA just determined that 43,000

individuals, located in each of the fifty states and the United States' territories, had "demonstrate[d], in a way that reviewers could reasonably believe . . . that they experienced discrimination by USDA in USDA farm lending." USDA, *Award Calculations*, Discrimination Financial Assistance Program, https://22007apply.gov./award-calculations.html. Based on information gathered from off-the-record statements by USDA and other government officials, **80 percent** of the relief awarded to DFAP applicants went to Black farmers.

## II.        COMMONALITY / PREDOMINANCE:

170.    Common questions of law and fact exist as to the Class members and predominate over any individualized inquiries. The USDA has acknowledged (repeatedly) that its policies have created a pattern and practice of racial discrimination against Black farmers since the USDA's inception. The discrimination the Provosts suffered since 2007 (and earlier) are just examples of the discrimination Black farmers have faced at the hands of the USDA for generations. As set out below, each of the proposed class claims rely on common questions of law and fact that predominate over individualized inquiries.

### A.      Disparate Treatment (Equal Credit Opportunity Act and Due Process Claims)

171.    Plaintiffs' disparate treatment claim raises questions common to the class that will predominate over individualized inquiries. The USDA's pattern and practice of discriminatory treatment manifests in many forms, such as delayed loans, infeasible loans, denied applications, failure to investigate civil rights complaints, and non-adherence to conflict of interest rules. The USDA itself

identified the following forms of discrimination in its processing of DFAP

applications:

- failure to provide appropriate assistance
- delay in processing a loan or loan servicing application
- denial of a loan or loan servicing
- prevention from applying for a loan or loan servicing
- adverse loan terms
- unduly onerous supervision of loan requirements

USDA, *Award Calculations*, Discrimination Financial Assistance Program,

https://22007apply.gov/award-calculations.html.

172.    Plaintiffs propose subclasses to account for these different methods by

which the USDA has implemented its policy and practice of discrimination.  In

order to demonstrate Class members were subject to a common policy and practice

of discrimination, Plaintiffs plan to rely on, without limitation, (a) statistical

evidence showing gross disparities in loan approval rates, processing times, and the

use of onerous loan conditions between Black and White farmers, even after

accounting for other factors using multiple regression analysis; (b) anecdotal

evidence, in the form of sworn affidavits, demonstrating a significant percentage of

Class members experienced the same policy and practice of discrimination; (c) social

framework analysis presented by a qualified expert, demonstrating USDA's policies

and organizational structure have fostered discrimination; (d) the USDA's

admissions of systemic discrimination; and (e) evidence the USDA chose to continue

relying on its same loan administration and approval policies, including the

Eligibility Requirements, even though it knew these policies resulted in

discrimination.

173.   For example, direct loan data obtained from the USDA through FOIA requests shows remarkable differences between the success rates for Black farmers as opposed to White farmers.  As shown in the figures below, in 2020, White farmers' direct loan applications were approved at a rate of 70%, whereas Black farmers' loans were approved at a rate of 40%.  That same year, White farmers' loans were rejected at a rate of only 7%, whereas Black farmers' loans were rejected at a rate of 19%.  Finally, White farmers only withdrew roughly 23% of applications, whereas Black farmers withdrew approximately 41%.[42]

174.   The stories behind these numbers mirror the Provosts' experiences, such as when Mrs. Provost withdrew her 2023 loan application after the loan was approved too late and for far less than was needed.  The statistics show these disparities persist year over year, administration over administration, on account of the USDA's discriminatory policies and practices.

---

[42] These data are consistent with analysis conducted by others based on similar data obtained from the USDA.  *See, e.g.*, https://www.npr.org/2023/02/19/1156851675/in-2022-black-farmers-were-persistently-left-behind-from-the-usdas-loan-system; Chandelis Duster and Janie Boschma, *Many Black Farmers Nationwide Struggling to Keep Their Farms Afloat As They Face Disparities Across The Board* (Dec. 15, 2021), https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html; Ximena Bustillo, *'Rampant Issues': Black Farmers Are Still Left Out at USDA* (July 15, 2021), https://www.politico.com/news/2021/07/05/black-farmers-left-out-usda-497876; *see also, e.g.*, *Cobb Declaration*; *Robb Declaration*.











175.    Using similar data through 2017, the USDA's own expert concluded that "materials and data reveal[ed] large and adverse disparities between minority and non-minority farmers" and "these disparities [could] not be explained solely by differences between minority and non-minority farmers or other factors untainted by discrimination." *Robb Declaration* at 5.  Specifically, Dr. Robb determined that these disparities could not be explained by "geography and types of agricultural products produced or by race-neutral characteristics of farmers, such as prior experience in farming or number of annual days devoted to farming, which might influence farming outcomes." *See id.*

176.    Even the few Black farmers who succeed in obtaining a loan have not seen the end of disparate treatment.  USDA records obtained by the journalistic enterprise *The Counter* show that the USDA foreclosed on Black-owned farms at a higher rate than other racial groups between 2006-2016.  How USDA Distorted Data to Conceal Decades of Discrimination against Black Farmers, The Counter,

https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/.  Even though Black farmers made up less than 3% of the USDA's direct-loan recipients for that period, Black farmers made up more than 13% of farmers with USDA-initiated foreclosures.  *The Counter* concluded, based on this data, that the USDA was more than six times as likely to foreclose on a Black farmer as it was to foreclose on a White farmer.  *Id.*

177.   With standard statistical methods like multiple regression analysis, Plaintiffs will demonstrate that race is a causal factor—*i.e.*, that the observed disparities in treatment are on account of the applicant's race.  This was the conclusion the USDA's own expert reached when analyzing similar data.  *See Robb Declaration* at 5.

178.   The USDA's processing of DFAP applications to assess whether individual applicants had experienced discrimination demonstrates that the common question—did the USDA have a policy or practice of discrimination against Black farmers?—predominates over individualized inquiries.  The USDA was able to review 58,000 applicants' allegations of discrimination in around six months by relying on an underlying inference that the USDA has engaged in a common policy and practice of racial discrimination.

179.   Under the DFAP application review guidelines, an applicant's allegations of discrimination were considered "validated" if "[t]he details contained in the application boxes, narrative, or supporting documents (or all three together) described discrimination for purposes of program eligibility by USDA in USDA farm

loan programs." *See* DFAP Validation Review Guide Version 1.12,

https://www.usda.gov/sites/default/files/documents/dfap-usda-validation-review-guide-08092024.pdf.

180.    In determining applicants' eligibility for DFAP, the USDA also approved applications even if the applicants were found to be ineligible for a loan based on "[f]ailure to cashflow"; "[f]ailure to try to get credit elsewhere"; "[i]nexperience in farm management"; or "poor credit" because each of these eligibility requirements "could have served as excuses for discrimination." *Id.* at 60.

181.    The DFAP model demonstrates how any individualized questions could be addressed here once the Court is able to address the common question of whether the USDA engaged in a pattern and practice of discrimination against Black farmers. The court could require all Class members, as was required for DFAP applicants, to identify instances in which they were subject to discrimination.

182.    Once the Court has found the USDA has engaged in a common policy and practice of discrimination against Black farmers, the individualized inquiries— as in the DFAP process—should require minimal evidence and review.

183.    Examples of common questions of law and fact that predominate over individualized inquiries in assessing the class's disparate treatment claim, without limitation, include:

- Does the USDA engage in a pattern and practice of discriminating against Black farmers in its administration of loans?

- Has the USDA chosen to continue relying on the same Handbooks, and their Eligibility Requirements, to direct loan approval and administration with full knowledge that the policies implemented through these Handbooks and Requirements result in discrimination against Black

farmers?

- Has the USDA intentionally perpetuated its pattern and practice of discrimination by failing to adequately investigate civil rights complaints and reprimand local officials who engage in discriminatory conduct?

## B.    Disparate Impact (Equal Credit Opportunity Act claim)

184.    Agriculture Secretary Vilsack admitted in 2021 that the USDA "must redress the discrimination that has proven to be systemic, evidently reflecting the way [the USDA and Congress] ha[ve] designed or implemented [their] programs, laws and regulations." *See Vilsack Statement*.  Plaintiffs have identified specific USDA policies which have caused discrimination against Black farmers.

185.    The USDA's (1) loan approval policy—including its policy that loan officers make these decisions based on the Eligibility Requirements set out in its Handbooks, and its reliance on local loan officials to carry out that policy—and (2) civil rights investigation policies that have caused Black farmers to face higher rates of loan denial and other adverse actions from the USDA, including the USDA's utter failure to enforce conflict of interest regulations when it comes to County Committee Members.

186.    The USDA has established a common framework for decisions on all loan applications requiring local loan officers to make decisions on loan applications based on set-out Eligibility Requirements. *See* FSA Handbook – Direct Loan Making, Part 4, Section 1; FSA Handbook – Guaranteed Loan Making and Servicing, Part 8, section 1.  That common framework incorporates factors that the USDA is aware are infused with racial bias—including past racially discriminatory acts by the USDA itself—and that result in racially discriminatory outcomes.  As a

result, the USDA's policy requiring loan decisions to be made pursuant to the Eligibility Requirements causes Black farmers to face greater rates of denials and adverse outcomes than White farmers.

187.   For example, the Eligibility Requirements require loan officers to make decisions based on credit history, past repayment of USDA loans, and past loan forgiveness.  Outside of prohibiting officers from penalizing recipients of loan forgiveness that was specifically the result of a formal discrimination claim or settlement, however, the Eligibility Requirements fail to instruct loan officers to take into account whether loan applicants' negative credit histories, issues with previous repayment, or previous instances of loan forgiveness were directly caused by the USDA's own admitted discrimination against Black farmers.

188.   The USDA has itself explained how the Eligibility Requirements result in worse outcomes for Black farmers:

> Reports on reasons for rejections reflect that for Black applicants, the most common reason for loan rejection was unacceptable credit history in recent years, whereas for White and other applicants, the primary reason for denial was their operating plan did not cash flow.  A direct impact of past discrimination may be long term impact on credit history which would not be remedied by reopening more loan programs, as it will take time to establish an acceptable credit history.

*Cobb Declaration* at 27, ¶ 84.

189.   Worse, the Eligibility Requirements are replete with undefined terms, directions encouraging loan officers to make decisions on a case-by-case basis, and invitations for loan officers to permit exceptions.  *See* FSA Handbook – Direct Loan Making, Part 4, Section 1.  A policy encouraging loan officers to make exceptions

and case-by-case decisions—where the USDA admits these same officials have engaged in a pattern of discrimination against Black farmers—unsurprisingly results in a sustained disparate impact for Black farmers.

190.    Additionally, the USDA's policy of delegation *itself* is one of discrimination.  Thus, despite decades of findings that its policies and organizational structure lead to rampant discrimination against Black farmers, the USDA has chosen to delegate authority in a decentralized manner that gives local officials free rein to discriminate.  Instead of administering farm loans centrally, the USDA delegates authority first from the Under Secretary for Farm Production and Conversation to the FSA Administrator, *see* 7 C.F.R. § 2.42(a)(28), then to the Deputy Administrator for Farm Loan Programs, *see id.* § 761.1(a), then to 50 State Executive Directors, *see id.* § 761.1(b)(1), and then to Farm Loan Chiefs, Farm Loan Specialists, District Directors, Farm Loan Managers, Senior Farm Loan Managers, Farm Loan Officers, Loan Analysts, Loan Resolution Specialists, and Program Technicians across the country, *see id.*  These officials are given broad, almost unfettered discretion when it comes to administration of these loans, including when assessing credit worthiness, inability to obtain reasonable credit elsewhere, whether prior debt relief stands in the way of future direct loans from the USDA, farming experience, and other criteria for granting direct loans.  *See* FSA Handbook - Direct Loan Making.  Without clear guidelines, local officials freely exercise their "discretion" to give nearly all available funds to White farmers, and withholding funding from Black and other minority farmers in a discriminatory manner, as

happened here. This policy of delegation is a central question to the validity of each class member's claim.

191. These common policies caused disparate impacts for all Class members. They were all subjected to the same policy delegating loan approval decisions to local officials who have been found to engage in racist decisionmaking and were all subjected to decisions based on the Eligibility Requirements.

192. Further, the USDA's civil rights investigation policy—of not actually investigating civil rights complaints—has exacerbated the disparate impact caused by the USDA's loan approval policies, allowing discrimination to go unchecked. The same is true with respect to the USDA's enforcement of conflict of interest regulations when it comes to County Committee Members.

193. Plaintiffs have presented initial statistical evidence demonstrating Black farmers are significantly more likely to face loan denials than White farmers and will present additional evidence to show these policies cause this disparate impact. Plaintiffs will use discovery to collect detailed data on USDA's decisions on loans for Black and White farmers. With this data, Plaintiffs will employ a qualified expert who will conduct statistical analysis, including the use of multiple regression analysis, to demonstrate these specific policies caused this disparity.

194. Indeed, even if the class's disparate impact claim were unsuccessful, it would still turn on common questions of law and fact. Plaintiffs' disparate impact claim will rely upon the following questions common to the class:

- Does the USDA's loan approval policy, as exercised through its Eligibility Requirements, discriminate against Black farmers?

- Does the USDA's civil rights complaint investigation policy discriminate against Black farmers?

- Does the USDA's policy of delegation discriminate against Black farmers?

### C. Civil Rights Investigations (Administrative Procedures Act claims)

195. Questions common to the entire class are also presented by Plaintiffs' claims that the USDA has both unlawfully withheld and unreasonably delayed agency action by failing entirely to investigate civil rights complaints, and acted arbitrarily and capriciously, by failing to complete its investigations according to the standards mandated by DM 4330-1. Investigations into OASCR's handling of civil rights complaints, as recently as 2021, have repeatedly concluded that OASCR is engaged in a pattern and practice of failing to conduct timely or adequate civil rights investigations. *See* Congressional Research Service, Racial Equity in U.S. Farming: Background in Brief 7 (Nov. 19, 2021), https://crsreports.congress.gov/product/pdf/R/R46969.

196. Common questions of law and fact that will predominate over any individualized inquiries include, without limitation:

- Does the USDA have a duty to investigate civil rights complaints?

- What constitutes a reasonable amount of time for the USDA to complete civil rights complaint investigations?

- What constitutes an adequate civil rights complaint investigation?

- Does Departmental Manual 4330-1 provide standards against which a court may assess the USDA's handling of civil rights complaints under the Administrative Procedures Act?

- Has the USDA acted arbitrarily and capriciously by failing to comply with Departmental Manual 4330-1's timing and adequacy requirements?

- Has the USDA operated under a common, off-the-books policy of delaying investigations and then closing complaints without collecting evidence?

- Do the USDA's policies result in it universally failing to timely or adequately investigate civil rights complaints?

**D. Conflict of Interest Violations (Administrative Procedures Act Claims)**

197.    Black farmers across the country, like the Provosts, have lost land leases to County Committee Members that use the information they receive through their positions with the USDA to discriminate against Black farmers in violation of governing regulations.  The Provosts will present evidence showing that USDA regularly receives reports of County Committee Members' self-dealing behavior targeting Black Farmers but consistently fails to act, in violation of governing regulations.

198.    While the details of individual incidents of self-dealing may vary, the USDA's default pattern and practice of fails to prevent County Committee members from abusing their power to harm Black farmers.

199.    Regardless of the details of individual instances of County Committee Members' abusing their positions, the USDA's failure to enforce its conflict-of-interest regulations (either through preventative action or in response to each new report) causes all Class members to suffer the same harm.

200.    Common questions of fact and law that will predominate over individualized inquiries, without limitation, include:

- Has the USDA failed to enforce its conflict-of-interest regulations?

- Has the USDA refused to discipline its officials despite awareness that they use Black farmers' information gained through their positions to

target their farms for personal enrichment?

- Is the USDA free to disregard its own regulations?

### E. Discrimination Financial Assistance Program (Administrative Procedures Act claim)

201.  The USDA acted arbitrarily and capriciously and failed to comply with its own published criteria in calculating award amounts under the DFAP program. The USDA's failure to apply its own standards, or any non-arbitrary basis for determining award amounts, was consistent in its execution of the DFAP program, impacting all award recipients.  Common questions of fact and law that will predominate over individualized inquiries include, without limitation:

- Did the USDA arbitrarily and capriciously administer the funds allocated through DFAP?

- Did the USDA fail to apply its published criteria for determining DFAP award amounts?

202.  In sum, each of Plaintiffs' proposed class claims will turn on common questions of law and fact that predominate over individualized inquiries.

## III.   TYPICALITY:

203.  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and Class members were denied equal access to credit under the USDA's loan program, fair and impartial civil rights investigations, and were unjustly targeted by USDA officials for personal profit as a result of the USDA's discriminatory conduct as described herein.  The USDA itself recently concluded that the Provosts demonstrated "in a way that reviewers could reasonably believe . . . that they experienced discrimination by USDA in USDA farm lending."  USDA,

*Award Calculations*, Discrimination Financial Assistance Program,

https://22007apply.gov./award-calculations.html.  Plaintiffs are advancing the same

claims and legal theories on behalf of themselves and all other Class members.  The

Plaintiffs and those of the other Class members arise from the same operative facts

and are based on the same legal theories.

## IV.    ADEQUACY:

204.    Plaintiffs fairly and adequately represent the interests of the Class

members.  Plaintiffs' interests do not conflict with the interests of the other Class

members they seek to represent.  Plaintiffs have retained competent counsel

experienced in the underlying legal issues and complex class action litigation who

have agreed to prosecute this case pro bono.  Plaintiffs will prosecute this action

vigorously.

## V.    SUPERIORITY:

205.    Class resolution is superior to individualized actions given the

potential for inconsistent results, the USDA's admissions regarding common

policies that lead to discriminatory treatment and impact for Black farmers, and the

judicial efficiencies to be gained by resolution on a class wide basis.  The USDA's

recent application process for Section 22007 awards demonstrates that a class wide

approach is necessary to address the scale of discrimination at issue.

206.    As outlined above, in determining eligibility for awards based on past

discrimination under Section 22007, the USDA was able to consider 58,000

applications and determined that 43,000 individuals had demonstrated they had

experienced eligible discrimination in the farm lending process over a period of a

little over six months.

207.   Agriculture Secretary Vilsack has admitted that "past actions . . . focus[ed] on determining whether producers can prove specific, individualized discrimination . . . have failed to do the necessary work tailored to addressing the systemic discrimination socially disadvantaged producers face." *See Vilsack Statement*.  Based on the USDA's own practice and admission, individualized actions are not adequate to address the USDA's pattern and practice of systemic discrimination.

## VI.      RULE 23(B)(2):

208.   Plaintiffs also seek certification of the proposed classes pursuant to Rule 23(b)(2).  Certification under Rule 23(b)(2) is appropriate because the USDA has acted or refused to act on grounds that apply generally to the class.  The USDA has three discriminatory policies that are challenged in this lawsuit: (1) the widespread practice of discrimination when administering direct and guaranteed loans; (2) the widespread practice of refusing to timely and adequately investigate civil rights complaints in the manner required by the USDA's own regulations; and (3) the widespread practice of refusing to enforce its conflict of interest regulations with regards to its County Committee Members.  Final injunctive or declaratory relief requiring the USDA to (1) cease the pattern and practice of discrimination in direct and guaranteed loan administration, (2) conduct timely and adequate investigations of civil rights complaints; and (3) enforce its conflict of interest regulations regarding its County Committee Members would be appropriate remedies for the classes as a whole.

## VII.       RULE 23(C)(4):

209.    Particular issues identified are also appropriate for certification under Rule 23(c)(4) because they are common to all class members and would materially advance the litigation.  Specifically, the issues of (1) whether the USDA has engaged in a pattern or practice of discrimination against Black farmers in its lending programs; and (2) whether the USDA's loan approval (loan Eligibility Requirements) and civil rights investigation policies have caused a disparate impact for Black farmers are appropriate for certification.

## FIRST CLAIM FOR RELIEF

(Violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 et seq.
(Disparate Treatment))

210.    Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

211.    The Equal Credit Opportunity Act ("ECOA") prohibits creditors from discriminating against applicants on the basis of, among other things, race and color.  15 U.S.C. § 1691(a)(1).  To state a claim, a plaintiff must allege: (1) discrimination on the basis of race, color, religion, national origin, sex or marital status, or age (2) by a creditor (3) as to any aspect of a credit transaction.  *See id.* Violations of this mandate can subject creditors to civil liability resulting in actual damages, punitive damages, equitable or declaratory relief, and the prevailing party's recovery of costs and fees.  15 U.S.C. §§ 1691e(a)-(d).  ECOA anticipates that such actions may be brought by a class.  15 U.S.C. § 1691e(a).

212.    Plaintiffs and Class members are "applicants" under the ECOA.

213.    The USDA, including the FSA, is a "creditor" under the ECOA and is subject to the ECOA's requirements and prohibitions.

214.    The ECOA creates a private right of action against a creditor who violates its anti-discrimination provisions.  Specifically, the ECOA provides that a "creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class." 15 U.S.C. § 1691e(a).

215.    The ECOA further authorizes "equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter."  15 U.S.C. § 1691e(c).

216.    The USDA has violated the ECOA, 15 U.S.C. § 1691(a), by unlawfully discriminating against Plaintiffs and Class members on the basis of their race. Specifically, as described herein, the USDA and FSA have discriminated against Plaintiffs and Class members by, among other things, engaging in widespread practices of failing to timely process loan applications, denying loan applications or causing them to be withdrawn, failing to conduct due diligence to confirm Plaintiffs' and Class members current debt, subjecting loans to adverse terms and burdensome supervision, and failing to properly service loans.

217.    These practices are so widespread that they amount to agency-wide policies.

218.   The USDA has further implemented this policy of discrimination nationwide by, after determining and admitting that its policies and practices have consistently resulted in discrimination against Black farmers, continuing to rely on the same personnel implementing the same policies.

219.   The USDA continues to direct its loan officials to rely on its Handbooks, including the Eligibility Requirements, despite its own admission that this system of loan approval and processing causes discrimination against Black farmers.

220.   The USDA continues to implement its policy of closing out civil rights complaints without completing true investigations, allowing the discrimination caused by its loan approval and administration policies to go unchecked.

221.   Plaintiffs and Class members seek all monetary, declaratory, injunctive, and other relief available under the ECOA to remedy the conduct of the USDA in connection with its discriminatory loan practices as alleged herein.

## <u>SECOND CLAIM FOR RELIEF</u>

(Violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 et seq.

(Disparate Impact))

222.   Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

223.   In addition to claims based on disparate treatment, ECOA allows for claims based on a disparate impact theory.  *See Palmer v. Homecomings Fin., LLC,* 677 F. Supp. 2d 233, 240 (D.D.C. 2010) ("There appears to be agreement among the

federal courts that disparate impact claims are permissible under the ECOA.").

224.   For an ECOA disparate impact claim to succeed, a plaintiff must "identify a specific policy or practice which the defendant has used to discriminate and must also demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group." *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006).

225.   First, the USDA's Eligibility Requirements contained in its Handbooks have caused Black farmers to face substantially higher rates of loan denials, loan withdrawals, and onerous loan conditions than White farmers.

226.   Second, the USDA's policy of delegating decisionmaking on loan approvals to local officials who have engaged in a pattern or practice of discrimination causes Black farmers to face worse outcomes from White farmers.

227.   Finally, the USDA's well documented policy of failing to meaningfully investigate civil rights complaints has eliminated any internal checks on ongoing discrimination.

228.   Despite Departmental Manual 4330-1 (in effect through August 2022) having required the USDA to conduct meaningful investigations and complete these investigations within 180 days of receiving civil rights complaints, the USDA had a non-public policy of delaying investigations and then closing out complaints without collecting reliable evidence or analyzing the claims therein.

229.   This unofficial policy exacerbates the disparate impact caused by USDA's Eligibility Requirements and policy of delegation.

230.    The USDA's implementation of materially unchanged versions of these policies which cause a disparate impact for Black farmers is a continuing violation. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982).

231.    Plaintiffs and Class members seek all monetary, declaratory, injunctive, and other relief available under the ECOA to remedy the ongoing harm caused by USDA's loan approval policy implemented through its Eligibility Requirements and civil rights investigation policy.

## **THIRD CLAIM FOR RELIEF**

(Violation of Administrative Procedures Act, 5 U.S.C. §§ 701 et seq. (5 U.S.C. § 706(2)—decisions closing civil rights complaints))

232.    Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

233.    The USDA has violated the APA by unlawfully discriminating against Plaintiffs and Class members on the basis of their race.  Specifically, as described herein, the USDA has discriminated against Plaintiffs and Class members by, among other things, failing to timely and adequately investigate civil rights complaints, and failing to enforce its conflict-of-interest regulations.

234.    The USDA has made its decisions to inadequately investigate civil rights complaints and fail to enforce its conflict-of-interest regulations final, and subject to review under the APA, by issuing final agency decisions.

235.    The USDA's actions were not only discriminatory, but also arbitrary and capricious and in violation of the USDA's governing regulations and

Departmental Manual.

236.    From October 18, 2000, through August 26, 2022, the USDA's handling of civil rights complaints was governed by Departmental Manual 4330-1, "Procedures for Processing Discrimination Complaints and Conducting Civil Rights Compliance Reviews in USDA Conducted Programs and Activities."

237.    Departmental Manual 4330-1 was published on the USDA's website and contained directions on how and when the USDA must process complaints, collect evidence, weigh evidence, and assess claims of discrimination.

238.    These policies directly impact Black farmers' right to receive non-discriminatory treatment from the USDA.

239.    As outlined above, OASCR's civil rights investigations did not come close to complying with Departmental Manual 4330-1.

240.    Rather than complete processing of civil rights complaints within 180 days, in the case of the Provosts and Class members, OASCR routinely took years to process complaints.

241.    And once it finally even purported to review complaints, OASCR failed to comply with Departmental Manual 4330-1's requirements of impartiality; to consider all claims raised in each complaint; to exhaustively collect evidence; to weigh that evidence to assess reliability; and to apply a preponderance of the evidence standard to the claims.  *See* USDA DM 4330-1.  The USDA's failure to comply with its own publicly promulgated standards for review of civil rights investigations was thus arbitrary and capricious.

242.    In addition to Departmental Manual 4330-1, the USDA's regulations provide a standard against which to review OASCR's processing of civil rights complaints alleging conflicts of interest.

243.    Under 5 C.F.R. § 2635.402(a), "[a]n employee is prohibited by criminal statute, 18 U.S.C. [§] 208(a), from participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he or any person whose interests are imputed to him under this statute has a financial interest, if the particular matter will have a direct and predictable effect on that interest."  Further, 7 C.F.R. § 7.26(a) provides that "[n]o county committee member, alternate to any such office, or county office employee, may at any time use such office or employment to promote any private business interest."  Finally, under 7 C.F.R. § 7.26(b), "County committee members, alternates, and any person employed in the county office will be subject to the official instructions issued with respect to conflicts of interest and proper conduct."

244.    The USDA acted arbitrarily and capriciously by failing to apply these regulations in its review of civil rights complaints alleging conflict-of-interest violations targeting Black farmers.

245.    Plaintiffs acknowledge that the D.C. Circuit held in *Garcia v. Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009), that, under the statutory scheme in place at that time, the ECOA private right of action offered an adequate remedy for the USDA's failure to investigate civil rights complaints related to credit transactions, foreclosing review under the APA.  But the *Garcia* Court's analysis relied heavily on

former Section 741, a statutory framework under which "Congress resurrected time-barred claims and gave such complainants two options: either file a complaint in the district court or renew their administrative complaint with the USDA with subsequent judicial review if the USDA denied relief." *Id.* at 523; *see also* Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681-31 (codified at 7 U.S.C.S. § 2279 Note).  Section 741 only applied to civil rights complaints that were filed before July 1, 1997, and accordingly does not govern Plaintiffs' and Class members' civil rights complaints. The *Garcia* Court's holding is no longer controlling because it was based on a long-expired statute.

246.    If the district court determines *Garcia* is still binding despite being based on an outdated statutory scheme, Plaintiffs are prepared to challenge *Garcia's* conclusion that ECOA offers an adequate remedy for the USDA's failure to investigate civil rights complaints based on credit-related transactions.

247.    Regardless, USDA has failed to complete adequate investigations of civil rights complaints that were not related to credit transactions, so the ECOA private right of action—even applying *Garcia*—does not provide an adequate remedy.  *See Garcia*, 563 F.3d at 526 (limiting its adequate remedy analysis to credit-related complaints).

248.    Specifically, Plaintiffs allege the USDA inadequately investigated their civil rights complaints reporting that a County Committee Member abused his position of power and access to their data to take over their farm leases for personal

gain.

249.    Even if ECOA offers an adequate remedy for the USDA's failure to investigate credit-related civil rights investigations, it offers no remedy for the USDA's failure to adequately investigate non-credit related complaints, such as complaints alleging discriminatory acts by County Committee members and discrimination in awards of benefits.

250.    Plaintiffs and Class members seek all declaratory, injunctive, and other relief available under the APA to remedy the conduct of the USDA in connection with its failure to timely or adequately process civil rights complaints.

## FOURTH CLAIM FOR RELIEF

(Violation of the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq. (5 U.S.C. § 706(1)—civil rights investigations)

251.    Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

252.    The USDA has also violated the APA by withholding and unreasonably delaying agency action in the processing of civil rights complaints.

253.    Under 7 C.F.R. § 15d.5(b), OASCR is required to "investigate" civil rights complaints, "make final determinations as to the merits of complaints . . . and as to the corrective actions required to resolve program complaints," and notify complainants of the final determinations of their complaints."

254.    As outlined herein, the USDA has failed to investigate civil rights complaints, make final determinations as to their merits, and notify complainants of its determinations.

255.    The APA requires agencies to "proceed to conclude a matter presented to it" "within a reasonable time."  5 U.S.C. § 555(b).

256.    When assessing whether an agency has failed to act within a reasonable time, D.C. courts consider the following factors (the "TRAC" factors):

> (1) the time agencies take to make decisions must be governed by a rule of reason, . . . ; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, . . . ; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; . . . (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority . . . ; (5) the court should also take into account the nature and extent of the interests prejudiced by delay, . . . ; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Telecomms. Research & Action Ctr. v. FCC ("TRAC")*, 750 F.2d 70, 77 (D.C. Cir. 1984) (internal citations and quotation marks omitted).

257.    Applying the TRAC factors here demonstrates the USDA has unreasonably delayed its processing of civil rights complaints.

258.    Addressing the first factor, the USDA's Departmental Manual 4330-1, required investigations to be completed within 180 days.  Similarly, 7 C.F.R. § 15d.5(c) requires the USDA to complete investigations of civil rights complaints alleging discrimination on the basis of disability within 180 days.  Delays over five

years are plainly unreasonable when considering the agency's own rules set a 180-day time limit.

259.    Addressing the second factor, when Congress had to set the appropriate amount of time for the USDA to process civil rights complaints following the *Pigford* Settlement, Congress required the USDA "to the maximum extent practicable within 180 days after the date a determination of an eligible complaint is sought under this subsection conduct an investigation, issue a written determination and propose a resolution in accordance with this subsection." Section § 741(c) of the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999, enacted in Division A, section 101(a) of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277.  Again, delays over five years, equating to over ten times the amount of time Congress considered appropriate for resolving complaints, are unreasonable.

260.    The other factors also demonstrate OASCR's completion of civil rights investigations has been unreasonably delayed.  Black farmers, like the Provosts, must work with the USDA and its local officials in order to support their farms and livelihoods.  Each day that the USDA delays processing civil rights complaints is another day the Provosts and Black farmers are subjected to discrimination—despite having already reported it to the USDA.  This discrimination has resulted in a large percentage of Black farmers losing their farmland and giving up farming

all together.  The USDA's systemic failure to timely resolve civil rights complaints also allows the widespread practice of discrimination to continue unimpeded.

261.    Plaintiffs' and Class members' claims only accrued after the USDA delayed its investigation of their civil rights complaints for years, making the agency action unreasonably delayed, and subject to judicial review.

262.    Plaintiffs and Class members seek all declaratory, injunctive, and other relief available under the APA to remedy the conduct of the USDA in unreasonably delaying the processing of civil rights complaints.

## <u>FIFTH CLAIM FOR RELIEF</u>

(Violation of the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq. (5 U.S.C. § 706(1)—enforcement of conflicts of interest regulations)

263.    Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

264.    The USDA has also violated the APA by withholding and unreasonably delaying agency action in the enforcement of its conflict-of-interest regulations.

265.    The APA allows courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

266.     Under § 706(1), courts may compel an agency "'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

267.    USDA's general and County Committee-specific regulations prohibit employees generally, and County Committee members specifically, from engaging in conflicts of interest.

268.    Under 5 C.F.R. § 2635.402(a), "[a]n employee is prohibited by criminal statute, 18 U.S.C. [§] 208(a), from participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he or any person whose interests are imputed to him under this statute has a financial interest, if the particular matter will have a direct and predictable effect on that interest."  5 C.F.R. § 2635.402(a).  Although 5 C.F.R. § 2635.106(c) proclaims to disclaim any rights created by the rules set out in that part, "[a] properly promulgated regulation, standing alone, cannot thwart judicial review otherwise available under the APA."  *Physicians for Soc. Responsibility*, 956 F.3d at 649.

269.    Addressing County Committees specifically, 7 C.F.R. § 7.26(a) provides that "[n]o county committee member, alternate to any such office, or county office employee, may at any time use such office or employment to promote any private business interest."  Under 7 C.F.R. § 7.26(b), "County committee members, alternates, and any person employed in the county office will be subject to the official instructions issued with respect to conflicts of interest and proper conduct."  Additionally, "[a]dverse personnel actions involving any county committee member or alternate member, county executive director, or other county office employee *will be taken* for failing to perform the duties of their office, impeding the effectiveness of any program administered in the county, violating official instructions, or for

misconduct." 7 C.F.R. § 7.28 (a) (emphasis added).

270.   Additionally, 7 U.S.C. § 1986(b) prohibits USDA employees and officers "who act[] on or review[] an application made by any person under this title for a loan to purchase land" from "acquir[ing], directly or indirectly, any interest in such land for a period of three years after the date on which such action is taken or such review is made."

271.   Finally, 7 U.S.C. § 1986(c) prohibits County Committee members from "knowingly mak[ing] or join[ing] in making any certification with respect to a loan to purchase any land in which he or any person related to him within the second degree of consanguinity or affinity has or may acquire any interest."

272.   These statutes and regulations are written with mandatory as opposed to discretionary language.

273.   The USDA has unlawfully withheld agency action by refusing to enforce these mandatory statutes and regulations.

274.   Plaintiffs and Class members seek all declaratory, injunctive, and other relief available under the APA to remedy the conduct of the USDA in connection with its discriminatory refusal to enforce conflict-of-interest regulations.

## SIXTH CLAIM FOR RELIEF

(Violation of the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq. (5 U.S.C. § 706(2)—DFAP awards)

275.   Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

276.    The USDA acted arbitrarily and capriciously in its calculation of awards under the DFAP program.

277.    The USDA has made final agency decisions on all DFAP applications, meaning these decisions are subject to review under the APA.

278.    Although DFAP was administered in part by nongovernmental program administrators, the USDA "[e]stablish[ed] program guidance, including how applications [we]re evaluated and awards [we]re calculated" and "[p]rovid[ed] oversight of the program and cooperative agreements."  USDA, *Program Overview*, https://22007apply.gov/program-overview.html.

279.    The USDA has published its guidelines on calculating DFAP awards, providing a standard against which a court can review its decisions.

280.    The USDA's DFAP award calculations bore no relation to individuals' respective economic losses or the number of instances of discrimination individuals had faced.  Specifically, Mr. Provost received only approximately $70,000, despite providing documentation that a series of discriminatory acts spanning seventeen years caused him to lose over $21 million in expected revenue.

281.    Other similarly situated individuals received amounts that were not related to the amount of discrimination they experienced and their economic losses in comparison with awards received by other applicants.

282.    The USDA's award calculations arbitrarily and capriciously departed from its guidance governing the calculation of DFAP awards.  *See* DFAP Validation

Review Guide Version 1.12, 186-91, https://www.usda.gov/sites/default/files/documents/dfap-usda-validation-review-guide-08092024.pdf.

283.    Specifically, the USDA announced its decisions on DFAP applications and paid out all DFAP funds in a period of less than two weeks.  USDA, *Biden-Harris Administration Issues Financial Assistance to More than 43,000 Farmers, Ranchers, and Forest Landowners through the Inflation Reduction Act's Discrimination Financial Assistance Program*, July 31, 2024, https://www.usda.gov/media/press-releases/2024/07/31/biden-harris-administration-issues-financial-assistance-more-43000.  USDA then told each applicant that the agency's decision was final, they had no ability to appeal, and that all funding had been spent.  *See id.*

284.    In announcing the distribution of DFAP awards, the USDA stated that "[t]he information provided in DFAP applications will continue to be reviewed and analyzed, and will provide a roadmap for USDA as we fine-tune our program equity efforts at the national, regional and local levels."  USDA, *Biden-Harris Administration Issues Financial Assistance to More than 43,000 Farmers, Ranchers, and Forest Landowners through the Inflation Reduction Act's Discrimination Financial Assistance Program*, July 31, 2024, https://www.usda.gov/media/press-releases/2024/07/31/biden-harris-administration-issues-financial-assistance-more-43000.  The USDA is likely to engage in a similar program in the future, but again prevent review, by making decisions simultaneously to the exhaustion of funding.

285.    Plaintiffs and Class members seek all relief available under the APA to remedy the conduct of the USDA in connection with its discriminatory and arbitrary and capricious practices as alleged herein.

## SEVENTH CLAIM FOR RELIEF

(Violation of the Fifth Amendment)

286.    Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

287.    The Constitution prohibits the federal government from depriving citizens "of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. 5.  Further, the Constitution forbids the federal government from discriminating on the basis of race.  *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

288.    The USDA has discriminated against Black farmers by engaging in a widespread practice of treating Black farmers differently than White farmers when processing loan applications.

289.    The USDA's allocation of funds disproportionately favored White farmers, while disadvantaging Black farmers.  The extreme nature of the disparate impact evinces intentional discriminatory motives in the design, implementation, and administration of the program, as supported by the USDA's admissions that it has discriminated against minority farmers for decades, and continues to do so today.

290.    Further, despite admitting that its policies have resulted in pervasive

discrimination, the USDA reaffirmed its policy and practice of discrimination by continuing to direct loan officials to apply the same Eligibility Requirements that have continually resulted in well-documented discrimination. The USDA's choice to reaffirm this policy despite the massive racial disparities that it has caused can only be explained as an intentional or deliberately indifferent decision to discriminate against Black farmers.

291.   The intentional or deliberately indifferent nature of USDA's continued discrimination against Black farmers is further revealed by its civil rights investigation policy.

292.   As explained above, the USDA, despite acknowledging that the proper investigation of civil rights complaints is a key component to preventing discrimination, continues to implement a policy of dismissing civil rights complaints without completing adequate investigations.

293.   Plaintiffs and Class members suffered damages by not receiving funds and by receiving less funds than they would have received had the USDA treated Plaintiffs and Class members equitably.

294.   Plaintiffs and Class members seek equitable relief to remedy the equal protection violations associated with the USDA's discriminatory loan practices.

## EIGHTH CLAIM FOR RELIEF

### (Declaratory Judgment)

295.   Plaintiffs, on behalf of themselves and all other similarly situated, incorporate by reference the allegations of the foregoing paragraphs as if set forth fully herein.

296.    An actual controversy exists between Plaintiffs and Class members on one hand, and Defendants on the other, as to their rights with respect to the USDA's loan programs administered by the FSA.

297.    Plaintiffs and Class members pray that this Court declare and determine, pursuant to 28 U.S.C. § 2201, that the USDA and FSA have violated and denied the rights of Plaintiffs and the Class members as to: (a) the statutory right of Plaintiffs and Class members to equal credit under the ECOA, 15 U.S.C. § 1691(a), with respect to USDA's direct loan programs administered by the FSA; and (b) the constitutional right of Plaintiffs and Class members to equal protection under the Fifth Amendment in connection with the distribution of funds.

298.    Plaintiffs and Class members also pray that the Court grant any necessary and appropriate relief as permitted by 28 U.S.C. § 2202.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial of all issues triable by a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that this Court enter judgment against Defendants as follows:

a)    Enter an Order finding and declaring that the USDA has unlawfully discriminated against Plaintiffs in connection with the USDA's loan program in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a);

b)      Enter an Order finding and declaring that the USDA's treatment of Plaintiffs in connection with the USDA's loan program violated Plaintiffs' constitutional right to equal protection under the Fifth Amendment;

c)      Enter a permanent injunction requiring the USDA to enact department-wide change to ensure equitable and timely consideration of Black farmers' loan applications, including an oversight committee to audit the disbursement of USDA program benefits and any other such initiative as articulated in the Equity Commission's *Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All*;

d)      Enter a permanent injunction barring USDA county committee members from accessing sensitive information about competitor-farmers and require the USDA to enforce their conflict of interest regulations;

e)      Award monetary relief pursuant to 15 U.S.C. §§ 1691e(a) and (c);

f)      Award attorney's fees and costs to Plaintiffs under 15 U.S.C. § 1691e(d) and 28 U.S.C. § 2412, and any other applicable statute or authority; and

g)      Award such other and further declaratory, injunctive, and monetary relief as the Court may deem just, proper, or equitable.

Dated:  September 16, 2024        Wilson Sonsini Goodrich & Rosati
Professional Corporation

 */s/ John B. Kenney*
John B. Kenney (D.C. Bar No. 1520911)
Robin S. Crauthers (D.C. Bar No. 1659397)
1700 K Street, NW
Washington, DC 20006
Telephone: (202) 973-8800
rcrauthers@wsgr.com
jkenney@wsgr.com

Ariel C. Green Anaba (admitted *pro hac vice*)
Luis Li (admitted *pro hac vice*)
Paul Watford (admitted *pro hac vice*)
Mark Yohalem (admitted *pro hac vice*)
Matthew Macdonald (admitted *pro hac vice*)
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
aanaba@wsgr.com
luis.li@wsgr.com
pwatford@wsgr.com
mark.yohalem@wsgr.com
matthew.macdonald@wsgr.com

Deno Himonas (admitted *pro hac vice*)
15 West South Temple
Gateway Tower West, Suite 1700
Salt Lake City, UT  84101-1560
Telephone: (801) 401-8520
dhimonas@wsgr.com

Luke Liss (admitted *pro hac vice*)
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
lliss@wsgr.com

Nora Ahmed (admitted *pro hac vice*)
American Civil Liberties Union of Louisiana

1340 Poydras Street, Suite 2160
New Orleans, LA 70112
Telephone: (504) 444-6046
nahmed@laaclu.org

*Attorneys for Plaintiffs*
*Wenceslaus Provost Jr. and Angela Provost*