**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WENCESLAUS PROVOST JR. *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:24-cv-0920-TJK |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, and | |
| the UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| *Defendants*. | |

**DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED CLASS COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ................................................... 2

    A.    USDA Loan Programs .................................................................... 2

    B.    The Equal Credit Opportunity Act.......................................................... 5

    C.    Section 22006 and 22007 of the Inflation Reduction Act..................................... 6

STATEMENT REGARDING FACTUAL ALLEGATIONS ............................................ 8

PROCEDURAL HISTORY................................................................................................ 8

LEGAL STANDARD......................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

I.    The Court Should Strike Plaintiffs' Class Allegations for Failure to Plausibly Allege a Common Policy of Discrimination or Predominance. ..................................... 11

    A.    Plaintiffs' first and fifth proposed classes fail to plausibly allege any common policy of discrimination, and individual inquiries will necessarily predominate over any common questions.............................................................. 12

    B.    Plaintiffs fail to state any individual claims to support their second, third, fourth, and fifth proposed classes. .......................................................... 18

II.    Plaintiffs Fail to State a Claim as to their APA Claims, and their DFAP Challenge Is Moot.............................................................................................................. 19

    A.    Plaintiffs' Claims Three, Four, and Five, which attempt to raise APA challenges to USDA's investigation of civil rights complaints or enforcement of its conflict-of-interest provisions, fail. ...................................... 20

        1.    APA review is not available for credit-related claims where ECOA provides an adequate remedy.................................................................. 20

        2.    Plaintiffs do not challenge any reviewable final agency actions. ............. 22

        3.    Several of Plaintiffs' APA Claims Are Time Barred............................... 24

    B.    Plaintiffs' sixth claim, which attempts to raise an APA challenge to the amount of DFAP awards, fails because it is moot and administration of the program was committed to USDA's discretion. .................................................. 25

i

1.     Any APA challenge to the amount of a DFAP award is moot because no appropriated funds remain available. ..................................... 25

2.     The Court lacks jurisdiction over an APA challenge to the amount of a given DFAP award because USDA's DFAP administration is committed to agency discretion. ............................................................. 27

     a)     The selection of procedures to calculate DFAP awards was committed to agency discretion. .................................................. 27

     b)     Plaintiffs offer only conclusory statements explaining how they believe USDA departed from its procedures. ...................... 29

III.    Plaintiffs' ECOA Claims Based on an Alleged Failure to Investigate Civil Rights Complaints, Untimely ECOA Claims, Equal Protection Claims, Disparate Impact Claims, and Declaratory Judgment Claims Should Be Dismissed for Failure to State a Claim. ..................................................................................................... 30

A.    Plaintiffs cannot state an ECOA claim based on any alleged failure to investigate civil rights complaints. ...................................................... 31

B.    The majority of Plaintiffs' ECOA claims are untimely. ....................................... 31

C.    Plaintiffs fail to state a claim that USDA has designed or administered its loan programs with intent to discriminate in violation of the equal protection clause. ....................................................................................... 33

D.    Plaintiffs fail to state a claim for disparate impact. ............................................ 36

1.     Challenging "USDA's loan approval policy" is impermissibly broad. ..................................................................................... 38

2.     The business necessity of considering creditworthiness in loan-making is manifest—and a foundation of the Equal Credit Opportunity Act. .................................................................. 40

3.     Because USDA offers centralized review of any loan denials, Plaintiffs cannot show a causal connection between FSA's decentralized structure and the disparities alleged in the Complaint........ 41

4.     Plaintiffs' failure to specifically identify facially neutral policies that cause any alleged disparities in the Complaint is reflected in the relief they seek. .......................................................... 42

E.    Plaintiffs' Declaratory Judgment Act claim should be dismissed as redundant of their ECOA and equal protection claims. ......................................... 43

CONCLUSION .................................................................................................... 43

# TABLE OF AUTHORITIES

**CASES**

*Adhvaryu v. Bank of Am., N.A.*,
  No. SA-cv-181836 (DOC), 2019 WL 6499211 (C.D. Cal. Aug. 1, 2019) ......................... 37, 38

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787  (2015) ..................................................................................................... 10

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) .......................................................................................... 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 10, 15, 30, 35

*Atherton v. D.C. Off. of the Mayor*,
  567 F.3d 672 (D.C. Cir. 2009) ....................................................................................... 35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ 10

*Bellinger v. Bowser*,
  No. 17-cv-2124 (TJK), 2018 WL 4705808 (D.D.C. Sept. 30, 2018) ......................... 35

*Boone v. MountainMade Found.*,
  684 F. Supp. 2d 1 (D.D.C. 2010) .................................................................................... 43

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ....................................................................................................... 20

*Bradshaw v. Vilsack*,
  560 F. Supp. 3d 101 (D.D.C. 2021) .......................................................................... 17, 18

*Cause of Action v. Nat'l Archives & Records Admin.*,
  926 F. Supp. 2d 182 (D.D.C. 2013), *aff'd,* 753 F.3d 210 (D.C. Cir. 2014) ............... 14

*Chiang v. Veneman*,
  385 F.3d 256 (3d Cir. 2004) ............................................................................................ 6

*City of Harper Woods Emps.' Ret. Sys. v. Olver*,
  589 F.3d 1292 (D.C. Cir. 2009) ..................................................................................... 10

*City of Houston v. HUD*,
  24 F.3d 1421 (D.C. Cir. 1994) ................................................................................... 25, 26

iii

*Clarke v. Holder*,
  767 F. Supp. 2d 106 (D.D.C. 2011), *aff'd sub nom. United States v. Straker*, 800 F.3d 570
  (D.C. Cir. 2015) ........................................................................................................ 24

*Cnty. of Suffolk, N.Y. v. Sebelius*,
  605 F.3d 135 (2d Cir. 2010) ................................................................................. 25, 26

*Cottrell v. Vilsack*,
  915 F. Supp. 2d 81 (D.D.C. 2013) *aff'd*, 2013 WL 4711683 (D.C. Cir. July 31, 2013) .... 20, 31

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ....................................................................................................... 36

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002) .................................................................................. 24, 28

*Duarte v. Quality Loan Serv. Corp.*,
  No. 217CV08014ODWPLA, 2018 WL 2121800 (C.D. Cal. May 8, 2018) .................... 38, 40

*Elson v. Black*,
  56 F.4th 1002 (5th Cir. 2023) ...................................................................................... 18

*Epps v. JPMorgan Chase Bank N.A.*,
  Civ. A. No. WMN-10-1504, 2012 WL 5250538 (D. Md. Oct. 22, 2012) ............................... 19

*Garcia v. Johanns*,
  444 F.3d 625 (D.C. Cir. 2006) ........................................................................... *passim*

*Garcia v. Veneman (Garcia I)*,
  211 F.R.D. 15 (D.D.C. 2002) ................................................................................. 15, 16

*Garcia v. Veneman (Garcia II)*,
  224 F.R.D. 8 (D.D.C. 2004), *aff'd and remanded sub nom. Garcia v. Johanns*,
  444 F.3d 625 (D.C. Cir. 2006) .............................................................................. 15, 16

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ............................................................................. 20, 21

*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960) .................................................................................................... 35

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971) .................................................................................................... 37

*Guy v. Vilsack*,
  No. 12-cv-1557 (ESH), 2013 WL 4883594 (D.D.C. Sep. 12, 2013) *aff'd*, 2014 WL 3027992
  (D.C. Cir. May 29, 2014) ...................................................................................... 20–21

*Haase v. Sessions*,
   835 F.2d 902 (D.C. Cir. 1987) ............................................................. 10

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................. 23, 28

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ........................................................ 10

*In re Navy Chaplaincy*,
   928 F. Supp. 2d 26 (D.D.C.) *aff'd*, 738 F.3d 425 (D.C. Cir. 2013) ........................ 35

*In re: McCormick & Co., Inc.*,
   217 F. Supp. 3d 124 (D.D.C. 2016) ....................................................... 12

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*,
   No. 3:08-CV-0546-D, 2016 WL 4494322 (N.D. Tex. Aug. 26, 2016) ..................... 38-39, 42

*Indian River Cty. v. Rogoff*,
   254 F. Supp. 3d 15 (D.D.C. 2017) ........................................................ 10

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977) ..................................................................... 40

*James v. U.S. Dep't of Educ.'s Off. for Civ. Rts*,
   No. 22-CV-5738 (LTS), 2022 WL 6807471 (S.D.N.Y. Oct. 11, 2022) ......................... 23

*James Madison Ltd. By Hecht v. Ludwig*,
   82 F.3d 1085 (D.C. Cir. 1996) ........................................................... 24

*Joorabi v. Pompeo*,
   464 F. Supp. 3d 93 (D.D.C. 2020) ....................................................... 9, 10

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ...................................................................... 9

*Larsen v. U.S. Navy*,
   525 F.3d 1 (D.C. Cir. 2008) ............................................................. 25

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................... 27, 28, 29

*Love v. Connor*,
   525 F. Supp. 2d 155 (D.D.C. 2007) ")", *aff'd & remanded sub nom. Garcia v. Vilsack*, 563 F.3d
   519 (D.C. Cir. 2009) .................................................................... 20

*Love v. Johanns*,
   439 F.3d 723 (D.C. Cir. 2006) ....................................................... 16, 31

*Love v. Veneman*,
   224 F.R.D. 240 (D.D.C. 2004) ............................................................... 16

*Make The Rd. N.Y. v. Wolf*,
   962 F.3d 612 (D.C. Cir. 2020) ............................................................... 28

*Meacham v. Knolls Atomic Power Lab.*,
   554 U.S. 84 (2008) ............................................................................... 39

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) ............................................................... 29

*Miller v. Perdue*,
   No. 2:17-cv-00670-SU, 2018 U.S. Dist. LEXIS 184737 (D. Or. Oct. 29, 2018) ................... 35

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ............................................................................. 35

*Physicians for Soc. Resp. v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020) ............................................................... 27

*Pride v. USDA*,
   No. 1:23-cv-02292, ECF Nos. 1 & 41 (D.D.C.) ......................................... 34

*Promundo-US v. HHS*,
   No. 18-CV-2261 (CRC), 2019 WL 3239245 (D.D.C. July 18, 2019) ............... 26, 27

*Scheiber v. United States*,
   77 F.4th 806 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 688 (2024) ............ 29

*Segar v. Smith*,
   738 F.2d 1249 (1984) ........................................................................... 37

*Shumaker v. Vilsack*,
   No. 7:22-CV-00084, 2023 U.S. Dist. LEXIS 151435 (S.D. Tex. Aug. 16, 2023),
   *aff'd*, 2024 WL 1113009 (5th Cir. Mar. 14, 2024) ................................... 17

*Smith v. City of Jackson*,
   544 U.S. 228 (2005) ............................................................................. 38

*Smith-Haynie v. District of Columbia*,
   155 F.3d 575 (D.C. Cir. 1998) ............................................................... 37

*Sofi Classic S.A de C.V. v. Hurowitz*,
   444 F. Supp. 2d 231 (S.D.N.Y. 2006) .................................................... 43

*Stastny v. S. Bell Co.*,
   628 F.2d 267 (4th Cir. 1980) ............................................................... 16

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Proj., Inc.*,
    576 U.S. 519 (2015) ................................................................ 38, 39

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................ 35, 36

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................................... 13

*\*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988) ....................................................................... 13

*Williams v. Conner*,
    522 F. Supp. 2d 92 (D.D.C. 2007) ............................................ 20, 31, 32

*Williams v. Glickman*,
    No. Civ. A. 95-1149 (TAF), 1997 WL 33772612 (D.D.C. Feb. 14, 1997) ............ 17

*Williams v. Vilsack*,
    620 F. Supp. 2d 40 (D.D.C. 2009) ............................................ 17, 18, 35

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) ....................................................................... 43

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ....................................................................... 35

**Constitutional Provisions**

U.S. Const., Art. II, § 3 ...................................................................... 23

**STATUTES**

5 U.S.C. § 701(a)(2) .......................................................................... 27

5 U.S.C. § 702 ................................................................................ 26

5 U.S.C. § 704 ................................................................................ 20

7 U.S.C. § 1922 ............................................................................. 2, 3

7 U.S.C. § 1941 ............................................................................. 2, 3

7 U.S.C. § 6932(b)(3) ......................................................................... 2

15 U.S.C. § 1691 .......................................................................... 5, 31

15 U.S.C. § 1691e ......................................................................... 6, 31

18 U.S.C. § 208 ............................................................................................................ 22

28 U.S.C. § 2401 .......................................................................................................... 24

22 U.S.C. § 2668a ........................................................................................................ 29

29 U.S.C. § 623(a)(2) ................................................................................................... 36

31 U.S.C. § 3701 .......................................................................................................... 41

42 U.S.C. § 2000e–2 .................................................................................................... 36

Inflation Reduction Act ("IRA")
  Pub. L. No. 117-169, 136 Stat. 1818, 2021 (2022) ................................... 6, 7, 8, 28

## LEGISLATIVE MATERIALS

H.R. Rep. No. 94-210 (1975) ....................................................................................... 40

## RULES

Fed. R. Civ. P. 15(c)(1) ............................................................................................... 32

Fed. R. Civ. P. 23 ........................................................................................................ 19

L.R. 23.1(b) ................................................................................................................. 13

## REGULATIONS

5 C.F.R. § 2635 ............................................................................................................ 23

5 C.F.R. § 2635.106 ..................................................................................................... 22

7 C.F.R. § 3.30(a) ........................................................................................................ 41

7 C.F.R. § 11 .................................................................................................................. 5

7 C.F.R. § 11.13(b) ........................................................................................................ 5

7 C.F.R. § 761.1 ............................................................................................................. 3

7 C.F.R. § 761.2 ......................................................................................................... 2, 3

7 C.F.R. § 762.120 ..................................................................................................... 4-5

7 C.F.R. § 762.125 ......................................................................................................... 5

7 C.F.R. § 762.128(d) .................................................................................................. 14

7 C.F.R. § 764.152 ......................................................................................................... 3

7 C.F.R. § 764.155 .................................................................................... 3

7 C.F.R. § 764.252 .................................................................................... 3

7 C.F.R. § 764.255 .................................................................................... 4

7 C.F.R. § 764.401 ........................................................................... 3, 4, 40

7 C.F.R. § 764.51 ...................................................................................... 3

7 C.F.R. § 780.5 ........................................................................................ 5

7 C.F.R. § 780.6 ........................................................................................ 5

7 C.F.R. § 780.7 ........................................................................................ 5

7 C.F.R. § 780.9 ........................................................................................ 5

7 C.F.R. § 780.15 ...................................................................................... 5

*Notice of Request for Public Comment on Providing Financial Assistance for Producers and Landowners Determined to Have Experienced Discrimination*,
87 Fed. Reg. 62,359 (Oct. 14, 2022) ....................................................... 6

**OTHER AUTHORITIES**

1-FLP, General Program Administration § 41,
https://perma.cc/PV3E-HYWJ ................................................................. 14

2-FLP Guaranteed Loan Making and Servicing § 31,
https://perma.cc/JT3W-WX9M ............................................................... 14

3 FLP, Direct Loan Making, Ex. 2, Definition of Terms (feasible plan),
https://perma.cc/RDY7-C2CM ...................................................... 3, 14, 39

2022 Census of Agriculture Highlights, Black Producers,
https://perma.cc/93ZN-BMW3 ................................................................ 36

Agriculture Secretary Thomas J. Vilsack, Opening Statement Before the House Committee on Agriculture – Remarks as Prepared (Mar. 25, 2021),
https://perma.cc/9FFW-GN8N ................................................................. 14

Application for Financial Assistance IRA Section 22007 USDA DFAP, Frequently Asked Questions ("FAQs") (Apr. 23, 2024)
https://perma.cc/LHK9-ZHYU ............................................................. 7, 30

DFAP Program Overview,
https://perma.cc/ZYY5-HVWS ............................................................... 6, 8

DFAP Validation Review Guide (July 16, 2024),
    https://perma.cc/2VGB-SPMY ................................................................. 8, 27

Inflation Reduction Act Investments in USDA Loan and Conservation Programs,
    https://perma.cc/Z9QC-L6EM ................................................................. 6

IRA Assistance for Producers Who Experienced Discrimination in USDA Farm Loan Programs,
    https://perma.cc/34WK-WRSB ................................................................. 6, 8

Non-Discrimination Statement,
    https://perma.cc/A48A-UXBE ................................................................. 14

United States Department of the Treasury, Foundational Concepts, Affirmative Duty to Collect,
    https://perma.cc/5B2Z-83FH ................................................................. 41

USDA FSA, Find a program,
    https://perma.cc/2JVK-4NLT ................................................................. 41

USDA FSA, Funding, Farm Service Agency,
    https://perma.cc/Z8PU-A5NS ................................................................. 41

USDA FSA, Outreach Programs,
    https://perma.cc/3XGY-QDJS ................................................................. 41

USDA, Guaranteed Farm Loan,
    https://perma.cc/3PZ2-FDAE ................................................................. 4, 5

USDA, National Appeals Division,
    https://perma.cc/RP36-Y4HC ................................................................. 41-42

## INTRODUCTION

Plaintiffs Wenceslaus Provost Jr. and Angela Provost allege that the United States Department of Agriculture ("USDA") discriminated against them in its administration of various farm loan programs between 2006 and 2024, including by failing to enforce government ethics regulations or adequately investigate civil rights complaints. Many of the claims alleged in the Complaint should be dismissed due to jurisdictional and pleading defects, including raising allegations that fall well outside of the statute of limitations, and impermissibly seeking to compel government investigations.

Throughout the Amended Complaint, Plaintiffs take aim at USDA's generally applicable and race-neutral eligibility requirements, including requirements that loan applicants demonstrate an adequate credit history and propose a farm operating plan that provides adequate cash flow to cover their debts and other expenses. But these are the common-sense pillars of responsible lending, so Plaintiffs cannot premise either a disparate impact claim or an equal protection claim on USDA's use of these criteria in its loan programs. And while USDA has acknowledged historic discrimination, those past actions do not demonstrate that Plaintiffs' claims can move forward. USDA has made significant procedural and policy changes to address and correct this history, and Plaintiffs cannot demonstrate that USDA's current loan policies or practices are discriminatory.

Even if Plaintiffs can state individual claims of discriminatory treatment under the Equal Credit Opportunity Act, they fail to state claims on behalf of classes of similarly-situated individuals. First, USDA's decentralized loan structure precludes a finding of commonality. There is no plausible basis for inferring that USDA—in spite of its many anti-discrimination policies—currently maintains an agencywide policy of discrimination in farm lending. Even if Plaintiffs could plausibly allege such a policy, a claim for discrimination requires the resolution of

1

myriad individual inquiries, precluding a finding of predominance. And as to Plaintiffs' remaining proposed classes, they fail the typicality requirement because Plaintiffs' own underlying claims fail as a matter of law. Accordingly, Plaintiffs' putative class allegations fail on the face of the Complaint.

After filtering the Complaint through Rule 12(b)(1) and 12(b)(6), what remains are three discrete, individual claims under the Equal Credit Opportunity Act ("ECOA") related to loan transactions in 2022, 2023, and 2024. All of the other claims in the Complaint should be dismissed.

## STATUTORY AND REGULATORY BACKGROUND

### A. USDA Loan Programs

The Farm Service Agency ("FSA") is a government agency within USDA responsible for operating farm loan programs, as well as other lending programs for agriculture producers. 7 U.S.C. § 6932(b)(3). Relevant here, Plaintiffs have applied for and received loans directly from FSA, and they have also applied for and received private loans guaranteed by the FSA. While direct and guaranteed loans have similar eligibility requirements, they differ in significant ways.

*Direct Loan Programs.* FSA offers two main types of direct loans to farmers and ranchers who cannot obtain commercial credit—farm ownership loans and operating loans. Specifically, FSA's farm ownership loans provide credit to farmers and ranchers for purposes of obtaining, enlarging, or improving farm property, *id.* § 1922(b), and its operating loans provide credit to borrowers purchasing such things as livestock, seed, and equipment, *id.* § 1941(c).

To be eligible for a USDA loan, an applicant must satisfy four main criteria: an applicant must be (1) a U.S. citizen; (2) a current or prospective owner or operator, depending on the type of loan, of a "family farm" under 7 C.F.R. § 761.2(b); (3) unable to obtain sufficient credit elsewhere on reasonable rates and terms; and (4) in possession of training or farm experience

sufficient to be successful.[1]  *Id.* §§ 1922(a)(1), 1941(a)(1).  A direct loan application must also include, *inter alia*, a description of the applicant's farm training and experience, a description of the farmland owned or to be acquired, the last three years of farm financial records and production records, documentation showing that the applicant cannot obtain sufficient credit elsewhere on reasonable terms, documentation of compliance with environmental regulations, verification of income, and a farm operating plan.  7 C.F.R. § 764.51.

FSA, primarily through local FSA staff, *see id.* § 761.1, will then review each individual loan application to ensure that borrowers are positioned for success and not overleveraging capital and perpetuating a cycle of debt, *see id.* § 764.401(a).  As one condition, FSA can only approve a direct loan if it determines that the applicant's "farm operating plan," which includes the projected cash flow budget reflecting production, income, expenses, and loan repayment plan, 7 C.F.R. § 764.51(b)(9), "reflects a feasible plan, which includes repayment of the proposed loan and demonstrates that all other credit needs can be met." *Id.* § 764.401(a)(1)(i); *see also id.* § 761.2 (defining "feasible plan"); 3 FLP, Direct Loan Making, Ex. 2, Definition of Terms (feasible plan), https://perma.cc/RDY7-C2CM.

One reason FSA might decline to approve a loan application is if the agency determines that there is "inadequate security for the type of loan requested."  7 C.F.R. § 764.401(b)(4).  Farm ownership loans, for example, must be secured, "[a]t a minimum, by the real estate being purchased or improved," *id.* § 764.155(b), while operating loans (not including microloans) must be secured by a "(1) First lien on all property or products acquired or produced with loan funds;

---

[1] Additionally, farm ownership and operating loans each have their own specific eligibility requirements related to debt forgiveness, owner-operator requirements, farming experience, and term limits captured in 7 C.F.R. § 764.152 and 7 C.F.R. § 764.252, respectively.

(2) Lien of equal or higher position of that held by the creditor being refinanced with loan funds," *id.* § 764.255(b).  A list of seven reasons a loan might be denied are contained in § 764.401(b): (1) The applicant's farm operating plan does not reflect a feasible plan; (2) The proposed use of loan funds is not authorized for the type of loan requested; (3) The applicant does not meet the eligibility requirements for the type of loan requested; (4) There is inadequate security for the type of loan requested; (5) Approval of the loan would cause the applicant's total indebtedness to the Agency to exceed maximum limits; (6) The applicant's circumstances may not permit continuous operation and management of the farm; or (7) The applicant, the farming operation, or other circumstances surrounding the loan are inconsistent with the authorizing statutes, other Federal laws, or Federal credit policies.

  *Guaranteed Loan Program.*  FSA's Guaranteed Farm Loan Programs provide a safety net to private financial loan institutions in order to help family farmers and ranchers obtain loans with reasonable rates and terms.  Guaranteed Farm Loan, https://perma.cc/3PZ2-FDAE.  With a guaranteed loan, the private third-party lender is FSA's customer, not the loan applicant; guaranteed loans are the property and responsibility of the private lender.  *Id.*  To obtain a guaranteed loan, both the private lender and loan applicant complete the Application for Guarantee and submit it to the FSA Service Center in their lending area. *Id.*  The Service Center then works with the commercial lender to process the guarantee.  *Id.*  The Farm Loan Officer reviews the application for applicant eligibility, repayment ability, adequacy of collateral, and compliance with other regulations, and if the applicant meets those requirements, the request is approved.  *Id.* Among other requirements, to qualify for an FSA guarantee, a loan applicant must be unable to obtain a loan without an FSA guarantee, must have an acceptable credit history as determined by the third-party lender, and must not be delinquent on any Federal debt.  *Id.*; *see also* 7 C.F.R.

§ 762.120.  And just as with USDA Direct Loans, an applicant's proposed operation must project a feasible plan.  7 C.F.R. § 762.125.  Once approved, the Service Center issues the lender a conditional commitment outlining the terms of the loan guarantee and indicating that the loan may be closed.  *See* Guaranteed Farm Loan, https://perma.cc/3PZ2-FDAE.  The lender closes the loan and advances funds to the applicant, after which the Service Center staff issues the guarantee.  *Id.* The lender services the loan to conclusion.  *Id.*  In the event the lender suffers a loss, FSA will reimburse the lender according to the terms and conditions specified in the guarantee.  *Id.*

*Loan Appeals*.  Applicants who are denied or otherwise dissatisfied with a loan offered or guaranteed by FSA may seek reconsideration pursuant to 7 C.F.R. § 780.7, mediation pursuant to 7 C.F.R. § 780.9, or appeal to the National Appeals Division.[2]  7 C.F.R. § 780.6 (outlining appeal procedures available when a decision is appealable); *but see id.* § 780.5 (listing decisions that are not appealable).  A participant requesting reconsideration, mediation or appeal must submit a written request as instructed in the notice of decision that is received no later than 30 calendar days from the date a participant receives written notice of the decision.  *Id.* § 780.15.  "An appellant may not seek judicial review of any agency adverse decision appealable [to the NAD] without receiving a final determination from the Division. . . ."  *Id.* § 11.13(b).

## B.  The Equal Credit Opportunity Act

In 1974, Congress enacted the Equal Credit Opportunity Act to prevent discrimination in the field of consumer credit.  The statute makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age," 15 U.S.C. § 1691(a)(1), and provides a private right of action against creditors who violate ECOA's antidiscrimination provisions, *id.*

---

[2] The National Appeals Division does not hear claims of discrimination.  7 C.F.R. § 11.

§ 1691e.  Under subsection (a), "[a]ny creditor who fails to comply with any requirement imposed under [ECOA] shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class."  *Id*. § 1691e(a).  "To establish a prima facie case under ECOA the class members must show that (1) plaintiff was a member of a protected class; (2) plaintiff applied for credit from defendants; (3) plaintiff was qualified for the credit; and (4) despite qualification, plaintiff was denied credit."  *Chiang v. Veneman*, 385 F.3d 256, 259 (3d Cir. 2004) (citation omitted).

### C.  Section 22006 and 22007 of the Inflation Reduction Act

Section 22006 of the Inflation Reduction Act ("IRA") provided $3.1 billion for USDA to provide relief for distressed borrowers with certain FSA direct and guaranteed loans.  Inflation Reduction Act Investments in USDA Loan and Conservation Programs, https://perma.cc/Z9QC-L6EM.  The statute directed USDA to expedite assistance for those borrowers whose agricultural operations are at financial risk.  *Id.*

Separately, Section 22007(e) of the IRA provided $2.2 billion in financial assistance for farmers, ranchers, and forest landowners who experienced discrimination in USDA's farm lending programs prior to January 1, 2021.  IRA, Pub. L. No. 117-169, § 22007, 136 Stat. 1818, 2021 (2022); IRA Assistance for Producers Who Experienced Discrimination in USDA Farm Loan Programs, https://perma.cc/34WK-WRSB.  USDA established the Discrimination Financial Assistance Program ("DFAP") to implement Section 22007(e).  DFAP Program Overview, https://perma.cc/ZYY5-HVWS.  Prior to implementing the program, USDA sought comments from the public. *See Notice of Request for Public Comment on Providing Financial Assistance for Producers and Landowners Determined to Have Experienced Discrimination*, 87 Fed. Reg. 62,359 (Oct. 14, 2022).  The DFAP application deadline closed on January 27, 2024.  Individuals and farming entities are permitted to both receive Section 22006 assistance and participate in DFAP,

if separately eligible.  *Id.*, Application for Financial Assistance IRA Section 22007 USDA DFAP, Frequently Asked Questions ("FAQs") at No. 3 (Apr. 23, 2024), FAQs at No. 3, https://perma.cc/LHK9-ZHYU.  DFAP applications were reviewed by third-party administrators applying a "substantial evidence" standard, which is less than a preponderance of the evidence. FAQs at No. 10, https://perma.cc/LHK9-ZHYU; *see also* DFAP Validation Guide at p.7 ("Terms such as 'evidence' or 'validation' are not intended to be legal terms of art but instead to be understood using their common meanings.").

Because Congress appropriated a fixed amount of money, "[t]he amount of money awarded to individuals through this program . . . depend[ed] on the number of eligible applicants."  FAQs at No. 12; *see also id.* (explaining that "if there are 50,000 eligible applicants, the average total award amount per applicant would be approximately $40,000; if there are 85,000 eligible applicants, the average total award amount would be approximately $25,000").  To fairly distribute this fixed amount of money required USDA to make decisions "for all applications, at the same time."  FAQs at No. 14.

The maximum award for an individual was statutorily capped at $500,000, IRA § 22007 (amending § 1006(e)), although USDA's materials noted that awards were expected to be much lower than that, FAQs at No. 12 ("However, it is important to understand that nearly all awards of financial assistance will be less than this amount.").

DFAP awards were "**not designed to and [did] not attempt to compensate applicants comprehensively for actual economic losses**."  FAQs at 12 (emphasis in original).  Instead, the amount of financial assistance awarded was based on the nature and consequences of the discrimination experienced and based on a fixed appropriation determined by Congress.  IRA § 22007 (amending § 1006(e)), FAQs at No. 12.

Congress instructed that the program "shall be administered through 1 or more qualified nongovernmental entities selected by the Secretary." IRA § 22007(e). Accordingly, regional hubs were responsible for conducting outreach, providing technical assistance, and providing initial determinations on application eligibility. IRA Assistance for Producers Who Experienced Discrimination in USDA Farm Loan Programs, https://perma.cc/34WK-WRSB. The national administrator reviewed each application, made determinations of eligibility, and evaluated eligible applications against USDA-approved standards, made decisions on individual applications, and distributed financial assistance after approval by USDA. DFAP Program Overview, https://perma.cc/ZYY5-HVWS.

USDA released a Validation Guide which described the system used to calculate what portion of the total pot appropriated by Congress should be awarded to each eligible applicant, based on a system that assigned points based on the consequences of discrimination identified by the applicant. DFAP Validation Review Guide (July 16, 2024), https://perma.cc/2VGB-SPMY (Appendix A and B).

### STATEMENT REGARDING FACTUAL ALLEGATIONS

Plaintiffs have an extensive history of participating in USDA's direct and guaranteed loan programs, as detailed in the Complaint. *See generally*, Am. Compl., ECF No. 36-1. Except where specifically noted, Defendants accept Plaintiffs' factual allegations as true for purposes of the resolution of this motion to dismiss, consistent with the applicable standards of review.

### PROCEDURAL HISTORY

On March 29, 2024, Plaintiffs filed their initial complaint. Compl. ECF No. 1. On June 24, 2024, Defendants filed a partial motion to dismiss many of the claims in the complaint on Rule 12(b)(1) and 12(b)(6) grounds. Defs.' Partial MTD, ECF No. 25. On September 16, 2024, Plaintiffs filed the Amended Complaint. Am. Compl., ECF No. 36-1.

The Amended Complaint, still a putative class action, challenges USDA's administration of its loan programs, investigation of civil rights complaints, and enforcement of government ethics regulations. As farmers who self-identify as Black, Plaintiffs seek to represent a nationwide class of Black farmers who, they claim, have suffered from discriminatory lending practices and other unscrupulous conduct by USDA. Specifically, Plaintiffs allege that USDA violated (i) ECOA's nondiscrimination provisions; (ii) the Administrative Procedure Act; (iii) the Fifth Amendment of the United States Constitution; and (iv) the Declaratory Judgment Act. The five classes they propose to represent include (a) a class of Black farmers who experienced a variety of negative treatment in virtually all phases of a USDA loan transaction, *id*. ¶ 162; (b) a class of Black farmers who submitted civil rights complaints that have not been responded to, *id.* ¶ 164; (c) a class of Black farmers who applied for a federal farm program with USDA and had their applications denied or reduced based on delinquent USDA debts that USDA has acknowledged should be forgiven on account of past discrimination, *id*. ¶ 165; (d) a class of Black farmers who lost land leases to USDA officials—including county committee members—who had access to information provided by socially disadvantaged farmers when applying for federal farm programs with USDA, Am. Compl. ¶ 166; and (e) a class of Black farmers who applied to DFAP, Am. Compl. ¶ 167. To remedy these alleged violations, Plaintiffs seek monetary, declaratory, injunctive, and other equitable relief, as well as attorney's fees and costs.

## LEGAL STANDARD

*Rule 12(b)(1).* "Rule 12(b)(1) requires courts to dismiss any case over which they lack subject-matter jurisdiction." *Joorabi v. Pompeo*, 464 F. Supp. 3d 93, 98 (D.D.C. 2020) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "It is the plaintiff's burden to establish that the Court has subject-matter jurisdiction," *id.* (citing *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)), and his failure to establish constitutional standing represents "a defect in

subject matter jurisdiction," *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). A plaintiff

has standing to seek judicial relief only when (1) the plaintiff has suffered an injury in fact that is

both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or

hypothetical; (2) the injury is traceable to the defendant's actions; and (3) the injury is redressable

by a favorable decision of the court. *See Ariz. State Legislature v. Ariz. Indep. Redistricting*

*Comm'n*, 576 U.S. 787 800–01 (2015) (citation omitted). Motions to dismiss for mootness are

properly brought under Rule 12(b)(1) because mootness deprives the court of jurisdiction. *Indian*

*River Cty. v. Rogoff*, 254 F. Supp. 3d 15, 18 (D.D.C. 2017).

    *Rule 12(b)(6).* Under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[I]n

deciding a Rule 12(b)(6) motion, a court may consider 'the facts alleged in the complaint,

documents attached as exhibits or incorporated by reference in the complaint,' or 'documents

upon which the plaintiff's complaint necessarily relies even if the document is produced not by the

plaintiff in the complaint but by the defendant in a motion to dismiss.'" *In re Domestic Airline*

*Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54–55 (D.D.C. 2016) (quotation omitted). And while

"courts must construe the pleadings broadly and assume that the facts are as plaintiff alleges,"

*Joorabi*, 464 F. Supp. 3d at 98–99, the Court "need not accept inferences unsupported by facts or

legal conclusions cast in the form of factual allegations." *City of Harper Woods Emps.' Ret. Sys.*

*v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

## ARGUMENT

    Plaintiffs' Complaint includes well-pleaded factual allegations sufficient to support only

three of their many claims at this stage of the litigation: a timely ECOA claim based on USDA's

alleged refusal to allow the Provosts to apply for a loan in 2022; a timely ECOA claim based on

alleged processing delays and an allegedly inadequate loan offered to Mrs. Provost in 2023; and a timely ECOA claim based on alleged processing delays and an allegedly inadequate loan offered to Mr. Provost in 2024.  Beyond these relatively narrow claims, Plaintiffs assert claims that fall outside of the Court's jurisdiction or otherwise fail to state a claim upon which relief may be granted.  These include untimely ECOA claims; claims under ECOA and the Administrative Procedure Act broadly challenging USDA's use of eligibility criteria for farm loans and the delegation of loan decision-making to local officers, and claims challenging Plaintiffs' DFAP awards, as well as claims related to USDA's enforcement of government ethics regulations and its handling of civil rights complaints; and a conclusory equal protection claim.  Each of these additional claims should be dismissed under either Rule 12(b)(1) or 12(b)(6).

Moreover, Plaintiffs' failure to plead a viable class in this case is apparent on the face of the Amended Complaint: Plaintiffs cannot seek to represent a class where they do not plausibly allege an agency-wide policy of discrimination that contradicts current USDA policies and practices, where individual inquiries predominate over any common claims of discrimination, and where the claims of the named Plaintiffs fail as a matter of law.  This case should therefore proceed solely on three of the Provosts' individual ECOA claims—the only well-pleaded claims over which the Court has jurisdiction.

## I.    The Court Should Strike Plaintiffs' Class Allegations for Failure to Plausibly Allege a Common Policy of Discrimination or Predominance.

At the outset, Defendants move to dismiss each of Plaintiffs' proposed classes.  As Defendants argued in their original motion to dismiss, Plaintiffs have failed to allege a "standard operating procedure" of discrimination that is common across class members, and individual inquiries needed to evaluate discrimination claims across USDA's 2,300 FSA offices will necessarily predominate over any common questions.  In fact, in their Amended Complaint,

Plaintiffs have materially *broadened* their first proposed class definitions.  While Plaintiffs' first class definition was originally proposed to be "[a]ll Black farmers whose farm loan applications were delayed and/or denied on account of race within the last five years[,]" Compl. ¶ 199, Plaintiffs now propose to represent a class of Black farmers "whose farm loan applications were delayed and/or denied, who were prevented from applying for a loan or loan servicing, who were offered an infeasible loan, who were subjected to adverse loan terms, or who were required to use a supervised account in order to receive a loan within the last five years or, alternatively, in the time period under which USDA's loan approval and administration policies remained materially unchanged."  Am. Compl. ¶ 162.  In doing so, they have compounded the individual inquiries required to evaluate their claims, touching nearly every aspect of a USDA loan transaction.  Plaintiffs' fifth proposed class, a class of Black farmers who had validated claims under DFAP, suffers each of these same defects.  Plaintiffs' four remaining class definitions (Am. Compl. ¶¶ 164–67) fail because Plaintiffs are atypical class members: their own claims are time-barred, are not supported by any factual allegations in the Complaint, or are otherwise jurisdictionally defective.  *See infra*, Part II, III.  Thus, each of their proposed classes fails at the pleading stage.

### A. Plaintiffs' first and fifth proposed classes fail to plausibly allege any common policy of discrimination, and individual inquiries will necessarily predominate over any common questions.

Although the D.C. Circuit has not yet considered the application of the plausibility standard to class allegations, several other circuits, and at least one court in this district, have held that "Rule 12(b)(6) motions can be used to strike class allegations when it is apparent on the face of the complaint that they cannot satisfy the requirements of Rule 23."  *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 140 (D.D.C. 2016).  Where, as here, the Complaint fails to plausibly allege that "questions of law or fact common to class members" will "predominate over any questions affecting only individual members," "a Rule 12(b)(6) motion can be used to strike class

allegations." *Id.* at 144–45 (internal quotation omitted).  This is consistent with Local Rule 23.1, which provides that "a defendant may move at any time to strike the class action allegations or to dismiss the complaint."  L.R. 23.1(b).

To "establish a charge of pattern and practice discrimination under ECOA, a putative class must prove that 'discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'"  *Garcia v. Johanns*, 444 F.3d 625, 628 (D.C. Cir. 2006) (citations omitted).  But Plaintiffs cannot plausibly do so, when they have conceded that "[t]he discrimination Black farmers face results less from top-down direction than from the USDA's decentralized structure."  Compl. ¶ 32, ECF No. 1; *see also* Am. Compl. ¶ 190 ("USDA has chosen to delegate authority in a decentralized manner that gives local officials free rein to discriminate").  As the Supreme Court recognized in *Wal-Mart Stores, Inc. v. Dukes*, a policy of "*allowing discretion* by local [decision-makers] … [o]n its face, . . .  is just the opposite of a uniform [] practice that would provide the commonality needed for a class action."  564 U.S. 338, 355 (2011) (emphasis in original).  Indeed, the Supreme Court went so far as to label this kind of discretionary decentralization a "very common and presumptively reasonable way of doing business—one that [it has] said 'should itself raise no inference of discriminatory conduct.'"  *Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988)).

And here, the plausibility of Plaintiffs' theory is further undermined by USDA's multiple anti-discrimination policies.  These policies include (but are not limited to) provisions in applicable regulations, the General Administration Handbook, and the Guaranteed Loan Making and Servicing Handbook, in addition to USDA's general nondiscrimination statement:

> In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex,

> gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA[.]

Non-Discrimination Statement, USDA available at https://perma.cc/A48A-UXBE; 7 C.F.R. § 762.128(d); 1-FLP, General Program Administration § 41, available at https://perma.cc/PV3E-HYWJ; 2-FLP Guaranteed Loan Making and Servicing § 31 ("FSA is required to comply with nondiscriminatory and *--equal opportunity practices in guaranteed loan making and servicing actions.--*"), https://perma.cc/JT3W-WX9M.  Beyond these general non-discrimination policies, USDA also has specific policies directing USDA officials to provide equal, race-neutral service. As just one example relevant to Plaintiffs' proposed class, "[a]n agency official will … not refuse to provide a requested application to any person" and will "not make oral or written statements that would discourage any individual from applying for assistance based on any ECOA prohibited basis."  3 FLP, Direct Loan Making § 41(A).[3]  Plaintiffs are thus correct that "USDA has established a common framework for decisions on all loan applications requiring local loan officers to make decisions on loan applications based on set-out Eligibility Requirements," and that is a common policy of non-discrimination.  *See* Am. Compl. ¶ 186; *see also id.* at n.2, Agriculture Secretary Thomas J. Vilsack, Opening Statement Before the House Committee on Agriculture – Remarks as Prepared (Mar. 25, 2021), https://perma.cc/9FFW-GN8N ("[R]acism and discrimination have no place at the Department of Agriculture.").  Plaintiffs thus have not "nudged [their] claims of invidious discrimination"—as a policy or practice across USDA—

---

[3] These Handbooks are referenced in and integral to Plaintiffs' Amended Complaint, and thus the Court may consider them at the motion to dismiss stage.  *See*, *e.g.*, *Cause of Action v. Nat'l Archives & Records Admin.*, 926 F. Supp. 2d 182, 185 (D.D.C. 2013), *aff'd*, 753 F.3d 210 (D.C. Cir. 2014).

"across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (internal quotations and citations omitted).

Setting aside this overarching plausibility problem, USDA's decentralized loan-decision-making structure, along with the necessarily context-specific reasoning for FSA's loan decision-making on individual loan applications, has led the D.C. Circuit and courts in this district to repeatedly decline to certify classes based on alleged discrimination defined much more narrowly than the one Plaintiffs propose to represent here. In *Garcia*, for example, plaintiffs sought to represent "a class of similarly situated Hispanic farmers throughout the nation who claim that the Department discriminated against them in denying them farm loans and other benefits because of their ethnicity and that it failed to investigate the discrimination complaints they subsequently filed with the Department." *Garcia*, 444 F.3d at 628. The D.C. Circuit affirmed the district court's denial of class certification because "commonality for a disparate treatment class is particularly difficult where, as here, multiple decisionmakers with significant local autonomy exist." *Id.* at 632. The court concluded that the proposed class, like Plaintiffs' here, could not identify a "centralized, uniform policy or practice of discrimination by the USDA that formed the basis for discrimination against [minority] loan applicants with varied eligibility criteria in over 2,700 counties nationwide. . . ." *Id.* at 632–33. Nor could any individual plaintiff "prevail without scrutiny of his or her individual loan application to determine whether the application was 'feasible' in terms of such objective criteria as an applicant's financial qualifications and repayment ability." *Garcia v. Veneman* (*Garcia I*), 211 F.R.D. 15, 24 (D.D.C. 2002); *see also Garcia v. Veneman* (*Garcia II*), 224 F.R.D. 8 (D.D.C. 2004), *aff'd and remanded sub nom. Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006). The concerns expressed by the D.C. Circuit apply with full force to Plaintiffs' proposed classes here: "The instant case, if allowed to proceed as a class

action, would quickly devolve into hundreds or perhaps thousands of individual inquiries about each claimant's particular circumstances," including the feasibility of putative class members' farm operating plans, their financial qualifications, and their ability to repay. *Garcia I*, 211 F.R.D. at 24; *Garcia II*, 224 F.R.D. at 16.

In *Love*, the plaintiffs proposed to represent two subclasses—again, both more narrowly defined than the classes proposed by Plaintiffs here—one of female farmers who asked for loan application forms but did not receive them; and another consisting of female farmers who received, completed, and submitted their loan application forms but did not obtain a loan. *Love v. Veneman*, 224 F.R.D. 240, 242 (D.D.C. 2004). The district court held that plaintiffs could not make the "significant showing" required by D.C. Circuit authority, that would "permit the Court to infer that members of the class suffered from a common policy of discrimination that pervaded all of the challenged decisions nationwide." *Id.* at 243 (cleaned up). "[T]he clear weight of authority examining decentralized decision making," the court held, "acknowledges that it 'cuts against any inference for class action commonality.'" *Id.* (quoting *Stastny v. S. Bell Co.*, 628 F.2d 267, 279 (4th Cir. 1980)). Potential non-subjective reasons for loan denials, such as insufficient collateral and insufficient income, further undercut a finding of commonality. *Id.*; *see also Garcia*, 444 F.3d at 636 ("In sum, the Department used an array of objective—and individual—justifications in denying the appellants loans."). The D.C. Circuit affirmed the denial of class certification. *See Love v. Johanns*, 439 F.3d 723, 727 (D.C. Cir. 2006).

Similarly, in *Williams v. Glickman*, the district court—when considering a similar putative class of minority farmers—concluded that "there are numerous questions of fact for each individual plaintiff which must be assessed to determine whether discrimination occurred," including the feasibility of applications and adequacy of collateral, and the knowledge and intent

of individual loan officers, among others.  No. Civ. A. 95-1149 (TAF), 1997 WL 33772612, at

*10 (D.D.C. Feb. 14, 1997).  Just like the plaintiffs in *Williams*, Plaintiffs "are asking the Court to

certify a class which would encompass every possible instance of discrimination in connection

with the [FSA's] making and servicing of loans."  *Id.* at *7.

Taken together, *Garcia*, *Love*, and *Williams* articulate two principal concerns with

proposed nationwide classes of farmers alleging that USDA discriminated in the administration of

its farm loan programs: the inability of plaintiffs to identify a common policy of discrimination,

given the decentralized county office system and express non-discrimination policies; and the

inability of plaintiffs to establish commonality and predominance given the individual

circumstances that affect loan eligibility, processing times, whether a loan is granted, whether

closing conditions have been met, and ultimately, whether discrimination occurred.  *See, e.g.*,

*Bradshaw v. Vilsack*, 560 F. Supp. 3d 101, 146 (D.D.C. 2021) (Friedman, J.); *Williams v. Vilsack*,

620 F. Supp. 2d 40, 51 (D.D.C. 2009) (Kollar-Kotelly, J.).[4]  Both of these concerns apply equally,

on the face of the Complaint, to the Provosts' first and fifth proposed classes.[5]

These types of fact-intensive and context-specific individual inquiries have played out in

individual ECOA discrimination claims brought by minority farmers against FSA officials in this

district.  For example, in *Bradshaw*, the court conducted a five-day bench trial on an individual's

---

[4] *See also*, *e.g.*, *Shumaker v. Vilsack*, No. 7:22-CV-00084, 2023 U.S. Dist. LEXIS 151435, at *23,
2023 WL 5491903 (S.D. Tex. Aug. 16, 2023), *aff'd*, 2024 WL 1113009 (5th Cir. Mar. 14, 2024)
(granting summary judgment in favor of USDA, finding that a Black farmer failed to establish a
*prima facia* claim of discrimination with respect to a 2021 loan denial and that USDA sufficiently
articulated nondiscriminatory reasons for its actions).

[5] Even if a DFAP applicant had a validated claim in DFAP's non-adversarial claims process,
applying a standard below a preponderance of evidence, each claim would still require the same
individualized scrutiny as any other discrimination claim under ECOA.

claim of discrimination in USDA loan-making under ECOA.  560 F. Supp. 3d at 142.  After considering the evidence presented at trial, including testimony of the witnesses, and having had the opportunity to assess the plaintiff's "assertions through the crucible of direct and cross-examination," the court held that the plaintiff failed to demonstrate racial animus on the part of the FSA decision maker and entered judgment in favor of USDA.  *Id.* (entering detailed findings of fact and conclusions of law).  And in *Williams*, "[a]fter a searching review of the parties' submissions," the court granted summary judgment to USDA, finding there was no evidence from which race discrimination could reasonably be inferred.  620 F. Supp. 2d 40, 49 (D.D.C. 2009) (Kollar-Kotelly, J.).  This included detailed evidence regarding the feasibility of the farmer's proposed plans.  *Id.* at 43.  These cases crystalize the salience of individualized inquiries into the circumstances of particular loan applications and the predominance problem that Plaintiffs face, and also dispel Plaintiffs' theory of a standard operating procedure of discrimination at USDA.

Because Plaintiffs' first and fifth proposed classes are both defective on the face of the Complaint and Plaintiffs' allegation of a common policy or practice of discrimination is otherwise implausible, the Court should strike the class allegations at the motion-to-dismiss stage.  *See Elson v. Black*, 56 F.4th 1002, 1007 (5th Cir. 2023) (affirming dismissal of class-action allegations).

### B.  Plaintiffs fail to state any individual claims to support their second, third, fourth, and fifth proposed classes.

Plaintiffs' second, third, and fourth proposed classes relate to their claims alleging that (a) USDA failed to timely or adequately investigate their civil rights complaints; (b) USDA denied or reduced minority loan applications based on delinquent USDA debts that USDA has acknowledged should be forgiven on account of past discrimination; (c) Plaintiffs lost a land lease to a USDA county committee member in violation of government ethics regulations; and (d) their DFAP awards were insufficient.  *See* Am. Compl. ¶¶ 164–67.  But Plaintiffs' claims, as alleged in

the Complaint, are each subject to dismissal: Plaintiffs' failure-to-investigate claim is not cognizable under the Administrative Procedure Act, *infra* at Part II.A; Plaintiffs have not alleged that USDA denied or reduced any of their loan applications based on delinquent USDA debts that USDA acknowledged should be forgiven on account of discrimination, particularly within the statute of limitations, *see* Am. Compl. ¶ 145 (alleging that USDA *approved* Mr. Provost's loans after he received IRA distressed borrower assistance and a third-party bank cancelled his debts), *see also infra* Part III.B (Am. Compl. ¶ 99); Plaintiffs' claim related to a land lease that they allegedly lost to a county committee member is both untimely and fails to state a claim under the APA, *infra* at Part II.A.2,3; while Plaintiffs' DFAP challenge similarly fails to state a claim under the APA and is also moot, *infra* Part II.B.  Because Plaintiffs fail to plead viable claims of their own, these claims are not typical within the meaning of Rule 23(a)(3) for purposes of class representation, on the face of the complaint.  *See Epps v. JPMorgan Chase Bank N.A.*, Civ. A. No. WMN-10-1504, 2012 WL 5250538, at *2 (D. Md. Oct. 22, 2012) (considering the plaintiff's motion to dismiss before turning to class certification, because the plaintiff's "claims cannot be 'typical' within the meaning of Rule 23(a)(3) if she does not have a claim herself").  Accordingly, Plaintiffs' class claims should be dismissed.[6]

## II.        Plaintiffs Fail to State a Claim as to their APA Claims, and their DFAP Challenge Is Moot.

Plaintiffs' third, fourth, fifth, and sixth claims are brought under the Administrative Procedure Act ("APA") (Am. Compl. ¶¶ 232–85).  Claims Three, Four, and Five seek to challenge USDA's investigations of civil rights complaints and USDA's enforcement of its conflict-of-interest provisions, while Claim Six seeks to challenge the amount Mr. Provost received in his

---

[6] To the extent Defendants' motion to dismiss the class allegations is denied, Defendants reserve all arguments that may be raised under Federal Rule of Civil Procedure 23.

DFAP award.  As described below, each of these claims fails.

**A. Plaintiffs' Claims Three, Four, and Five, which attempt to raise APA challenges to USDA's investigation of civil rights complaints or enforcement of its conflict-of-interest provisions, fail.**

Plaintiffs fail to state a claim as to their APA claims challenging USDA's handling of civil rights complaints or conflict-of-interest provisions because ECOA provides an adequate remedy for their credit-related claims, because they do not challenge any other timely, final agency actions, and because civil rights investigations and enforcement are entrusted to the Executive's discretion.

       *1.     APA review is not available for credit-related claims where ECOA provides an adequate remedy.*

Plaintiffs' claims Three, Four, and Five seek to challenge USDA's alleged failure to investigate civil rights complaints and alleged failure to enforce its conflict-of-interest provisions. *See, e.g.*, Am. Compl. ¶ 233; Am. Compl. ¶ 254.

The APA only provides for review of agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  Accordingly, because it is well established that ECOA provides a "special and adequate review procedure" for discrimination claims related to credit transactions, APA review is not available.  *See Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988)); *Love v. Connor*, 525 F. Supp. 2d 155, 160 (D.D.C. 2007) ("The rule that emerges from this unbroken line of [D.C.] circuit decisions is that, where a victim of discrimination can sue directly to remedy her injury, no action will lie under the APA for failure to adequately investigate, monitor, or police that discrimination"), *aff'd & remanded sub nom. Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009); *see also Cottrell v. Vilsack*, 915 F. Supp. 2d 81, 90 n.9 (D.D.C. 2013), *aff'd*, 2013 WL 4711683 (D.C. Cir. July 31, 2013); *Williams v. Conner*, 522 F. Supp. 2d 92, 102–03 (D.D.C. 2007); *Guy v. Vilsack*, No. 12-cv-1557 (ESH), 2013 WL 4883594, at *2 (D.D.C. Sep. 12, 2013), *aff'd*, 2014 WL

3027992 (D.C. Cir. May 29, 2014).

Indeed, ECOA, as the congressionally-designed approach for addressing claims of discrimination relating to credit transactions, may provide an adequate remedy even if the directly analogous ECOA claim is foreclosed. For example, in *Garcia*, the D.C. Circuit affirmed the dismissal of APA claims brought based on a failure-to-investigate theory because ECOA offered an adequate remedy, even though the D.C. Circuit had previously affirmed the dismissal of failure-to-investigate ECOA claims because the claims were not sufficiently credit-related. *See Garcia*, 563 F.3d at 521 ("This court affirmed . . . the dismissal of the failure-to-investigate claims brought under [ECOA]. The question in this second interlocutory appeal is whether appellants' failure-to-investigate claims are reviewable under the [APA]. Because appellants fail to show they lack an adequate remedy in a court, we affirm the dismissals of their APA failure-to-investigate claims and remand the cases to the district court." (citations omitted)).

Plaintiffs acknowledge this line of precedent in the Amended Complaint but attempt to distinguish between "credit-related civil rights investigations" and other civil rights investigations: "Even if ECOA offers an adequate remedy for the USDA's failure to investigate credit-related civil rights investigations, it offers no remedy for the USDA's failure to adequately investigate non-credit related complaints . . . ." Am. Compl. ¶ 249. But many of the civil rights complaints that form the basis of Plaintiffs' claims *are* credit-related.[7] For this reason alone, any APA claims

---

[7] *See, e.g.*, Am. Compl. ¶ 107 (describing a civil rights complaint that alleged that USDA officials "object[ed] to [Mr. Provost's] Chapter 12 bankruptcy plan in ongoing bankruptcy proceedings; refus[ed] to grant timely and adequate loans; fail[ed] to offer debt forgiveness or other financial assistance; forc[ed] the assumption of parental debt; and approv[ed] a loan with an unauthorized, photocopied signature"); Am. Compl. ¶ 118 (describing a civil rights complaint that alleged that USDA had handled loan feasibility inconsistently and described USDA's "requirement that he assume Provost Sr.'s debt and [USDA's] administration of guaranteed loans throughout the

related to credit transactions, including portions of Claims Three, Four, and Five should be dismissed.

> ### 2.    *Plaintiffs do not challenge any reviewable final agency actions.*

In addition to the availability of an adequate remedy under ECOA, Plaintiffs fail to challenge final agency actions subject to APA review. The alleged failure to enforce conflict-of-interest regulations and alleged failure to adequately investigate civil rights complaints—even those complaints that are not credit-related as discussed *supra* Part II.A.1—are not final agency actions. And to the extent Plaintiffs seek to challenge the alleged misconduct of a county committee member in persuading landlords to break their leases with Plaintiffs, that is not agency action at all.

In any event, the enforcement of conflict-of-interest provisions and the investigation of alleged violations are committed to USDA's and the Attorney General's discretion. These provisions reserve enforcement to the Attorney General, government agencies, and the Office of Government Ethics, without dictating how that "responsibility" should be exercised. *See* 5 C.F.R. § 2635.106(a) ("[A] violation of this part . . . may be cause for appropriate corrective or disciplinary action to be taken under applicable Governmentwide regulations or agency procedures. Such action may be in addition to any action or penalty prescribed by law."); *id.* § 2635.106(b) ("It is the responsibility of the employing agency to initiate appropriate disciplinary or corrective action in individual cases."); *see also* 18 U.S.C. § 208; *cf. also* Am. Compl. ¶¶ 243,

---

years"); Am Compl. ¶ 123 ("Mrs. Provost pointed out that the USDA had not complied with its own regulations concerning debt service margins.").

268 (citing 5 C.F.R. § 2635).[8]

In *Heckler v. Chaney*, the Supreme Court concluded that an agency's decision to "refus[e] to take enforcement steps" is a decision presumptively committed to "an agency's absolute discretion" and "general[ly] unsuitab[le] for judicial review."  470 U.S. 821, 831 (1985).  The Court gave three primary rationales—first, "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as whether "agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies," and whether the agency has the resources to undertake the action at all.  *Id*.  Second, "when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts are often called upon to protect."  *Id*. at 832 (emphasis in original).  Finally, "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'"  *Id*. (quoting U.S. Const., Art. II, § 3).

Each of these factors confirms the unavailability of judicial review of USDA's alleged non-enforcement of government ethics regulations or the alleged inadequacy of USDA's civil rights investigations.  *See*, *e.g.*, *James v. U.S. Dep't of Educ.'s Off. for Civ. Rts*, No. 22-CV-5738 (LTS), 2022 WL 6807471, at *2 (S.D.N.Y. Oct. 11, 2022) (citing *Heckler* and holding that the Office of Civil Rights' "disposition of Plaintiff's complaint is a discretionary act that is not reviewable under

---

[8] For purposes of this Motion to Dismiss only, Defendants assume without conceding that the ethics regulations cited by Plaintiffs apply to USDA county committee members.

the APA"). Here, as in *Heckler*, the Court has therefore "no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002); *see also Clarke v. Holder*, 767 F. Supp. 2d 106, 113 (D.D.C. 2011), *aff'd sub nom. United States v. Straker*, 800 F.3d 570 (D.C. Cir. 2015). Accordingly, the Court lacks jurisdiction over Plaintiffs' Claim Five, Am. Compl. ¶¶ 263–74, alleging failure to enforce conflict-of-interest regulations. And because Plaintiffs' claims are subject to dismissal, Plaintiffs likewise cannot represent a class with respect to these types of allegations. *Supra* Part I.B.

### 3. Several of Plaintiffs' APA Claims Are Time Barred.

Furthermore, many of the events described in Plaintiffs' Amended Complaint fall well outside the APA's six-year statute of limitations. Because the APA does not set a specific statutory deadline, the six-year statute of limitations of 28 U.S.C. § 2401 applies to claims brought under the APA. *See* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."); *see also James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1093–94 (D.C. Cir. 1996) (the APA "carries a six-year statute of limitations").

Accordingly, any claims that arose prior to March 29, 2018, are time-barred. This includes any alleged conflict of interest violations prior to March 29, 2018, *see* Am. Compl. ¶¶ 95–97 (alleging actions by County Committee members in 2015 to 2017); *cf.* Am. Compl. ¶¶ 57–59 (generally alleging that County Committee members have "historically used their position to discriminate against Black farmers"), and the civil rights investigation initiated by Plaintiffs in 2016, *see* Am. Compl. ¶¶ 102–03, which was closed in 2018, *see* Ex. A, Notice of Closure. Because Plaintiffs' claims are time-barred, they are unable to represent a class with respect to these types of claims. *See supra* Part I.B.

**B. Plaintiffs' sixth claim, which attempts to raise an APA challenge to the amount of DFAP awards, fails because it is moot and administration of the program was committed to USDA's discretion.**

Plaintiffs' Amended Complaint adds a count six raising an APA challenge to the amount of financial assistance provided to Mr. Provost, and perhaps others, in DFAP awards. Am Compl. ¶¶ 275-85. This claim fails both because it is moot due to the nonavailability of any further DFAP funds, and because the selection of an appropriate award was committed to USDA's discretion.

*1.  Any APA challenge to the amount of a DFAP award is moot because no appropriated funds remain available.*

Plaintiffs' attempted APA challenge to the *amount* of the DFAP financial assistance received by Mr. Provost—and, potentially, unspecified others—is moot because USDA has already obligated all of the money appropriated for the DFAP and thus there is no relief this Court can afford.[9]  "Federal courts lack jurisdiction to decide moot cases" where relief cannot be afforded, *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (quotation marks omitted), and here, USDA can no longer award Mr. Provost—or anyone else—a greater share of the $2,200,000,000 appropriated by Congress for DFAP because those funds are unavailable.  As such, any claim regarding the amount of a DFAP award should be dismissed as moot.

---

[9] For the purposes of mootness due to unavailability of appropriated funds, it does not matter if the specific funds become unavailable before or during the pendency of the lawsuit, or whether plaintiff had a practical opportunity to seek relief prior to unavailability.  *See City of Houston*, 24 F.3d at 1426–27 ("Indeed, even if a plaintiff brings suit before an appropriation lapses, this circuit's case law unequivocally provides that once the relevant funds have been obligated, a court cannot reach them in order to award relief." (citing cases)); *see also Cnty. of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 142 (2d Cir. 2010) ("As a result, while the claims in *City of Houston* were moot at the time they were filed, plaintiffs' claims became moot, despite their efforts, during the course of this litigation. Unfortunately, however, these are distinctions without a difference for purposes of the mootness doctrine. . . . . Our analysis turns on the fact that, irrespective of the status of these appropriations when the action was commenced, HHS had exhausted them by the time the proceedings were remanded.").

Courts have dismissed as moot APA challenges arguing that plaintiffs should have been entitled to a greater share of a fixed pot of appropriated money where that pot had already been obligated elsewhere or otherwise became unavailable before or during the suit. *See*, *e.g.*, *City of Houston v. HUD*, 24 F.3d 1421, 1424 (D.C. Cir. 1994) ("It is a well-settled matter of constitutional law that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation."); *Promundo-US v. HHS*, No. 18-CV-2261 (CRC), 2019 WL 3239245, at *4 (D.D.C. July 18, 2019) (plaintiffs' claims for funding from 2018 Teen Pregnancy Prevention Program appropriation were moot where those funds were already exhausted); *Cty. of Suffolk v. Sebelius*, 605 F.3d at 142 (plaintiffs' claims for additional funds from HHS's FY 2007 and 2008 appropriations were moot where those specific funds were already exhausted).

Here, USDA has already used all of the $2,200,000,000 appropriated by Congress for the program. *See* Ex. B, Schlanger Decl. ¶¶ 12–13.

Nor could Plaintiffs salvage this claim, even if they attempt to identify other funding sources and allege that those could provide substitute funds. This is because "[a]n award of monetary relief from any source of funds other than [the specific] appropriation would constitute money damages rather than specific relief, and so would not be authorized by APA section 702." *City of Houston*, 24 F.3d at 1428. The APA does not permit suits for "money damages," 5 U.S.C. § 702, so monetary awards are only permissible when "such an award constitutes specific relief— that is, when a court orders a defendant to pay a sum owed out of a specific res." *City of Houston*, 24 F.3d at 1428. Where that specific res has become unavailable—for example, because it has been obligated or has lapsed—providing the same amount of money from a different funding source would constitute money damages beyond the APA's waiver of sovereign immunity. *See*,

*e.g.*, *id.* (rejecting plaintiffs' argument that the defendant-agency could pay it from other funds); *Promundo-US*, 2019 WL 3239245, at *7 (same).

       2.    *The Court lacks jurisdiction over an APA challenge to the amount of a given DFAP award because USDA's DFAP administration is committed to agency discretion.*

USDA set forth the procedures it used to calculate the amount of DFAP awards in Appendices A and B of its DFAP Validation Review Guide. DFAP Validation Review Guide (July 16, 2024), https://perma.cc/BX9X-US69. Plaintiffs' theory of how they believe the calculation of DFAP awards was arbitrary and capricious is somewhat opaque: it is unclear whether Plaintiffs' theory is (1) that USDA arbitrarily and capriciously selected procedures, and should have selected different procedures instead, or (2) that USDA arbitrarily and capriciously did not follow the procedures it selected. Either theory would fail.

       a)    *The selection of procedures to calculate DFAP awards was committed to agency discretion.*

To the extent Plaintiffs intend to allege that USDA's chosen procedures for calculating DFAP awards were arbitrary or capricious, *see*, *e.g.*, Am. Compl. ¶ 283 (appearing to criticize the timeline used by USDA, the lack of an appeal process, and USDA's distribution of all appropriated funds), Plaintiffs fail to allege any reason that any of these features would be arbitrary or capricious.

But in any event, USDA's selection of award procedures was expressly committed to USDA's discretion by law and thus excluded from APA review. 5 U.S.C. § 701(a)(2). The exception to judicial review applies to "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)), as well as instances where "the statute is drawn so that a court would have no meaningful standard

against which to judge the agency's exercise of discretion," *id.* (quoting *Heckler*, 470 U.S. at 830); *see also infra* Part II.A.2.

USDA's decision of what procedures to use to calculate DFAP awards fits squarely within this exception. IRA § 22007(e) lacks any "statutory reference point" that could furnish a "meaningful standard against which to judge the agency's exercise of discretion." *Drake*, 291 F.3d at 72. The statute appropriated $2.2 billion for a financial assistance program and directed USDA to provide financial assistance to farmers "determined to have experienced discrimination prior to January 1, 2021 in [USDA] farm lending programs." The statute stated that the amount of assistance should be "as determined to be appropriate based on any consequences experienced from the discrimination" and should be no more than $500,000. IRA § 22007(e). The statute did not impose any specific conditions on how USDA should "determine" an "appropriate" amount, instead conferring broad discretion on USDA. "In looking for judicially administrable standards by which to judge the Secretary's decision, that language is an empty vessel." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 633 (D.C. Cir. 2020).

This is similar to cases in which courts have found that an agency's decision of how to use a lump-sum appropriation was committed to agency discretion. *See Lincoln v. Vigil*, 508 U.S. at 184 (Indian Health Service's decision to reallocate funding away from a children's health program was committed to the agency's discretion and thus unreviewable). "The D.C. Circuit has extended *Lincoln*'s reasoning to agency decisions involving non-lump sum appropriations as well." *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75 (D.D.C. 2018) (Brown Jackson, J.). In *Milk Train, Inc. v. Veneman*, for example, the D.C. Circuit concluded that USDA's decision to impose a cap on a milk subsidy program was committed to agency discretion because Congress "left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy

28

farmers." 310 F.3d 747, 751 (D.C. Cir. 2002). And just last year, the D.C. Circuit held that the Department of State's administration of a compensation fund was unreviewable because the governing statute did not "direct[] the Secretary to allocate funds in any particular way—it just requires him to 'determine the amounts due.'" *Scheiber v. United States*, 77 F.4th 806, 814 (D.C. Cir. 2023) (quoting 22 U.S.C. § 2668a), *cert. denied*, 144 S. Ct. 688 (2024).

In addition, devising the method of dividing a fixed pot provided by Congress among eligible applicants involved "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," *Lincoln*, 508 U.S. at 193, because USDA has significant experience in administering assistance programs subject to broad congressional appropriations involving direct payments to applicants.

> b)    *Plaintiffs offer only conclusory statements explaining how they believe USDA departed from its procedures.*

To the extent that Plaintiffs contend that USDA wrongfully departed from its procedures in setting an award for Mr. Provost or others, that claim also fails. *See* Am. Compl. ¶ 279 ("The USDA has published its guidelines on calculating DFAP awards, providing a standard against which a court can review its decisions.").

Plaintiffs offer nothing more than conclusory statements explaining why they believe Mr. Provost should have received a different amount. *See*, *e.g.*, Am. Compl. ¶ 280 ("The USDA's DFAP award calculations bore no relation to individuals' respective economic losses or the number of instances of discrimination individuals had faced. Specifically, Mr. Provost received only approximately $70,000, despite providing documentation that a series of discriminatory acts spanning seventeen years caused him to lose over $21 million in expected revenue."). Plaintiffs also state that "[t]he USDA's award calculations arbitrarily and capriciously departed from its guidance governing the calculation of DFAP awards. . . . Specifically, the USDA announced its

decisions on DFAP applications and paid out all DFAP funds in a period of less than two weeks. USDA then told each applicant that the agency's decision was final, they had no ability to appeal, and that all funding had been spent," Am. Compl. ¶¶ 282–83, but Plaintiffs do *not* allege that USDA's DFAP procedures required it to pay out DFAP funds over a period other than two weeks, to provide an appeal, or to retain a reserve of unused funding.

These conclusory statements are insufficient to meet Plaintiffs' burden even at the pleading stage. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Reading Plaintiffs' allegations in the light most favorable to them, the closest they come to explaining why they believe that USDA's procedures were not followed is pointing to a vague, alleged discordance between the "approximately $70,000" that Mr. Provost was awarded and the "$21 million in expected revenue," that he believes he lost over multiple years. Am. Compl. ¶ 280. But there is no inference to be drawn from this alleged *discordance* because there is no reason to expect a *concordance*— USDA stated explicitly that its procedures for calculating DFAP awards were "not designed to and [did] not attempt to compensate applicants comprehensively for actual economic losses." FAQs at 12; *see also* Inflation Reduction Act § 22007(e) (limiting financial assistance to a recipient under § 22007(e) to "not more than $500,000"). It is thus unsurprising that the amounts would be different, and that mere fact casts no doubt on USDA's application of its chosen procedures.

### III. Plaintiffs' ECOA Claims Based on an Alleged Failure to Investigate Civil Rights Complaints, Untimely ECOA Claims, Equal Protection Claims, Disparate Impact Claims, and Declaratory Judgment Claims Should Be Dismissed for Failure to State a Claim.

Plaintiffs' ECOA claims based on an alleged failure to investigate civil rights complaints, untimely ECOA claims, conclusory equal protection claims, and redundant declaratory judgment claims should be dismissed for failure to state a claim under Rule 12(b)(6).

**A.  Plaintiffs cannot state an ECOA claim based on any alleged failure to investigate civil rights complaints.**

Plaintiffs appear to try to base both of their ECOA claims on USDA's alleged failure to investigate civil rights complaints. *See*, *e.g.*, Am. Compl. ¶ 220 (claim 1, alleging that "USDA continues to implement its policy of closing out civil rights complaints without completing true investigations"); *id.* ¶ 227 (claim 2, alleging "USDA's well documented policy of failing to meaningfully investigate civil rights complaints").  But this theory runs headlong into the binding precedent in this circuit.  ECOA addresses discrimination "with respect to any aspect of a credit transaction."  15 U.S.C. § 1691(a).  The D.C. Circuit has been clear that "even a liberal interpretation of 'credit transaction' does not encompass 'failure to investigate a discrimination complaint.'"  *Love*, 439 F.3d at 732; *see also Garcia*, 444 F.3d at 636–37 ("We exercise our jurisdiction over the dismissal of the ECOA failure-to-investigate claim, . . . and affirm the district court's dismissal for the same reason—the failure to investigate a discrimination complaint is not a 'credit transaction' within the meaning of ECOA.").  Accordingly, Plaintiffs' ECOA claims should be dismissed to the extent they seek to rely on any alleged deficiencies in investigating or processing civil rights complaints.

**B.  The majority of Plaintiffs' ECOA claims are untimely.**

ECOA contains a five-year statute of limitations.  15 U.S.C. § 1691e(f); *see also Cottrell*, 915 F. Supp. 2d at 90 & n.7 (explaining that after 2010, ECOA claims must be filed within five years after the alleged discrimination occurred).  An ECOA statute of limitations defense may be raised under Rule 12(b)(6).  *Williams*, 522 F. Supp. 2d at 99.

A vast majority of the allegations in the Amended Complaint concern events that occurred before March 29, 2019, and therefore fall outside of the ECOA statute of limitations.  *See* Compl.

(filed Mar. 29, 2024).[10]  A summary chart is provided below.  Each of Plaintiffs' untimely claims

should be dismissed.  *See Williams*, 522 F. Supp. 2d at 99.

| | Allegations | Application of Statute of Limitations |
|---|---|---|
| 1 | Around 2007 or 2008, Plaintiffs allege that Mr. Provost wished to take over the assets collateralized in his father's debts.  It was "not an option" for Mr. Provost to "establish[] a relationship with his father's bank" and USDA denied Mr. Provost's direct loan application. Plaintiffs allege this led Mr. Provost to seek a guaranteed loan around 2008.  Am. Compl. ¶ 74. | Outside the Statute of Limitations |
| 2 | Between 2008–2012, USDA allegedly guaranteed loans provided by private banks to Mr. Provost that he characterizes as "infeasible."  *Id.* ¶¶ 75–81.  Several landlords allegedly terminated his leases.  *Id.* ¶ 81. | Outside the Statute of Limitations |
| 3 | In 2013, Plaintiffs allege that Mr. Provost struggled to obtain an operating loan but ultimately secured a $300,000 loan "late in the season."  *Id.* ¶ 82. | Outside the Statute of Limitations |
| 4 | In 2014, Mr. Provost had "outstanding debts."  *Id.* ¶ 84. Plaintiffs allege that Mr. and Mrs. Provost entered into a post-nuptial agreement that would permit USDA to issue loans to Mrs. Provost, presumably because Mr. Provost was experiencing difficulty in obtaining loans.  *Id.* ¶¶ 83– 84.  Mrs. Provost obtained loans, although Plaintiffs allege they were "infeasible" and funds were delayed, and Mr. Provost also secured a loan in mid-June 2014. *Id.* ¶¶ 84–90.  Plaintiffs allege that Mr. and Mrs. Provost were both unable to repay their 2014 loans due to "reasons outside their control."  *Id.* ¶ 90.   Plaintiffs allege that Mrs. Provost's 2014 loan was forgiven by USDA.  *Id.* ¶ 91. | Outside the Statute of Limitations |
| 5 | In 2015, Plaintiffs allege that Mr. Provost was unable to obtain a loan from "the bank" or USDA.  *Id.* ¶ 92. Mrs. Provost obtained a loan in 2015 and received an | Outside the Statute of Limitations |

---

[10] Defendants assume for the purpose of this motion that the claims in the Amended Complaint— with the exception of the claims relating to DFAP—relate back to the initial complaint, Fed. R. Civ. P. 15(c)(1), and thus calculate from the date of filing the initial complaint.

| | | |
|---|---|---|
| | emergency loan from USDA.  *Id.* ¶ 91. | |
| 6 | In 2017, Mrs. Provost allegedly sought a loan from USDA, which was allegedly denied based on the earlier forgiveness of her 2014 loan.  *Id.* ¶ 99. | Outside the Statute of Limitations |
| 7 | In 2017 and 2018, a local lender and USDA allegedly objected to Mr. Provost's Chapter 12 bankruptcy petition. *Id.* ¶ 100. | Outside the Statute of Limitations |
| 8 | In 2022, the Provosts allegedly sought additional loans from USDA, but Plaintiffs allege that USDA "refused" to let them apply.  *Id.* ¶ 131. | As Pleaded, Within Statute of Limitations |
| 9 | In 2023, Mrs. Provost allegedly applied for operating loans from USDA, but alleges there were processing delays and the offered amount was half of the requested amount, causing Mrs. Provost to withdraw her loan application.  *Id.* ¶¶ 134–37. | As Pleaded, Within Statute of Limitations |
| 10 | In late 2023 to early 2024, Mr. Provost allegedly experienced delays securing a loan from USDA after a private lender allegedly misapplied Inflation Reduction Act funds to Mr. Provost's delinquent debts.[11]  *Id.* ¶¶ 138–42. Even after his operating loan was approved, he alleges that USDA has delayed disbursing the funds and that his approved loan was otherwise insufficient. *Id.* ¶¶ 138–48. | As Pleaded, Within Statute of Limitations |

Three discrete credit transactions that fall within the statute of limitations, beginning in 2022, *see* Am. Compl. ¶¶ 131, 134–37, 138–48; USDA does not move to dismiss ECOA claims based on those transactions.

### C. Plaintiffs fail to state a claim that USDA has designed or administered its loan programs with intent to discriminate in violation of the equal protection clause.

In their seventh claim for relief, Plaintiffs attempt to plead a claim under the Fifth

---

[11] Notably, Plaintiffs do not allege—in ¶¶ 132–42, or elsewhere in the Amended Complaint—that USDA denied or reduced any of their loan applications based on delinquent USDA debts that USDA acknowledged should be forgiven on account of discrimination.

Amendment's equal protection clause, broadly challenging USDA's "programs."[12] *Id.* ¶¶ 286–94. To support their allegations of "intentional discriminatory motives," Plaintiffs allege that USDA's allocation of funds disproportionately favors white farmers (*id.* ¶ 289); that USDA's continued use of eligibility requirements evidences a decision to discriminate against Black farmers (*id.* ¶ 290), and that USDA's "policy of dismissing civil rights complaints without completing adequate investigations" reveals continued discrimination against Black farmers (*id.* ¶¶ 291–92). *See generally id.* ¶¶ 185–94. They seek permanent injunctive relief "requiring the USDA to enact department-wide change" including an oversight committee to audit the disbursement of USDA program benefits and any other such initiative as articulated in the Equity Commission's Final Report: *Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All. Id.* Prayer for Relief (c). But none of Plaintiffs' conclusory allegations or the statistics referenced in the Complaint state a claim for an equal protection violation.

USDA's loan programs, including its loan eligibility requirements, are race neutral on their face. To the extent that Plaintiffs intend to challenge USDA's loan programs writ large as discriminatory, using the statistical disparities addressed in the Complaint to support an inference of intentional discrimination, Plaintiffs fail to plausibly allege that USDA's loan programs are designed with a purpose to discriminate against Black farmers. Alleging "purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences'"; "[i]t instead involves a decisionmaker's undertaking a course of action 'because of,' not merely

---

[12] Plaintiffs' equal protection claim largely resembles the equal protection claim that the *Pride* plaintiffs brought to challenge USDA's Market Facilitation Program (MFP), which has been dismissed as moot. Compl. ¶¶ 141–47, ECF No. 1, *Pride v. USDA*, No. 1:23-cv-02292 (D.D.C.); *see also* Order at 22–25, ECF No. 41, *Pride v. USDA*, No. 1:23-cv-02292 (D.D.C.) (dismissing Claim II). Plaintiffs here do not challenge MFP or any similar discretionary distribution programs.

'in spite of,' [the action's] adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 676–77 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)); *see also Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). As Defendants showed *supra* Part I, Plaintiffs cannot plausibly allege a policy of discrimination across USDA; the same plausibility problem plagues Plaintiffs' allegations that the policies reflected in FSA's handbooks were themselves instituted with the intent to discriminate. Indeed, courts have repeatedly found USDA's eligibility and feasibility requirements to provide legitimate, non-discriminatory bases for loan denials. *See*, *e.g.*, *Miller v. Perdue*, No. 2:17-cv-00670-SU, 2018 U.S. Dist. LEXIS 184737, at *14 (D. Or. Oct. 29, 2018); *Williams*, 620 F. Supp. 2d at 49.

And although "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of [a] state action," the Supreme Court has emphasized that "such cases are rare." *Arlington Heights*, 429 U.S. at 266. The Supreme Court has identified *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), as "archetypal examples" of clear patterns demonstrating invidious discrimination. *Bellinger v. Bowser*, No. 17-cv-2124 (TJK), 2018 WL 4705808, at *6 (D.D.C. Sept. 30, 2018) (citing *Arlington Heights*, 429 U.S. at 266). In *Gomillion*, "a local statute altered the shape of a city from a square to a 28-sided figure, which had the effect of removing from the city all but four of its 400 African American voters, and not a single white voter." *In re Navy Chaplaincy*, 928 F. Supp. 2d 26, 34 (D.D.C.), *aff'd*, 738 F.3d 425 (D.C. Cir. 2013). And in *Yick Wo*, "a city board of supervisors denied building ordinance waivers to over 200 Chinese applicants, but granted waivers to all but one non-Chinese applicant." *Id*. "Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not

determinative . . . ." *Arlington Heights*, 429 U.S. at 266.

As captured in the most recent Census of Agriculture, Black farmers make up approximately 1.4% of the country's roughly 3,400,000 producers. *See* 2022 Census of Agriculture Highlights, Black Producers, https://perma.cc/93ZN-BMW3. "[B]ecause [white producers] make up a large share of the [farmer producer] population, one would expect them to make up an outsized share of recipients of any cross-cutting [farm lending] program." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020). Indeed, if the racial disparities Plaintiffs allege were deemed sufficient to state a claim for discrimination, "virtually any generally applicable [farm lending] policy could be challenged on equal protection grounds." *Id*. at 1916.

And the specific statistics cited in the Complaint—that in 2020, "White farmers' direct loan applications were approved at a rate of 70%, whereas Black farmers' loans were approved at a rate of 40%"; and "White farmers' loans were rejected at a rate of only 7%, whereas Black farmers' loans were rejected at a rate of 19%," Am. Compl. ¶ 173, for relative differences of 30% and 12%—do not reflect the extreme disparities described in *Yick Wo* and *Gomillion* that support an inference of intentional discrimination. For these reasons, Plaintiffs fail to state an equal protection claim.

### D. Plaintiffs fail to state a claim for disparate impact.

The D.C. Circuit has questioned whether disparate impact claims are cognizable under ECOA, explaining that ECOA lacks the Title VII language that "gives rise to a cause of action for disparate impact discrimination." *See Garcia*, 444 F.3d at 633 n.9; *see also id*. (noting that Title VII explicitly "prohibit[s] actions that 'otherwise adversely affect' a protected individual" (quoting 42 U.S.C. § 2000e–2(a)(2); 29 U.S.C. § 623(a)(2))); *see also id*. § 2000e-2(k)(1)(B)(i) (addressing burden of proof in Title VII disparate impact cases). But the Court need not resolve whether

ECOA provides a disparate impact cause of action because Plaintiffs fail to state such a claim.

"To state a claim for discrimination based on disparate impact, a plaintiff must plead (1) the existence of an outwardly neutral practice or policy; (2) a significantly adverse or disproportionate impact on applicants of a particular type produced by the defendant's facially neutral practice or policy; and (3) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact." *Adhvaryu v. Bank of Am., N.A.*, No. SA-cv-181836 (DOC), 2019 WL 6499211, at *5–6 (C.D. Cal. Aug. 1, 2019) (setting forth the standard for an ECOA disparate impact claim). "If this showing is made, the defendant can raise 'business necessity' as an affirmative defense, and will prevail if successful in proving that the challenged [business] practice has 'a manifest relationship to the [business] in question.'" *Segar v. Smith*, 738 F.2d 1249, 1298 (1984) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)).[13]  Plaintiffs' claim fails at both steps of this inquiry.

To frame this analysis, Plaintiffs arguably identify two sets of policies alleged to have caused discrimination against Black farmers: "(1) [USDA's] loan approval policy—including its policy that loan officers make these decisions based on the Eligibility Requirements set out in its Handbooks, and its reliance on local loan officials to carry out that policy"; and "(2) civil rights investigation policies that have caused Black farmers to face higher rates of loan denial and other adverse actions from the USDA."  Am. Compl. ¶ 185; *see also id*. ¶ 43 (criticizing USDA for "requir[ing] USDA officials to take credit history into account").  Because USDA's "civil rights investigation policies" are not aspects of a credit transaction, they are not actionable under ECOA.

---

[13] This type of affirmative defense may be raised by a 12(b)(6) motion to dismiss if the facts that give rise to the defense are clear from the face of the complaint. *See Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

*See supra* Part III.A.  Therefore, Plaintiffs cannot state a disparate impact claim with reference to this alleged policy.  *Duarte v. Quality Loan Serv. Corp.*, No. 217CV08014ODWPLA, 2018 WL 2121800, at *4–8 (C.D. Cal. May 8, 2018) (dismissing plaintiffs' disparate impact claim because post-foreclosure credit reports were not an aspect of the credit transaction, and thus were not actionable under ECOA).

As to the other category of identified policies—USDA's loan eligibility criteria and its reliance on local FSA loan officials—Plaintiffs fail to state a claim for several reasons.  At the outset, broadly challenging "loan eligibility criteria" set out in FSA Handbooks is not specific enough to state a claim for disparate impact; and the only policies challenged with any specificity are USDA's consideration of creditworthiness and feasibility, along with FSA's decentralized loan approval structure.  But the business necessity of considering creditworthiness and ability to repay in loan-making is manifest—indeed, ECOA is intended to ensure that loans are awarded based on this type of criteria rather than upon race.  Accordingly, Plaintiffs have not pleaded any viable disparate impact claims.

### 1.     Challenging "USDA's loan approval policy" is impermissibly broad.

The Supreme Court has recognized (albeit in the Fair Housing Act context) that "a disparate-impact claim that relies on a statistical disparity," as alleged here, "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Proj., Inc.*, 576 U.S. 519, 542 (2015).  Identifying such a "specific practice is not a trivial burden," *Adhvaryu v. Bank of Am., N.A.*, Case No. SA CV 18-1836-DOC (ADSx), 2019 WL 6499211, at *6 (C.D. Cal. Aug. 1, 2019) (citation omitted); it is not "enough to simply . . . point to a generalized policy."  *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005).  This "robust causality requirement," *Inclusive Cmtys.*, 576 U.S. at 542, serves at least two purposes.  *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08-CV-

0546-D, 2016 WL 4494322, at *6 (N.D. Tex. Aug. 26, 2016) (considering the applicable standards on remand following the Supreme Court's decision). "First, the court cannot evaluate whether the offending policy caused a statistically significant disparity without knowing the offending policy with precision." *Id*. (citing *Meacham v. Knolls Atomic Power Lab*., 554 U.S. 84, 100 (2008)). And second, "identification of a specific policy or practice is also essential for determining how to remedy the disparate impact." *Id*. So while the Court "need not now decide what remedy, if any, is required in this case, consideration of the potential remedies for disparate impact claims demonstrates what kinds of policies are offending."[14] *Id*.

Here, Plaintiffs' challenge to "USDA's Eligibility Requirements" is too broad to state a claim for disparate impact. *See*, *e.g.*, 3 FLP, Direct Loan Making, Part 4 § 1, Eligibility Requirements. Included within USDA's Eligibility Requirements are numerous discrete policies, including among others, limitations based on citizenship and prior controlled substances violations. Plaintiffs do not plead which, if any, of these eligibility requirements they allege have a disparate impact on Black farmers, and so the Court has no way to scrutinize whether a causal connection exists, let alone to fashion relief that would ensure that the purported disparate impact is redressed. *See* Am. Compl. ¶ 225. And importantly, loan approval has several requirements beyond eligibility, further destroying any causal relationship between the eligibility criteria and the disparities alleged in the Amended Complaint. For one, assuming an applicant is eligible, FSA can "only" approve a loan if "[t]he applicant's farm operating plan reflects a feasible plan, which includes repayment of the proposed loan and demonstrates that all other credit needs can be met,"

---

[14] *See also id.* ("The Supreme Court requires that '[r]emedial orders in disparate-impact cases . . . concentrate on the elimination of the offending practice, and courts should strive to design race-neutral remedies.'" (citing *Inclusive Cmtys.*, 576 U.S. at 521)).

among other requirements.  7 C.F.R. § 764.401, Loan Decision.  But Plaintiffs similarly do not identify which, if any, of USDA's loan approval criteria they are alleging have disparate impacts on Black Farmers.  *See* Am. Compl. ¶ 225.

Because they have not identified with specificity a USDA policy that has plausibly caused the statistical disparities alleged in the Amended Complaint, Plaintiffs fails to state a claim for disparate impact.

2.    *The business necessity of considering creditworthiness in loan-making is manifest—and a foundation of the Equal Credit Opportunity Act.*

Outside of their ECOA disparate impact claim but elsewhere in the Amended Complaint, Plaintiffs appear to challenge USDA's consideration of creditworthiness and feasibility in the loan-making process.  *See* Am. Compl. ¶ 186 ("the Eligibility Requirements require loan officers to make decisions based on credit history, past repayment of USDA loans, and past loan forgiveness").  But the business necessity of USDA's credit history and feasibility determinations—whether a proposed loan can be repaid and other credit demands can be met, 7 C.F.R. § 764.401(a)(1)—in deciding whether to issue credit, is self-evident.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (recognizing that to succeed, a disparate-impact discrimination plaintiff must show an employment practice falls "more harshly on one group than another and cannot be justified by business necessity.").  "[T]he guiding principle of the ECOA is that an applicant's access to credit and favorable credit terms *ought to be based on creditworthiness*, not on improper factors such as the applicant's race."  *Duarte*, 2018 WL 2121800, at *8 ("[D]iscrimination in credit transactions on the basis of race . . . must be prevented.  Numerous instances of denial of credit for reasons *other than a person's creditworthiness* were brought to the Committee's attention during hearings on the legislation." (emphasis added) (citing H.R. Rep. No. 94-210, at 3 (1975))).  Indeed, it would be

counterproductive for USDA to make loans that it anticipates cannot feasibly be repaid, particularly given USDA's obligation to pursue collections. 7 CFR § 3.30(a); 7 FLP, Direct Loan Servicing – Debt Collection and Resolution (establishing collection protocols pursuant to the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, *et seq*.); *see also* United States Department of the Treasury, Foundational Concepts, Affirmative Duty to Collect, https://perma.cc/5B2Z-83FH. Thus, to the extent that Plaintiffs challenge USDA's consideration of creditworthiness and feasibility in its loan-making, their claims fail as a matter of law; ECOA does not forbid lenders from taking these criteria into consideration, even if they result in disparities.

> 3.  *Because USDA offers centralized review of any loan denials, Plaintiffs cannot show a causal connection between FSA's decentralized structure and the disparities alleged in the Complaint.*

Plaintiffs' allegations regarding USDA's policy of delegated decision-making, which is to say, FSA's overall structure,[15] are fatally flawed for an additional reason, because they overlook the existing availability of a centralized appeal process, of which the Court may take judicial notice. While local FSA officials make initial loan decisions, including any determinations regarding eligibility, any farmer that receives an adverse decision can challenge that decision with the National Appeals Division ("NAD"). NAD reports directly to the Secretary of Agriculture and is, by law, independent from the direction and control of any other agency within USDA. National

---

[15] FSA administers of dozens of USDA programs, including for example, the Beginning Farmer and Rancher Development Program, disaster relief programs, multiple farming insurance programs, as well as USDA's direct and guaranteed loan programs, most of which are administered through local FSA offices. Find a Program, https://perma.cc/2JVK-4NLT. FSA's current loan portfolio exceeds 30 billion dollars. *See* Funding, Farm Service Agency, https://perma.cc/Z8PU-A5NS (describing $10,000,000,000 in funding for FSA loan programs in 2024 alone). FSA's outreach efforts are also coordinated at the state level. Outreach Programs, https://perma.cc/3XGY-QDJS.

Appeals Division, https://perma.cc/RP36-Y4HC.  That means, to the extent a farmer disagrees with his loan denial, he can already receive centralized review of that determination, independent of any local officials.  Plaintiffs cannot demonstrate a causal connection between any initial consideration by local officials of loan applications—as opposed to a centralized review process— and disparities in the final loan determination.

       4.     *Plaintiffs' failure to specifically identify facially neutral policies that cause any alleged disparities in the Complaint is reflected in the relief they seek.*

In their Prayer for Relief, Plaintiffs seek a permanent injunction "requiring USDA to enact department-wide change to ensure equitable and timely consideration of Black farmers' loan applications, including an oversight committee to audit the disbursement of USDA program benefits and any other such initiative as articulated in the Equity Commission's *Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All*[,]" which included "66 recommendations . . . for embedding equity into USDA's policies, practices, and processes," none of which include the elimination of FSA's decentralized system, or a recommendation not to consider creditworthiness or feasibility in loan-making.  *See* Final Report, p.1.  These unspecified remedies do not provide alternatives to USDA's consideration of creditworthiness and feasibility in its loan-making, further demonstrating that these policies are not "offending."  *See Inclusive Cmtys. Project, Inc*, 2016 WL 4494322, at *6.  At base, to the extent ECOA permits a disparate impact cause of action, it does not provide Plaintiffs with a vehicle to achieve their preferred policy goals through litigation, including the centralization of USDA's loan process.  *See id.*, 2016 WL 4494322, at *7 (Because ICP has not sufficiently identified a specific, facially-neutral policy that has caused a statistical disparity, the court cannot fashion a remedy that removes that policy.").

### E.    Plaintiffs' Declaratory Judgment Act claim should be dismissed as redundant of their ECOA and equal protection claims.

"[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). For example, courts may dismiss claims under the Declaratory Judgment Act when those claims are duplicative or redundant of other claims. *Boone v. MountainMade Found.*, 684 F. Supp. 2d 1, 12 (D.D.C. 2010). Plaintiffs here seek two declarations: first, that USDA has violated Plaintiffs' statutory right to equal credit under ECOA; and second, that USDA violated the constitutional right of Plaintiffs to equal protection under the Fifth Amendment in connection with the distribution of funds. *See* Am. Compl. ¶ 297. But Plaintiffs have not stated an equal protection claim, and whether Plaintiffs' rights were violated under ECOA will necessarily be resolved by Plaintiffs' ECOA claim, rendering their request for declaratory relief redundant. *See Sofi Classic S.A de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249–50 (S.D.N.Y. 2006) ("Plaintiffs' declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action. Therefore, the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action."); *see also Boone*, 684 F. Supp. 2d at 12.

### CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' DFAP-related APA claims under 12(b)(1) and dismiss their remaining APA claims, untimely ECOA claims, Fifth Amendment claims, ECOA disparate impact claims, Declaratory Judgment Act claims, and class claims under Rule 12(b)(6), leaving only Plaintiffs' timely individual ECOA claims.

Dated: November 7, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Faith Lowry*
FAITH E. LOWRY
REBECCA KOPPLIN
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005

*Counsel for Defendants*